IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CAROLINE ROSS, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Civil Action 5:18-cv-269 |
| | § | |
| | § | |
| JUDSON INDEPENDENT | § | TRIAL BY JURY |
| SCHOOL DISTRICT, et al | § | |
| Defendants | § | |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' PLEA TO THE JURISDICTION AND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Caroline Ross (hereafter "Plaintiff" or "Ross"), an African American female, who was born in 1961, files this her Responses to Defendants' Plea to the Jurisdiction and Motion for Summary Judgment ("Responses"). In this legal dispute, Ross presents a claim under Chapter 21 Texas Labor Code Claim against Judson ISD ("JISD" or "Judson" or "District"), and claims against Judson ISD, Dr. Carl A. Montoya, Elida Bera, Richard LaFoille, Dr. Melinda Salinas, and Renee Paschall under Title 42 Section 1983 and 1988. All other claims are abandoned by Plaintiff.

## PREFACE

No claim brought herein by Plaintiff Ross is pursuant or ancillary to the school laws of the state of Texas, but are brought pursuant to Chapter 21 of the Texas Labor Code, and Title 42 § 1983 and 1988. *McIntyre v. El Paso Indep. Sch. Dist.*, 499 S.W.3d 820 (Tex. 2016); *Fort Worth Indep. Sch. Dist. v. Palazzolo*, No. 02-18-00205-CV (Tex. App. Jun. 13, 2019).

On February 24, 2016, Caroline Ross, Principal at Metzger Middle School in the minority-majority Judson Independent School District was suddenly and unexpectedly suspended as Principal of Metzger Middle School ("Metzger") in the JISD, removed from any access to Metzger and JISD, and on June 7, 2016 was non-renewed for any future employment in JISD.

Ross timely filed her Charge of Discrimination within 180 days from the a discriminatory act , allowed the EEOC 180 days to investigate, received a TWC/CRD Notice of a Right to File a Civil Action, and filed her suit within 60  days from the date of her receipt of that notice. Additionally, Ross plead that there were others from outside her protected class who were treated more favorably, and that her class characteristics were the cause of her being non-renewed. JISD says that their sham or bad faith replacement of Ross with Black females, of comparable age defeats Ross'

claim. But Ross can show that the reasons given by JISD for her nonrenewal were pretextual, and that the true reason was one of her protected class status.

JISD's jurisdictional claims and Tex. Lab. Code Chapter 21 aside for the moment, Plaintiff claims that JISD's decision to non-renew Ross was void *ab initio* because: JISD's actions regarding Ross' suspension and/or non-renewal did not afford Ross minimal Fourteenth Amendment due process (procedural or substantive); JISD made *no claim or showing* Ross was *evaluated annually*-as JISD *MUST DO* (Emphasis added); JISD has made no claim or showing that its Board of Trustees considered the most recent evaluations of Ross' performance (the evaluation for her 2014-2015 school year performed on June 11, 2015 by Associate Superintendent Nancy Robinson) or that the evaluations were not relevant-as JISD's Board *MUST DO* (Emphasis added) before making a decision not to renew" Ross'; JISD's Board's failure to list all reasons used in its decision to non-renew Ross' future employment and the Board's further failure to list all reasons used as a basis for Ross' future employment in JISD policy. See Texas Education Code ("TEC") 21.354, 21.3541, 21.203, and *Palazzolo* (*supra*) at 18[1].

---

[1] "We begin our review here by acknowledging that the legislature knows how to create a mandatory and exclusive requirement through the use of words such as "must" and "shall." Tex. Gov't Code Ann. § 311.016(1)-(3) (explaining that while "may" creates discretionary authority or grants permission or a power, "shall" imposes a duty, and "must" creates or recognizes a condition precedent); *Moses v. Fort*

## FACTS

1.      Ross (African American) served with distinction and loyalty as a public educator with the JISD. [Exh. 30; Exh. 19, Jose Macias (Board Member until August 30, 2019); Exh. 18, Renee Lafreniere (former Assistant to the JISD Board of Trustees and Superintendent, then JISD Director of Career And Technology Eduaction-CATE-until July 2019, and now Career and Technology Specialist for the office of the Superintendent for Puiblic Instruction of Washington state) ¶ 1-9, 20, 24-33].

2.      According to Elida Bera ("Bera"), former Associate Superintendent of JISD from approximately August 2015 until she became the Superintendent of Kingsville ISD in November 2018, Ross was non-renewed on June 7, 2016 because : Lauren Hopkins (Black) told Bera that Ross had approved her name being signed by Hopkins as a counter signature on 16 school checks [Exh. 34], and had even shown Hopkins how to trace her signature on a window (Hopkins also said that Ross' former secretary-now a teacher-Jamie Coggins, Caucasian, had shown Hopkins how to trace Ross' signature on the window; both Ross and Coggins denied

---

*Worth ISD*, 977 S.W.2d 851, 853 (Tex. App.—Fort Worth 1998, no pet.) ("We  conclude that the word 'must' as used in section 21.301 of the education code creates a mandatory requirement that the school district file the local record not later than the 20th day after the petition for review is filed."); *see also City of Houston v. Houston Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 580 (Tex. 2018) (stating that statutory construction is a legal question for courts, whose goal is to ascertain and to give effect to the legislature's intent as expressed by the statute's language)." *Palazzolo*, (supra) @ 18.

Hopkins' statements, but Coggins was not disciplined and Ross was non-renewed); if students attended during-school pep rallies (the Athletic Director and coaches charged the entry fee to those students who attended during -school pep rallies to feed the athletic fund [Exh. 32]), and Hopkins said they were charged admission for feeding Ross' slush fund; Teachers who wore denim/jeans (which was against the JISD's dress code) were charged to wear denim/jeans to feed Ross' slush fund (not against policy or rule until May 30, 2016 when Bera and Montoya promulgated a proscriptive rule [Exh. 48]); and students were charged for pencils and notebooks. [Exh. 6, Bera Depo p.40 ¶ 5-20, p.64 ¶ 10 –p. 64 ¶ 25, and p.**68 ¶ 9-19 (previous write-ups of Ross by Bera when Mackey had been Superintendent, before Robinson asasigned supervision of secondary schools and Bera had stopped going to Metzger )**] [Id. p.23 ¶ 15-18, p.28 ¶ 3-p.29 ¶ 2] (Emphasis added).

3.     According to Superintendent Carl A. Montoya ("Montoya"), former Superintendent of JISD until he retired in 2018, he remembered the reasons given for nonrenewal of Ross were as those recalled by Bera in her deposition: checks or teaching her relatively new Secretary-Bookkeeper Lauren Hopkins how to forge checks; charging students to attend pep rallies to feed Ross' slush fund; charging students for notebooks; charging

teachers who wore jeans during the school day; **having received negative evaluations at the hands of Bera during Mackey's administration**; and failure to timely deposit money. [Exh. 11 Montoya Depo. P.62 ¶ 10-p.63 ¶18].

4.     The demographic makeup of JISD students was primarily African American and Hispanic, with the White population in decline over the mid to late 2000s; however, the teacher demographics did not reflect the student body, with the number of African American and Hispanic teachers declining while the percentage of White teachers increased..[Exh. 18, Affidavit of Renee Lafreniere, p.1 ¶ 6-7].

5.     The racial makeup of the Principals in JISD's five middle schools before Debbie Grady was appointed Interim Principal of Metzger Middle School in the midst of the 2015-2016 school year, per Elia Bera was as follows: Mr. McFalls (White); Mr. Pittman (White); Dr. Melinda Salinas (Hispanic); Ms. Ross (Black or African American); and Mr. Haynes (Black or African American). [Exh. 6 Depo. Bera p.37 ¶ 25-p.39 ¶ 1].

6.     Ross' last performance evaluation in JISD as by Associate Superintendent Nancy Robinson on June 11, 2015, for the 2014-2015 school year. [Exh. 28; Exh. 50 Depo Ross p.77 ¶ 19-p.80 ¶ 23].

7.     JISD Chief Financial Oficer ("CFO") José Elizondo Jr. ("Elizondo") recalls having conducted only two investigations of Principals prior to the investigation of Ross and that neither of those investigations resulted in termination of the Principals' Termination of employment. [Exh. 10 Depo Elizondo p.14 ¶ 9-13].

8.     One of those cases, according to Elizondo, involved a bank account being overdrawn and the Principal retaining and not depositing cash in excess of $20,000.00, the money being held by the Principal at the school in drawers, cabinets, and closets. [Id. p.13 ¶ 23-p.14 ¶ 8].

9.     The two principals who were involved were Sharon Roddy (African-American) and Loretta Carter (White); both Principals were reassigned and later both retired from JISD [Id. p.14 ¶ 9-p.15 ¶ 10].

10.     As for facts about how other Principals or campus administrators-reasonable comparators-were treated, Bera reluctantly offered testimony of an out-of-class comparator to Ross who had been treated more favorably, Marsha Bellinger; Bellinger was a troubled (White) Principal who had been reassigned repeatedly and  has been  promoted to now serve in the Central Office. [Exh. 4, Bera @ Bd. p.336 ¶ 5-p.342 ¶ 3]. It should be noted by  the court how desperately JISD through its presiding

Board President Salyer and attorney Russo resisted any evidence regarding Bellinger being placed on the record of the non-renewal hearing. [Id.].

11.    Ross gave testimony regarding discrimination about other, out-of- protected-class Principals or administrators who were more favorably treated and younger. [Exh. 50, Depo. Ross p.81 ¶23-p.84 ¶ 25, p.108 ¶ 23-p.122 ¶ 9].

12.    Ross gave testimony regarding discrimination about other, out-of-protected-class Principals or administrators who were more favorably treated and **younger**. [Id. p.85 ¶ 1-p.84 ¶ 25].

13.    Ross gave testimony regarding discrimination about other, out-of- protected-class Principals or administrators who were more favorably treated and non **African American**. [Id. p.125 ¶ 17-p.149 ¶ 3].

14.    Renee Lafreniere states that the treatment of Ross was unfair- [and] any other administrator..would have been given the opportunity to redirect the correct procedures and/or develop an improvement plan; and JISD had done such corrective plans and improvement procedures in the past, examples being Principal Marsha Bellinger (White), Assistant Principal(White) Mihleder. [Exh. 18 Renee Lafreniere p.1 ¶ 95-98].

15.    Montoya *indicated*  after Ross had been non-renewed, he had received a request for a reference for Ross  from a potential employer in

Education but that he had been afraid to give Ross a reference, even though she had been a good Principal, because of the JISD Board and his fear that it might affect his, Montoya's employment. [Exh. 11 Depo Montoya p.28 ¶ 19-25].

16.     Elizondo seemed to testify that he thought Montoya's fears of giving Ross a good reference were reasonable. [Exh. 10 Depo Elizondo p.17 ¶ 2-p.20 ¶ 7, p.28 ¶ 19-p.29 ¶ 11].

17.     Montoya also made an odd remark about a (White) male administrator, Mr. Urbanowitz (sp), again indicating that he would have handled the Ross matter differently and considered reassaignment or less, but for how he had handled a White male administrator named Urbanowitz (sp) who had a $1.98 issue—stealing hot dogs from a neighborhood store, and after that the JISD Board would have apparently not permitted him  to do less that terminate Ross. [Exh. 11 Depo Montoya p.80 ¶ 16-p.81 ¶ 24].

18.     At the time of Ross's nonrenewal on June 7, 2016, Elizondo said that the Board of Trustees was upset about having to terminate the employment of a white male administrator, Urbanowitz (sp). [Exh. 10 Depo Elizondo p.109 ¶ 21-p.110 ¶ 10].

19.     Renee Lafreniere recalls the Urbanowitz matter in greater detail because she worked with Urbanowitz in her role as the CATE Director;

Lafreniere stated that Urbanowitz was a Caucasian male Assistant Principal at Judson High School, and he had been appointed as the school administrator to deal with oversight of the CT programs at his school. [Exh. 18 Renee Lafreniere p. 3 ¶ 46-57]. Apparently Urbanowitz was a serial hot dog thief . [Id. ¶ 51-54]. Urbanowitz was not fired by JISD, but forced to resign. [Id. ¶ 57].

20.    When asked about the Urbanowitz matter and allegations against Ross, and whether the Board's position was if Urbanowitz was forced to resign then Ross should be fired, "sauce for goose and sauce for the gander..", Montoya seemed to understand and agree with the analogy. [Id. p.81 ¶ 3-24].

21.    The appointment and assessment of Principals in the Montoya administration was delegated by Montoya to Bera; Montoya testified that Bera was his delegee to make the decisions regarding JISD's Principals [Exh. 11 Depo. Montoya p.18 ¶ 6-p.19 ¶ 13]. When Ross was suspended on February 24, 2016, Bera replaced her with an under 40, African American, male, Assistant Principal Nato James. [Exh.  ] Someone at JISD *apparently "snapped"* realizing that James' being Black wasn't sufficient, *because he was under 40 (younger) and male*, so Bera, Irma Hernandez, and Montoya selected a reluctant Director of Curriculum and Instruction in the Cenytral

Office, Debbie Grady, who is Black, female, and was in her 60s to be the Interim-Principal of Metzger  for approximately five (5) months but because of Montoya's promise to return Grady to Curriculum and Instruction by summer, replaced her at Metzger with another Black female, Tracey Valree, who had no secondary school experience and had a rough history at Masters Elementary in getting along with her elementary staff— but Valree was Black and female. [Exh. 50, Depo Ross p.109 ¶ 18-p.114 ¶ 24].

22.     Ross claims that both appointments were sham or pretextual replacements, being appointments, as demonstrated by the fact that Hernandez and Montoya seemingly broke the rules in order to persuade Grady to accept the 5 month Interim Principal appointment at  Metzger, Support for that allegation comes from Debbie Grady, and Renee Lafrenierre who stated that "It was well known that Ms. Grady did not want to be Interim Principal or Principal of Metzger Middle School, but that she was placed in that position after Ms. Ross was suspended because she was African-American and legally acceptable to Ms. Bera as a post-Caroline Ross 'place-saver' at Metzger for Ms. Guerrero or Ms. Davidson."[Exh. 18 Renee Lafreniere p.2 ¶ 18].

23.    "After Ms. Ross was fired and Ms. Grady openly discussed her temporary status to staff and parents alike, Ms. Bera appointed Tracee Valree, another African-American administrator who was an (sic) principal at Masters Elementary School, yet had no administrative experience in the secondary schools of Judson ISD." [Id. p.2 ¶ 19].

24.    Under Principal Ross' leadership, Metzger Middle School, which had been a celebrated and exemplary middle school both nationally and even internationally, Metzger begin to sink into a (sic) grievances between staff and Principal Valree, locally know for student fights and poor discipline, and by the time I resigned in the summer of 2019, the campus had receiveda failing grade, an "F" from the Commissioner of Education." [Id. p.3 ¶ 20].

25.    Debbie Grady recalls that when Associate Superintendent Nancy Robinson announced her intent to retire from JISD, Robinson warned Grady against staying in JISD because "Bera [was] going to go after [Grady]." [Exh. 14 Affidavit Debbie Grady ¶ 20-23]

26    Grady further recalls, JISD (Bera) then posted a new position which would essentially supervise the position held by Grady, so the fully qualified Grady applied f or the position. But also applying for the position

was Tori Austin, White, and a former (but experientially unqualified for the posting) co-worker of Grady's. [Id. ¶ 26-32].

27.    Both Grady and Austin applied for the position and Austin was chosen (by Bera). [Id.].

28.    Soon after being hired, Austin placed Grady on a Growth Plan; then, Irma Hernandez recruited Grady to take Nato James' place as the Second Interim-Principal at Metzger, but Grady, sensing that it was a ruse to separate her from her preferred Curriculum duties demurred on the basis that she had just been placed under a Performance Improvement Plan by Austin which prevented her from being transferred or promoted. [Id. ¶ 34-44].

29.    When Irma Hernandez claimed ignorance of Austin's personnel action against Grady (even though Hernandez was in charge of Human Resources), Grady persisted in her refusal to accept the Interim Appointment because of her Growth Plan, and Hernandez insisted on taking the matter to Montoya. [Id. ¶ 44-49].

30.    When Grady and Herndandez met with Montoya, the Superintendent so wanted Grady to become the new Interim Principal at Metzger that he **voided Austin's Growth Plan, removed it from Grady's file and promised that when it was all over in the**

**summer, Grady could return to her Curriculum and Instruction position.** [Id. ¶ 45-46]. (Emphasis added).

31.     Consequently, Grady checked out the unusual personnel action with her association's representative who said Montoya could do anything he wanted to do and she accepted Montoya's and Herndandez' deal. [Id.].

32.     Therefore, in April 2016, Grady was reluctantly assigned to be Interim Principal of Metzger Middle School. [Id. ¶ 49]. At the beginning of the 2016/2017 school year, Grady was transitioned back to a district administrator, being promoted to Executive Director of Elementary Schools.[Id. ¶ 51].

33.     Grady testifies that she was succeeded by Tracy Valree (Black, female) who was promoted to Metzger from Masters Elementary School with Metzger being her "first transition to a secondary education". [Id. ¶ 52-54].

34.     Grady continued, "Ms. Valree was at Metzger for a short period of time, there was an issue with her ability to run the school and she was sent back to Masters Elementary to serve in as an Assistant Principal. [Id. ¶ 54].

35.    In fact, the TEA score card for Metzger shows that the school has become more low performing annually after Ross' halcyon experiences peaking in 2015, and Metzger was lower yet on the 2018-2019 STARR test. [2]

36.    Elizondo's assistant, JISD's staff auditor, Teresa Bair said that the financial anomalies at Metzger Middle School which she had found to have been caused by Secretary-Bookkeeper Lauren Hopkins had resulted in no loss of money. [Exh. Depo Bair p.22 ¶ 21-24, p.26 ¶ 2-7].

37.    Despite the fact that there was no missing money at Metzger after Teresa Ramon (JISD's police Chief) and Teresa Bair (JISD's internal Auditor) had concluded their investigations, the JISD's "insurance/Board policy/Lobbyist/Legal Services" vendor Texas Association of School Boards ("TASB") published a statewide flier which included an article that Ross had been terminated for mishandling money, or wordsto that effect. [Exh. 58 TASB Newsletter].

38.    There was no missing money under Ross, and as to whether Principals other than Ross had been more favorably treated, not being terminated or non-renewed like Ross when they experienced audit "anomalies" like Metzger in 2014-2015, internal Auditor Bair pointed out that bookkeeping anomalies at the schools still occur in JISD, and that she

---

[2] https://www.schooldigger.com/go/TX/schools/2499010446/school.aspx

does retraining, Principals haven't been terminated [Exh. 8 Depo Bair p.45 ¶20-25]; and even recently, one Principal under Superintendent Montoya, Yliana Gonzalez, had to twice experience retraining because of "anomalies." [Exh. 8 Depo Bair p.46 ¶ 2-19, p.55 ¶ 19-p. 56¶ 1].

39.     After the conclusion of JISD Chief Ramon's investigation into the checks and Hopkins forging the signatureof Ross, Chief Ramon stated that as far as the "forgery" and checks, "everything was accounted for …", the investigation was closed and the matter referred to the administration for administrative handling. See [Transcript of the Nonrenewal Hearing Regarding: Caroline Ross (Witness Chief Ramon) p.201 ¶ 7-15].

40.     Lafreniere stated in her affidavit that Ross had become vulnerable to Bera with the departure of Mackey and Robinson and the advent of the new superintendent Dr. Montoya with the new HR Director Irma Hernandez in place. [Exh. 18 ¶ 45-47].

41.     Lafreniere stated that Bera was hostile to Ross and Bera affirmed her negative feelings toward Ross. [Id. Exh. 18].

42.     Lafreniere stated, Bera often made comments that she felt Dr. Mackey was giving African American preference, and resented the preferential treatment which she perceived that Dr. Mackey gave to African Americans. [Exh. 18 ¶ 11-12].

43.     Bera clearly did not like Ross, and felt that Ross was treated differently and should be fired or removed, but Mackey would not specifically do that; it was Bera's belief that Mackey and Ross were related (as they came from the same hometown). [Id. ¶ 13].

44.     Lafreniere officed adjacent to Bera. [Id.].

45.     It was well known that Bera wanted to remove Ross from her position as Principal of Metzger Middle School and even fire Ross, and Bera was open about her dislike of Ross being Principal of Metzger and was open that she wanted to replace Ross as the Principal of Metzger with either Lisa Guerrero (Hispanic) or Loretta Davidson (Caucasian). [Id. ¶ 14-16].

46.     Before Superintendent Mackey removed Bera from her role as the Assistant Superintendent who supervised Secondary Principals, and Caroline Ross, Bera wrote Ross on February 9, 2012 and had HAND DELIVERED to Ross, a "Letter of Reprimand" which *extravagantly* accused Ross of "..falsification of records, and misappropriation of federal funds ..." [Exh. 51].

47.     On February 23, 2016, at "14:00" hours, JISD Police Officer Robert O'Callaghan "..was instructed to start an investigation of possible forged signatures from an activity account at Metzger Middle School." At "15.02" hours , O'Callaghan recalled and wrote that he had at

"approximately 0915 Hours" gone to the office of Lauren Hopkins..[to ask] her about discrepancies in the signature of Ms. Ross, on 15 checks written from June 25th, 2014 through April 17, 2015..[because]..the signature of Ms. Ross are (sic) clearly different than the signature on the business signature card that was provided by Chase bank...I asked Mrs. Hopkins to give me a written statement, which she provided. The interview lasted approximately one half hour..[and]..was recorded using a department issued body camera." [Exh. 53. Judson ISD/Ross p.10238-10239].

48.    On February 23, 2016, Hopkins wrote a statement for Officer O'Callaghan at approximately "9:24 AM". [Exh. 54 Judson ISD/Ross p.01196].

49.    On February 23, 2016, "at approximately 10 am, Associate Superintendent Elda Bera wrote a witness statement which stated in part, "On Tuesday, February 23 during the Superintendent leader's meeting break, Ms. Ross asked me to step into the hallway with her. She asked me if I knew why the police was (sic) at her campus questioning her secretary about her (Ross') signature on some checks and some payments to her brother. She stated the following:

- she has always received a clear audit fron Teresa Bair from the Finance office;

- The money paid to her brother was "legit and on the up and up;"

- All paperwork for her brother, like the W2 forms, were on file;

- She stated: "even Ms. Robinson has hired by brother." (former Associate Superintendent for C&I);

- She stated she always had clear audit findings.

    **When she told me she had always had clear audit findings, I told her the audit process had changed this year.  I explained that a new form had been added to the audit findings where the principal and I would have to sign off after I had reviewed them.  I told her I had not received her school's audit findings yet.**  I told her I would check with Ms. Ramon, the district police chief as to why they were at her campus and get back with her. (Emphasis added).

[Exh. 55 Judson ISD/Ross p.01227].

50.    On February 24, 2016, at 9:15 AM, Hopkins went to the Central Administration and met with the Chief of Police Ramon and two other ladies (probably Elida Bera, and Irma Hernandez); in that meeting, Hopkins again wrote a statement in which she stated, inter alia, "Since April 2015 I have not signed any checks on Ms. Ross's behalf. I purchased a

signature stamp for Ms. Ross + all APs. I have used the stamp for checks a few times since. I have never signed any type of district documents [smudge]using her signature. The last time I approved forms was yesterday 2/22/16 from her computer, I approved a few request to spend funds. If I remember correctly it was for Coach Pogue to go to Sams, + a Music and Arts for Band. I have confided in Ms. Debra Stephens on several occasions asking how I get my boss to approve her own forms. Ms. Stephens has always told me I have to stop. Ms. Ross would never [smudge] do it and always asked + gave me no choice but to approve all forms." [Id. Judson ISD/Ross p.00060].

51.     Oddly, Hopkins wrote and signed three more, non-sequential statements on "2/24/16" *also* at "9:15 AM", the next  [Id. Judson ISD/Ross p.01235] saying in significant part,

"On 2/23/16 I was questioned by Lt. Callahan (sic) regarding signitures (sic) on checks. I was terrified and did not know the Ross.' When realizing loyalty was no longer a good thing I told Ms. Bera and Chief Ramon that yes I did sign Ms. Ross's name on the checks because there was a clear understanding + knowledge that I signed checks by Ms. Ross. Ms. Ross would tell me it wasok to sign when she wasn't present. I also mentioned to Ms, Bera + Chief that

Ms. Ross gave me the authority to approve AESOP, Eduphoria, Efinane (sic) Plus, monitor her e-mail on her behalf. Her last password was *********."

52.   The next Hopkins statement said, [Id. Judson ISD/Ross-p.00058] stating,

> "On 2/23/16 I was questioned by Lt. Callahan (sic) I was questioned by Lt. Callahan regarding signatures on checks. I was terrified and did not know the situation would turn out so huge. I mentioned: "All checks are signed by Ms. Ross." When realizing loyalty was no longer a good thing I told Ms. Bera and Chief Ramon that yes I did sign Ms. Ross' name on the checks because there was a clear understanding and knowledge that I signed checks by Ms. Ross. Ms. Ross would tell me it was ok to sign when she wasn't present. I also mentioned to Ms. Bera and Chief that Ms. Ross gave me the authority to approve AESOP, Eduphoria, E-finance Plus, and monitor her e-mail on her behalf. Her last password was Tony*****. [Id. Judson

ISD/Ross p.00058].

53.   The next Hopkins statement said, [ Id. Juson ISD/Ross p.00059] stating:

"Before leaving Metzger today 2/24/16, I pulled Ms. Ross from a meeting to inform her that I was asked to come speak to Ms. Bera.  Ms. Ross replied: "Lauren you have to tell them you signed the checks and I didn't know they are out to get me and I will have you back" she also mentioned "nothing will happen to you, you will get a slap on the hand like I always get."  This is my first secretary job and feel very confident with what I do.  I only know what's ok and not ok from what Ms. Ross has taught me along with Ms. Coggins.  I have always done what was asked of me to meet Ms. Ross' expectations as my direct supervisor and her secretary. [Id. Juson ISD/Ross p.00059].

54.    On March 29, 2016, Irma Hernandez, Executive Director Human Resources wrote a letter to Montoya "Regarding: Information Requested by Mr. Macias, itemizing 35 dates of events in Ross'employment history with JISD, which notably contain no reference to any evaluation of Ross' performance, and specifically no reference to Robinson's June 11, 2015 evaluation of Ross' performance, her last year of performance, before being suspended and non-renewed. [Exh 56 Judson ISD/Ross p.00590-00594].

55.     Ross was notified by Montoya he had recommended to the Board that she be non-renewed for future employment in the JISD for five (5) reasons, four (4) of which are as follow: "failure to fulfill duties or responsibilities"; "incompetency or inefficiency to perform duties"; "failure to comply with Board policies and administrative regulations"; "failure to meet District standards of professional conduct" [Exh. 3 Witness: Caroline Ross) p.283 ¶ 2-13].

56.     Bera testified in her deposition, that the two reasons [Exh. 6 Depo. Bera p.64 ¶ 10-p.68 ¶ 15] for which Ross was charged and non-renewed where she allowed Lauren Hopkins to sign her name on checks and showed Hopkins how to sign her, Ross' name by using the window [Id.], and charged kids for attending assemblies–pep rallies-during school using the money for her, Ross' slush fund; Bera added as an afterthought, **"Yeah. And for me it was just the previous write-ups that I had had on her."** (Emphasis added).  [Id.].

57.     It should be noted that the previous writeups of Ross by Bera predated Bera's being removed by then Superintendent Mackey from responsibility over the secondary Principals, specifically Ross, putting the date of those writeups in 2012, when Bera said that when Robinson was

supervising Ross, Bera didn't go to Metzger, "she stayed out.". [Id. p.87 ¶ 20-25].

58.     But Bera's animosity toward Ross stemmed in part from the belief that under Mackey , Ross had "nine lives" [Exh. 52 Judson ISD/Ross p.01158] and Ross, considered by Mackey to be a "sister" who needed "help" [Exh. 6 Depo Bera p.28 ¶16-p.30 ¶ 15] was given favorable treatment by former Superintendent Mackey which she didn't deserve and JISD Board member Dr. Melinda Salinas did **not receive like treatment from Mackey (who Ross referred to as "Willis" according to Bera and Dr. Salinas) when Salinas had been a JISD Middle School Principal (before she resigned JISD to join her father Arnaldo Salinas on the JISD Board of Trustees).** [Id. p.17 ¶ 1-p.18 ¶ 1, p.18 ¶ 9-p.20 ¶ 13, p.37 ¶ 23-p.38 ¶ 1, and p.85 ¶ 8-p.86 ¶ 12].

59.     Another source of Bera's animosity toward Ross was that Bera believed Ross and Mackey were blood related, and she resentyed Mackey and believed that Mackey treated Ross favorably, and treated Hispanic's and Whites unfavorably, when he had expressed that his "goal of  the district [was] to ensure that teaching staff mirrored the students in demographics...and Elida Bera often made comments that she felt Dr. Mackey was giving African Americans preference, and Elida Bera clearly

did not like Ms. Ross[,] Bera felt [Ross] was given preference, that she was treated differently, thatmshe should be fired or removed from her position, and that Dr. Mackey would specifically not do that, it was Ms. Bera's belief that they were related (as they came from the same home town).". [Exh. 18 Renee Lafreniere ¶8-13].

60.    Bera, as Montoya's Associate Superintendent with responsibility for all JISD Principals [Exh.   testified in her deposition, that Ross was charged and non-renewedthe two reasons [Exh. 6 Depo. Bera 64/10-68/15] for which Ross was charged and non-renewed were she allowed Lauren Hopkins to sign her name on checks and showed Hopkins how to sign her, Ross' name by using the window [Id.], and charged kids for attending assemblies –pep rallies-during school using the money for her, Ross' slush fund. [Id.] Then, Bera added as an afterthought, "**Yeah. And for me it was just the previous write-ups that I had had on her.**" (Emphasis added) . [Exh. 6 Depo Bera p.68 ¶9-p.70 ¶ 6]. The previous writeups of Ross by Bera predated Bera's being removed by then Superintendent Mackey from responsibility over the secondary Principals, specifically Ross, putting the date of the last write-up before ose writeups in 2012. [Id. p.23 ¶ 7-24].

61.    JISD's investigation *into Ross* officially started, as far as Ross knew on or about Wednesday, February 24, 2016 when by Superintendent Montoya's letter, Ross was suspended from Metzger Middle School.[Exh.31].

62.    Apparently the investigation had originally focused on whether Ross had aided and or benefitted her Secretary-Bookkeeper Lauren Hopkins in he supposed forgery of Ross' signature on school checks in the 2014-2015 school year.

63.    But while the February 24, 2016 announcement of the investigation apparently started because Metzger School's relatively "new hire"[3]Secretary-Bookkeeper, Lauren Hopkins, admitted to having forged Ross' name as a counter signature to 16 checks in the 2014-2015 school year, it expanded on the testimony of Hopkins and a disgruntled Assistant Principal Channell Gomez, seguing into additional claims of:

1.) Ross had students attend during school pep rallies and charged them for their attendance in orsder to feed  her slush fund,

2.) Ross charged faculty members for wearing denim/jeans in violation of policy,

---

[3] Lauren Hopkins transferred from Jose Elizono's Supervision to become Caroline Ross' Secretary-Bookkeeper in 2012-2013, succeeding Jamie Coggins who had served Ross in the Secretarial-Bookkeeping position until she had been hired by JISD as a Teacher.

3.) Ross charged poor students for pencils and notebooks in violation of policy,

4.) Ross had alcohol on Metzger's campus in a red SOLO Cup,

5.) was under the influence of alcohol at the 8th grade Graduation, "Bridging Cermeny" in May 2015; and

6.)Ross had failed to timely deposit funds (presumably PTA funds).

64.     There aretwo emails which address the subject of during school pep rallies, one by the Metzger Athletic Director, and one from Assistant Principal Channell Gomez. [Exh. 32]

65.     Renee Lafreniere stated that a policy regarding the prohibition of JISD Principals charging Teachers for wearing denim/jeans published in the JISD Monday Memo (May 30, 2016). [Exh. 18 Renee Lafreniere ¶ 70-78].

66.     Lauren Hopkins was encountered by a JISD Police Officer in her office at Metzger Middle School on Tuesday, February 23, 2016, while Ross was a Principal's meeting being conducted by Ms. Bera at the Central Office. [Exh. 50 Depo Ross p.56 ¶ 13-24; Exh. 9 Depo Hopkins p.38 ¶ 7-p.46 ¶ 3].

67.    Lisa Butler ("Butler") a Black female, approximately 40 years old, married and a mother, who was President of the PTO at Metzger Middle School [Exh. 16 Affidavit of Lisa Butler ¶ 1-5].

68.    Butler stated that she met Elida Bera during the investigation process when the administration was going after Ms. Ross. [Id. ¶ 11].

69.    Butler stated that she heard Metzger Assistant Principal Channell Gomez express personal animosity toward Ross, saying, "I cannot stand her, "[Ross] aint ever here, I can't stand her." [Id. ¶ 34-35].

70.    Further, Butler recalled that she saw Lauren Hopkins sign Ms. Ross' name several times because Lauren didn't want to go looking for Ms. Ross so she would just sign her name; but Butler said **she never saw Lauren Hopkins go to the window and trace Ms. Ross' name**. [Id. ¶ 37-39]. (Emphasis added).

71.    Butler continued as Metzger's PTO President through the 2015-2016 school year, and was incharge of the Fall Festival, when the PTO made so much money that trash bags were filled and she and Laura were to count the money, but that never happened because Lauren kept the money in her office, never had time to count it, and finally said that she had counted it and deposited much less than Butler had believed to have been collected. [Id. ¶ 43-52].

72.     Then after Christmas 2015, in either January or February 2016, Butler heard about the investigation and texted Lauren asking what was happening; Lauren explained that she had been suspended saying **"if anyone asks you tell them that you saw Ms. Ross give me permission to write and sign those checks.I am trying to save my job…"** to which Butler says she responded, **"I'm not going  to lie for you. I just want to know what is going on, but I will not lie for you."** Butler then stated that Lauren Hopkins stated, "Oh, I'm not asking you to lie, I'm asking you to …you know I was helping you out with the Fall Festival **and I had to pay back the money for the checks that were written and now Ms. Ross is claiming to not know about the checks.",** to which Butler said she asked, well Lauren, did Ross know about the checks?" and Lauren replied, "Well I told her." Butler said that she then texted Ross, "I hope everything is okay.", to which Ross replied by text, "They aretrying to railroad me over some stuff I didn't even know was going on." [Id. ¶ 57-61].

73.     Butler then said that two days after texting Lauren and Ross, JISD CFO Elizondo called her and asked her to come to Metzger to answer some questions. Butler said that she went Elizondo was accompanied by [women one of whom was] a lady who was transcribing the conversation

[which has never been produced to Ross] in response to Elizondo's questions, Butler answered that she had never seen "Ms. Ross give Lauren permission to sign her name or write the checks...", but that she "saw Lauren write the checks and [she, Butler] had been the ercipient of some of those checks such as Home Depot, and WalMart and Lauren would get cash back on the checks and keep it." [Id. ¶ 62-66.]

Butler continued, "The women said, "Well maybe Lauren went into Ms. Ross' office.." [and Butler] explained that everything [she] witnessed happened in Lauren's office and [she] was positive that Ms. Ross never gave any permission that she [Butler] was aware of." The woman who was head of HR told [Butler] there was an investigation and they would let me kow if they needed anything else." Butler said, "They called her] and asked [her] if [she] could come back and write a statement and sign the paper the girl had transcribed of the conversation when [Butler] had been in the office." [Id. ¶ 68-70].

Butler went on to say, she agreed and "..went in to read and sign [the statement]" [Id 70]; however, Butler continued, "" **I read through the statement the girl had transcribed and I said, 'you're putting words in my mouth, I didn't say half of this.' They told me, 'you can just go ahead and sign it.' I said, I'm not signing this**

statement.' "[Id. ¶ 71]. Butler finishes her affidavit by saying that " **The woman who was with Mr. Elizondo and asked [her] to lie and sign a statement that was altered as to my transcription was Irma Hernandez, the head of JISD HR." [Id. ¶ 75].**

74.    In a statement ostensibly prepared and signed by Channell Gomez ("Gomez") at the request of Elida Bera and Irma Hernandez on March 28, 2016, Gomez seemingly accused Ross of having been drinking alcohol from a red solo cup on Metzger's campus and behaving as if she were under the influence of alcohol on the night of the 8th Grade Bridging Ceremony. That statement was used by JISD as is Exhibit A-18 in the hearing of June 7, 2016. [Exh. 37].

75.    In her deposition, Gomez stated she liked Ross, and had a good working relationship with Ross each of the three years Gomez worked for Ross. [Exh. 7 Depo. Gomez p.9 ¶ 16-p.17 ¶ 10], said that on the night of the Bridging ceremony In May 2015 Ross was talking to the parents thanking them for being present and knocked a Mason jar with an electronic votive candle off the stage, but there was no uproar or attention paid to the event by the audience. [Id. p. 25 ¶ 1-6, ¶ 12-21; p.26 ¶ 3-14].

76.    Gomez now states that Ross made no"bizarre movements" and "doesn't recall her speech being slurred." [Id. p.49 ¶ 3-10]. Gomez denied

having ever accused Ross of being inebriated at the Bridging event and drew no significance to the fact that the Mason jar with the battery driven votive had been knocked off the stage by Ross as she was speaking to the audience.[Id. p.20 ¶ 20-22; p.21 ¶ 2-19].

Gomez said that she did not by her testimony on June 7, 2016 "intent to affirm that, in Gomez's mind, Caroline Ross had behaved as if she was operating or acting under the influence of alcohol at the night of the eighth grade graduation in 2015 when Gomez gave answers to Mr. Russo's questions. [Id. p.40 ¶ 19-25]. Gomez concluded by saying that "was a good mentor." [Id. p. 53 ¶ 23-25].

77.     Bera recommended to Montoya that he non-renew Ross, and Montoya said in his deposition, but for what he had been told by Bera, Hernandez, Elizondo, and legal counsel he would have handled the Ross matter differently and not non-renewed her employment in JISD, but would have "**put in policies for sure**" and **"trained"**.[4][Exh. 11 Depo Montoya p.77 ¶ 20-p.79 ¶ 6].

78.     On May 19, 2016, Dr. Carl Montoya hand delivered a "NOTICE OF PROPOSED NON RERNEWAL" to Ross, without specific reasons or

---

[4]  Superintendent Montoya's words were certainly chosen carefully, and clearly indicate that there were no existing policies specifically regulating Ross' alleged mis-conduct, and she had been trained. In fact, the testimony of Renee Lafreniere regarding the May 30, 2016 , Monday

supporting/back-up data. [Exh. 59 Judson ISD/Ross-02665, JISD L.R. 0614, EXHIBIT A-32].

89.     On May 19, 2016 the JISD Board of Trustees met in noticed session and in item 8 A.-B. considered and by a motion made by Dr. Melinda Salinas, Seconded by Renee Paschall, "approve[d] the recommendation of the Superintendent to propose the non-renewal of the employment contract of Carolyn (Caroline) Ross..."[Exh 60 Judson ISD/Ross-02992, JISD L.R.-0941, Exhibit A-31].

90.     On June 17, 2016 the JISD Board of Trustees' Agenda was posted to include as item 4, "Propose[d] name change from Willis R. Mackey High School to Veterans Memorial High School. [Exh. 61 Judson ISD/Ross-00054].

91.     On June 7, 2016, the Board of Trustees of the JISD met in open session, despite the warning of Bera to Renee Lafreniere to have Ross not challenge her non-renewal in an open or public session [Exh. 18 Renee Lafreniere ¶ 92-93], the JISD Board met in open session and heard testimony. Dr. Melinda Salinas' father Arnoldo Salinas, also a member of the Board stated, "Having heard all the evidence nd arguments presented regarding the proposed non-renewal of the employment of the contract of Carolyn Ross, I move that the preponderance of the evidence supports the

Superintendent's recommendation to non-renew Ms. Ross' term contract; therefore, I move that the Board non-renew the term contract of Carolyn Ross, effective at the end of this school year, for the reasons set forth in her notice letter." [Exh. 41 Judson ISD/Ross-031353, Exhibit A-38].

92.    On May 26, 2016 Irma Hernandez sent a Request to Cooperate with ongoing Investigation" to Lauren Hopkins, and instructing her to meet with District Counsel, Mr. Russo and Irma Herndanez on May 27, 2016 at 11:00 a.m. in the JISD Human Resources Department. [Exh. 62 Judson ISD/Ross-00057].

93.    As for Lauren Hopkins non-appearance at the June 7, 2016 hearing to be a witness, Irma Hernandez stated that she had instructed Hopkins to be present as a witness at the hearing Hopkins said that she be a witness

94.    Hopkins testified at her deposition that she met with the District's lawyer and Ms. Hernandez, and that the District's male lawyer "came out" and presented Hopkins with a letter which said that she was not testifying against Ms. Ross, and that she dd not know who prepared the letter. [Exh. 9 Depo Hopkins p.49 ¶ 1-22].

95. Consequently, Hopkins did not appear at the hearing, and since Chapter 21 Texas Education Code does not provide the Board with

subpoena power as it does an independent hearing officer who normally conducts non-renewal hearings, it is reasonably inferable that the hearing of the non-renewal of Ross' contract was not merely to rig the jury but to do all possible to make sure that Hopkins was not a witness. At the hearing, Bera testified that she was part of the decisionmaking process in the non-renewal of Ross, ***but that she did not rely on the statements of Lauren Hopkins..*** [Exh. 4 Excerpts of Hearing Transscript Bera p.335 ¶ 14-24].

96.     For her part, Hopkins, who prepared several statements on February 24, 2016 while meeting with the Chief of JISD Police and Bera and Hernandez, testified that at one point when she was in the room alone, before she began to write a statement, the Chief of Police came in to get water and said that Ms. Ross was turning everything against –"putting the entire blame on [Hopkins]..." [Exh. Depo Hopkins p.55 ¶ 11-21].

97.     At the end of the hearing, Texas Association of School Boards ("TASB"), JISD's insurance and legal provider, through its Counsel of School Attorneys ("CSA") or Texas Association of School Attorneysfor JISD and its TASB/CSA/TASA members published across the state, a newsletter. [Exh. 58].

## ARGUMENT

1.    When asked about Montoya's remark that he was afraid to give a positive recommendation to Ross for fear of losing his employment at the hands of the Board, Elizondo seemed to state that Montoya was reasonable in his fear of negative repercussions from the Board. [p. 17 ¶ 2-p.20 ¶ 7,p p. 28 ¶ 19-29/11].  Elizondo said that there were always issues in school reports and that wasn't unique to Metzger meaning there were always situations where there were checks without the appropriate documentation. [Id. p.35 ¶ 3-20] continuing, Elizondo said there was no question of waste, fraud, or abuse issues at Metzger under Ross's leadership prior to the 2015-16 school year. [Id p.36 ¶ 21-p. 37 ¶2] Elizondo says that Bera is the only administrator who would know about the problems at Metzger. [Id. p.60 ¶ 4-19]. Elizondo recalls that Lawrence said she had been instructed by Ross to sign her name on the checks even though it's a forbidden practice, [Id. p.69 ¶12-20], and Ross said that she had not given Lauren authority to sign her name to the checks which created a conflict of stories. [Id. p.70 ¶1-8]. Elizondo says that bookkeeping problems at Metzger or any other school in JISD are fixed by retraining, and the bookkeeping problems are fairly common with all schools. [Id. p. 78 ¶ 13-23].

2.      Elizondo admitted that Bera in 2018 had caused a discrimination claim against the District, the claim by Ms. Husik who had been paid a settlement of $10,000.00. [Id. p.105 ¶ 14-p.107 ¶ 17].

3.      At the time of Ross's nonrenewal on June 7, 2016, Elizondo said that the Board of Trustees was upset about having to terminate the employment of a white male administrator, Urbanowicz. [Id. p.109 ¶ 21-p.110 ¶ 10].

4.      Superintendent Carl Montoya said he had one call asking him for a recommendation on Ross for employment, and "... We are being honest here. The problem was I was still Superintendent. The Board had approved her firing. I believe-and this is my thought-that if I had done that reference, it would have jeopardized me in my job. Because the board [would ask] here's the decision why are you doing this? You know, that type of thing." [Exh. 11 Depo Montoya p.28 ¶ 19-5].  When asked if a reference on Ross for future employment would have been a good reference, Montoya Said, "... Ross was a good principal." [Id. p.29 ¶ 6-10]. Montoya stated that based upon Nancy Robinson's evaluation of Ross dated June 11, 2015 [Exh. 28], Wherein Robinson said, "Ms. Ross has built a strong instructional team. She's led the school to once again grow in terms of student

achievement." And the scores given by Robinson to Ross meant that Ross, "the person being evaluated did an excellent job." [Id. p.26 ¶ 10-p.47 ¶ 11].

5.      Ross, having served approximately 33 years in Texas' public education systems, and a 19 year administrative veteran of the JISD, was suspended because of an investigation into a limited audit of Ross' Secretary Bookkeeper's check signing of 16 Metzger checks written during the 2014-2015 school year. Ross testified that the audit was called for by her arch professional antagonist Elida Bera [Exh. 50 Depo. Ross 218/4-8].

6.      Bera, former Superintendent Mackey's Assistant Superintendent had been recently promoted to Associate Superintendent by Mackey's successor,  General Superintendent, Dr. Carl Montoya's ("Montoya") Associate Superintendent, upon the retirement of Associate Superintendent Nancy Robinson in the summer of 2015 .

7.      On February 24, 2016, Ross was suspended by JISD's new Superintendent Dr. Carl Montoya successor to former Superintendent Dr. Willis Mackey. [Exh. 31]

8.      For about 10 years Anita Bera ("Bera")(Hispanic) served as JISD's Executive Director, then Deputy Superintendent. [Exh. 6 Depo Bera 9/4-8]

9.     In December 2007, the JISD Board of Trustees hired Dr. Willis Mackey (African American) as Superintendent.

10.     Superintendent Mackey disapproved of Bera's service in her position as Associate Superintendent, and demoted her by reducing her responsibilities from supervising and assessing secondary Principals such as Ross, Dr. Melinda Salinas[5], and ____Vidaurri. [   ] Bera claimed that Mackey harshly and improperly disciplined Salinas and Vidaurri and did not fire Ross as he should. [  ] Bera did not point out in her related depositiontestimony that it was Dr. Melinda Salinas and her father Arnold Salinas who had been elected to the Board of Trustees until she was disciplined by Mackey and to the position of Assistant Superintendent.

11.     During Ross's 19 years in the JISD, or performance assessments were proficient and when serving as a Principal her appraisals were outstanding earning her distinctions year after year. The Associate Superintendent of JISD at the time even noted, "Ms. Ross has built a strong instructional team, she's led the school to once again grow in terms of student achievement."[Exh. _____]

---

[5]  A defendant herein because she and her father are members of the JISD Board of Trustees which on June 7, 2016 failed to recuse themselves and voted to non-renew Ross immediately after votinfg to rename the Willis Mackey High School to Veteran's Memorial High School. Bera focused hostility against Ross for Mackey's earlier discipline

12.    Meanwhile, racial tensions amongst white patrons of the district and others began to focus on JISDs Superintendent, perceived by many onlookers as being the result of his being African American. Under Mackey's leadership JISD passed its first bond issue in nearly 7 years and made singular improvements and academics. Significantly, not only did Mackey open new and important educational venues in the district but the district's fund balance topped $40 million realizing significant savings through the refinancing of older bonds to the tune of $11 million. Superintendent Mackey's curriculum decisions and implementation of instructional systems because JISD to become one of only three public school districts in the San Antonio Metro area in which all campuses, elementary-middle school-in high school, met state and federal academic standards.  His leadership both past and present was generally considered to be outstanding; but he had his critics, and those critics generally formed along race lines, using Twitter and other social media to generate back channel complaints and criticisms about the Mackey administration.

13.    On April 14, 2014, Superintendent Mackey informed the school board of JISD that he intended to retire at the end of the 2014-2015 school year.

---

of Salinas and Vidaurri without punishing Ross (for sending roses to her secretary on National Secretary's Day and

14.    On September 17, 2015, JISD, building a new high school, and wrestling with the task of deciding what name should be placed on the building, dealt with a social media backlash against naming the school after the former African-American Superintendent, and voted 5 to 2 in favor of naming the new school after Dr. Willis Mackey.

15.    Media took note that the decision was met with plenty of negative comments on the districts Facebook and Twitter accounts.

16.    Nevertheless, despite the negative feedback, the district defended its decision to name the school after Superintendent Mackey.

17.    In December 2015, JISD Board was again whipped by local forces into changing the name of the under-construction Mackey high school; yet the board resisted, and the name of the building remained Willis Mackey High School for a while longer, until the tweets and social media opposition resulted in changes on the school board. Racism disguised as some other more socially palatable excuse pressed the JISD Board to not

---

then reimbursed her campus fund), when Salinas was employed as a JISD Middle School Principal.

name the new high school after the District's former African American Superintendent.

18.    In the meantime, sometime in February 2016, false allegations were generated against Ms. Ross, falsely accusing her of misappropriation of funds. Ms. Ross received the most severe punishment available, nonrenewal and termination after 19 years of service. In Ms. Ross's situation, the hollow and fake allegations against her were never verified or supported by credible evidence.

Ross was not the only JISD professional educator accused of offenses similar to the one leveled against her or worse.

However, Ross was the only JISD Principal or Administrator terminated or nonrenewed by JISD in her memory.

JISD has pursued a pattern and practice of treating protected persons less favorably than non-protected persons.

Caroline Ross did not fail to have proper documentation for expenditures and two signatures per check. Ross did not direct her secretary to sign checks for her. Ross did not lie to district investigators

about this matter. Ross did not engage in impermissible fundraising activities by charging students for composition books paid for by the district and for attending events such as pep rallies and performances.

Ross has not exhausted her legal remedies and is within her rights to state a claim for violation of the TCHRA.

## TIMELINE OF 2015-2016

| | |
|---|---|
| June 11, 2015 | Ms. Ross received a Principal Appraisal Summary Sheet with "E" to" E+" (outstanding) evaluations and a comment by Assoc. Superintendent Nancy Robinson, to wit: " Ms. Ross has built a strong instructional team. She has led the school to once again grow in terms of student achievement. |
| July 2015 | Superintendent forced to retire. Assoc. Sup. Nancy Robinson also retires |
| September 2015 | Notice of Texas Education Agency's 2014- |

2015 "Distinction" for academic improvement and progressive improvement in attendance at Metzger Middle School. (No Banner provided by JISD as for 2012-2013 year: causing Public humiliation and disrespect to students and community.

| February 23, 2016 | Campus Police interview Secretary/Bookkeeper, Laura Hopkins, in regard to her having committed forgery. Ms. Hopkins denied signing checks, denied petty cash fund. The police state that an ongoing investigation will clear her if she says Ms. Ross okayed it. She swooped up the police offered chance to falsely blame someone else. |
| February 24, 2016 | Ross interviewed by police and for the first time sees checks. Ms. Ross denied ever giving permission to anyone to sign her |

name to checks and pointed out that any two out of three people were available to sign checks. Understanding seriousness of forgery charge Ross wants to check the calendar to see if she was on campus on the days the checks were signed. Ross denies ever giving permission and wanted to see original records and checks along with documentation submitted at the time the checks were requested and issued.

February 25, 2016

Ross was placed on administrative leave with pay- with the Superintendent's Letter stating misappropriation of funds. Barred from campus and unable to examine records to establish proof that she did not want or need signatory authorization for anyone. Unable to secure records for PAD (Principal's

activity fund)

March 23, 2016                   Ms. Laura Hopkins claims Ross had given
                                 permission for check writing; maintained
                                 a petty cash fund and allowed Ms.
                                 Hopkins to use password for routine
                                 forms and check requisitions. Ms.
                                 Hopkins was told that the police had
                                 established that "all funds were
                                 accounted for" and the only criminal
                                 action towards Ms. Hopkins was that Ms.
                                 Coggins vehemently denied the
                                 outrageous story that Ms. Coggins had
                                 instructed Hopkins how to trace Ross's
                                 signature by holding it up to window
                                 light.

May 9, 2016                      Ross was ambushed with a request for
                                 "an interview since investigation was
                                 over."

Ross attended with her representative of choice. The attorney for the JISD was there and had 30 pages of questions based entirely on the interview with Ms. Laura Hopkins. Ross denied each and every allegation while pointing out that her calendar will show that she was on campus every day and there was no need for anyone except the assistant Principal, was the second in charge, to sign any checks or access reporting channels. The issue of Jean Day was raised although JISD had no Policy (A policy against Jean Days was issued on May 31, 2016. The Wagner staff had put Jean Day money in a fund to sponsor alternative graduation parties and post prom "safe events".)

May 19, 2016

Board meeting held with Ms. Ross's non-renewal on the agenda. Several

people spoke in  support.

Board, by motion, voted 6-1 to not renew and authorized formal notice be sent.

| | |
|---|---|
| May 21, 2016 | Ross requested an open hearing. |
| May 25,2016 | Notice was provided to Ross that her hearing was scheduled for June 7, 2016. |
| May 30, 2016 | JISD Attorney Russo filed claim of misrepresentation of items that are based solely on Ms. Hopkins statement or statements made by others to Ms. Hopkins. |
| June 2, 2016 | Ross and JISD Exchanged exhibits for the hearing. |
| June 6, 2016 | Ross objected to Russo's JISD's Exhibits  23 and  37  because  they  were  unreliable |

hearsay.

| | |
|---|---|
| June 7, 2016 | The hearing was rife with unconstitutional violations of due process, all the more important because Ross' was denied a constitutionally adequate hearing, upon which her career and job depended. The constitutionally deficient hearing was held and the majority of the Board ignored the morally correct and legal thing, deprived Ross of fundamental fair play even though Ross objected repeatedly: to unreliable hearsay by a declarant with reputation for untruthfulness and acts of moral turpitude; because Board's wrongful act, JISD-HR Director Irma Hernandez testified that the person who had altered official records and forged Ross' name, Hopkins, was the only one who had made |

the allegation of a criminal action by Ms.
Ross.  JISD caused Hopkins, Ross'
accuser, not to appear. Asst. Prin. Gomez
was impeached as to existence of petty
cash fund or a "pot". Gomez admitted she
never saw Hopkins deposit money into a
pot; she also admitted she only heard Ms.
Ross make reference to a pot "once in 4
years." She stated she did not know if a
Principal Activity Fund existed. HR
Director Irma Hernandez was also
impeached as to Ms. Hopkins being made
aware that Ms. Ross's former
secretary/bookkeeper,  Ms. Coggins,
vehemently denied the outrageous story
that Ms. Coggins had showed Ms.
Hopkins how to trace Ms. Ross's signature
by holding it up to window light. Board
voted 5-1 to non-renew and **one
member who voted with the**

**majority did not appear**.

**The District's wrongdoing caused Ms. Hopkins to not be available.** The District's HR administrator proffered legal advice to Ms. Hopkins that the District could not prevent Ross from bringing criminal charges against Hopkins. District's Exhibit 37, pages 205-206. This effectively dissuaded the witness from attending live, and being subject to cross examination, on the inconsistent and discredited stories she has given. The statements should have been denied admittance. Tex R. Evid. 801(5). Consequently, not only was one of the jurors or board members who convicted Ross was missing from the vote at the hearing, but the single and only accuser of Ross refused to appear for fear

of subjecting herself to perjury charges.

**Ross was subjected to discriminatory employment practices because of her race, sex, and age, when other persons outside of her protected classifications were treated more favorably than Ross.**

## CAUSE OF ACTION AGAINST DEFENDANT: DISCRIMINATION IN VIOLATION OF THE TEXAS COMMISSION ON HUMAN RIGHTS ACT

It is agreed that Ross is an African American female who was born on June 18, 1961. Unquestionably, she is a member of three protected classes of employees underthe Tex. Lab. Code, Chapt. 21., her race, her gender, and her age.

It is clear that the timeline of this case has established that she was non-renewed on June 7, 2016 and received the required certified mail notice completing the non-renewal process within 180 days of the date that she filed her first Charge of Discrimination 451-2016-01981 (race and age) with the EEOC/TWC on June 10, 2016, and her second Charge of Discrimination (race and sex)  451-2017-00505 with the EEOC/TWC on November 28, 2016. It is agreed that she filed her state suit within 60 days

from the date she received her stutory permission to file a civil action, and

that she filedthat  suit within two years from the date of her non-renewal.

## RESPONSE  TO THE PLEA TO THE JURISDICTION REGARDING ROSS' TEXAS LABOR CLAIMS

Ross adopts by reference her previously filed response and

supplemental response to JISD's Plea to the Jurisdiction.

## ARGUMENT

Caroline Ross (Ms. Ross) is an African American woman who has

devoted her entire adult life to education. For her work, she has been

celebrated except by Elida Bera, and Board members Salinas, Salinas,

Paschall, Lafoille, and Salyer.

She was employed by Defendant, JISD, for over 20 years, and up until

her contract was non-renewed on June 7, 2016, effective June 21, 2016, and

cut off for future employment from future employment in the JISD. Ross

has received stellar praise from her students, parents, staff, administration,

and community, and in fact when under her leadership Metzger middle

School scored well on the state's STARR Test, and without her, the school

has sunk into a slough of despond, receiving an "F" from the state on the

last testing cycle in 2019. [Exh. 18 ¶¶ 24-41, 60-64]

JISD's last Board (other than former member Jose Macias), targeted

Ross because she was an outspoken supporter of former African American

superintendent Willis Mackey and his programs, and because she had been vigorously supported by Willis Mackey, because she opposed illegal employment practices directed against her by Elida Bera, who having lost the power to assess and harm Ross under Mackey (and his Associate Superintendent Nancy Robinson, regained that power for the 2015-2016 school year and even affirmed in her deposition that the drive to non-renew Ross throttled into "hyper drive " [Exh. 6 Depo Bera p.85 ¶ 22-p.86 ¶ 12], under Montoya.

With Mackey's investiture as Superintendent, Renee Lafreniere, former Assistant to the Board and Superintendent, then JISD's Director of Career and Technology Education stated, Mackey aspired to balance the racial demographics between teachers and in JISD. [Exh. 18 ¶ 4-9].

because of her race, for those reasons claimed by Ms. Ross in her Charge of Discrimination to the EEOC and Texas Workforce Commission. The JISD Board in conspiracy with the administration had arbitrarily manipulated the investigation of false charges against Ms. Ross, gerrymandered the facts to construct false charges against her, and sat as a partial and unfair arbiter of its own decision to non-renew her contract and defame her, in a fundamentally unfair process.

When Ms. Ross asked the Commissioner of Education to review the JISD's Board's decision to non-renew her contract, **the Commissioner denied that he had jurisdiction over Ms. Ross's claims that JISD had acted illegally, arbitrarily, and unconstitutionally against her. Per the substantial evidence rule, the Commissioner accepted *other* of the JISD Board of Trustees's acts and false claims against Ms. Ross. The JISD Board was not performing a judicial function, nor was the Commissioner of Education. Neither had jurisdiction over the issues that are relegated by the statutory scheme of Chapter 21 et seq., Tex. Labor Code ("CHRA").**

Ms. Ross established jurisdiction under the CHRA by filing her (verified) Charges of Discrimination within 180 days of the identified discriminatory acts, filing her suit within 2 years of the date of those discriminatory acts, and has met her burden of establishing a *prima facie* case of discrimination by direct discrimination . [  ]The JISD's decision to non-renew her was based on reasons set out by thee Tex. Education Code, and JISD policy. JISD was not empowered to judicially determine-were it able-to determine constitutional issues, or CHRA issues. The CHRA statutory scheme is clearly the exclusive basis for determining illegal

discrimination in the workplace on the basis of CHRA retaliation, race, age, color, disability and gender. The only administrative remedy which must be exhausted is that of the CHRA, and the only determinant for whether jurisdiction of this court exists over CHRA claims are filing a charge of discrimination within 180 days of the discriminatory act, receiving a right to sue or file a civil action, fling that action within 60 days of the date the right to sue was received, and that within two years of the date of the illegal, discriminatory act. The issue of whether the *McDonald Douglas* burden shift or mixed motive test for motive, is not jurisdictional. But were the existence of justificatory reasons for an adverse action to be found to exist, the motive is still not decided against the victim of discrimination, if she can demonstrate to the fact finder that others outside of the clss were treated less harshly. Ms. Ross claims that Defendant's reason(s) for termination/non-renewal of Ms. Ross's contract was a pretext for discrimination and a motivating factor in their decision.

An unfair hearing was conducted before the board regarding the non-renewal/termination of Ms. Ross's employment contract. Zealous objections were made by Ms. Ross regarding testimony that was unreliable hearsay. Defendants proffered their own exhibit where the witness admitted that she previously did not tell the truth. (How do we know she is

telling the truth now?) When questioned about the veracity of the witness's statement, Defendant offered no legitimate excuse.

In fact, Defendants urged their key witness, Lauren Hopkins to not appear at the June 7, 2016 "hearing" so that she could escape cross-examination. With a faulty witness statement from a witness the Defendant's knew would not attend the hearing and a routine internal audit finding with only minor errors, Defendant's based their decision to terminate and non-renew Ms. Ross's employment contract.

Without having the ability to cross-examine the Defendant's "key" witness, Ms. Ross was not only unfairly prejudiced by the testimony, but she was effectively denied the opportunity to have key facts heard that would shed major light on the true intentions, motives, and bias behaviors that were all directed toward Ms. Ross. The collusion between several scorned employees still upset about "one of their own," Assistant Superintendent Anita Bera's demotion and a board with a shocking disregard and clear prejudice against African Americans is shameful. Each of them using their powers and positions to effect discrimination and ultimately the termination and non-renewal of Ms. Ross's contract.

Now, Defendants insist on a plea to the jurisdiction of this Court and allege that because of the hearing conducted on their turf and on their

terms, Ms. Ross should be collaterally estopped from presenting her argument before the Court, because no claim urged herein arises under the school laws of the state of Texas. *McIntyre* (supra) Ms. Ross did not fail to exhaust her administrative remedies; instead, she followed every procedure required and is here before this Court because justice requires maintenance of this suit. The Commissioner said that he did not have jurisdiction over Ross' appeal; without jurisdiction no merits of whether substantial evidence

On **February 24, 2016** Superintendent Montoya of JISD wrote to Ms. Caroline Ross and stated, inter alia: "This letter is written to advise you that you will be suspended effective immediately; *pending the outcome of an investigation regarding allegations of inappropriate use and/or management of campus funds* ." (Emphasis added) [Exh. 31].

On **May 13, 2016** Superintendent Montoya wrote a letter to Ms. Ross and her nonlegal or nonlawyer representative stating inter alia, the following:

> "This letter is written as a professional courtesy to notify you in advance of my recommendation to the Board of Trustees that your term employment contract with the District be proposed for nonrenewal at the end of the current school year, pursuant to the

Texas Education Code and Board Policies. DFBB (Legal) and (Local).

"The Board of Trustees will consider the proposed nonrenewal of your term employment contract at its meeting which is scheduled for May 19, 2016. I will post the public agenda for that meeting on or about May 16., 2016. Enclosed you will find a copy of the Judson Independent School District Board policies identified above.

If you wish to consider resignation as an alternative, please contact the District's Chief Human Resources Officer, Irma Hernandez, at either (sic) 210-945-5621. [Judson ISD/Ross-00993].

Lauren Hopkins, JISD's key accuser against Ms. Ross, was not present at Ms. Ross' non-renewal hearing before the JISD Board on June 7, 2016. Hopkins refused to attend.

Hopkins' refusal to attend worked out in a peculiar manner, in that between the time she sat down to write a statement about what happened at Metzger school regarding the signing of Ross' name on checks, and Hopkins actually writing the statement accusing Rosss of approving Hopkins signing Ross' name, the Chief of JISD's  Having refused to attend any meetings without her attorney and her attorney being unavailable because of the hearing being scheduled on a holiday weekend, she refused to appear and testify.

Superintendent Montoya delivered a letter to Caroline Ross on **May 19, 2016** which stated inter alia, the following:

> "Pursuant to the provisions of Section 21.206 of the Texas Education Code, JISD Board policy DFBB (Legal), JISD Board policy DFBB (Local), and Paragraph 9 of your employment contract with the Judson Independent school district, please be advised that the Board of Trustees, at the Board meeting held on May 19, 2016, voted to approve my recommendation to consider a proposed nonrenewal of your employment contract with the District. Pursuant to the instructions of the Board, **this document constitutes the Board's notification to you that your employment contract is being proposed for nonrenewal. The reasons for the proposed non-renewal found in policy DFBB are as follows:**
>
> > **2. Failure to fulfill duties or responsibilities.**
> >
> > **3. Incompetency or inefficiency in the performance of duties.**
> >
> > **6. Failure to comply with Board policies are administrative regulations.**
> >
> > **15. Failure to meet the District standards of**

**professional conduct.**

**29. Misrepresentation of facts to supervisor**

**or other district official in the conduct of**

**district business.** (Emphasis added)

As you are probably already aware, under Section 21.207 of the Texas Education Code, policy DF BB (legal), and policy DF BB (local), you are entitled to request a hearing concerning the proposed action to non-renew your employment contract with the district. The Board has determined that any hearing on this proposed non-renewal will be conducted by the Board. As result, if you desire a hearing, you must notify the Board, in writing, not later than the fifteenth (15th) day after receiving this notice of Proposed Non-Renewal... Enclosed for your information, are copies of the following items, some of which contain information in support of the recommendation for proposed non-renewal of your employment contract with the District:

Exhibit A: Copy of the written statement of Ms. Lauren

Hopkins dated February 24, 2016, a copy of which

was marked as exhibit 8 and provided to you at your

interview on May 9, 2016;

Exhibit B: Copy of your employment contract with the

district which expires at the end of the 2015-2016

school year;

Exhibit C, Copy of Policy DFBB (LEGAL);

Exhibit D: Copy of DFBB (LOCAL);

Exhibit E: Copy of board policy DH (LEGAL);

Exhibit F: Copy of board policy DH (LOCAL);

Exhibit G: Copy of Board policy DH (EXHIBIT); and

Exhibit H: Copy of written statement of Ms. Chanell

Gomez dated April 5, 2016, a copy of which has

previously been provided to your former attorney

and to your current non-attorney representative.

[Judson ISD/Ross-00963 through 00965, Exhibit A- Exhibit H

Judson ISD/Ross-00967 through 00992. Judson ISD/Ross-01007

through 01008.]

On **May 26 2016**, Lauren Hopkins was notified of the hearing before

the Board of Trustees regarding the nonrenewal of Ms. Ross's contract. On

May 27. 2016 Ms. Hopkins refused to participate in the hearing. Judson

ISD/Ross-01007 through 01008. The denial of the opportunity for Ms.

Ross to confront her accuser Hopkins, after the JISD had ostensibly worked privately with Hopkins for extended periods of time, constitutes a violation of due process. The Board of Trustees has no legal authority to issue subpoenas and Hopkins' appearance could ostensibly not be compelled. It is believed that JISD colluded with Ms. Hopkins to facilitate  her from being available to give testimony or being cross-examined by Ms. Ross. Judson ISD/Ross-01007 through 008

As for JISD's witnesses for the prosecution, JISD had an obligation to disclose the names of witnesses against Ms. Ross, what though witnesses were reasonably likely to know, or have the ability to reveal in testimony, and to make those witnesses available at the hearing to satisfy Ms. Ross' rights of confrontation. JISD did not timely disclose witnesses JISD intended to call, and would not present witnesses requested by Ross, who were subject to JISD's control.

On **June 9, 2016** JISD Superintendent Montoya notified Ms. Caroline Ross by letter of the same date as follows: "at a properly convened Board meeting held on June 7, 2016 the Judson Independent School District Board of Trustees voted to non-renew your term contract with the District...This correspondence constitutes the board's notification to you that your 2015-2016 contract with the district has been non-renewed. As a

result, your employment with the district will end at the expiration of your current contract on June 21, 2016. By way of background, pursuant to the provisions of Section 21.206 of the Texas Education Code, Policy DFBB (Legal), Policy DFBB (Local) and your employment contract with the Judson Independent School District, the Board of Trustees voted to propose nonrenewal of your contract at a board meeting held on May 19, 2016, pursuant to the provisions of Section 21.207 of the Texas Education Code. **On May 20, 2016** through Irma Hernandez, as my designee, you were provided with written notice of the proposed nonrenewal. Subsequently, you requested to have a hearing before the Board, and that hearing laws (as noted above) conducted on June 7, 2016.

After considering the testimony of the witnesses, the exhibits admitted before the Board and all relevant laws and district policies, a motion was made in open session to non-renew your contract with the District. The motion was seconded and passed to the vote of 5 to 1. The motion approved by the board was founded upon your performance as was provided in the notice of the proposed nonrenewal and follow-up communications. [Exh. 24].

On **June 21, 2016** Superintendent Montoya of JISD wrote to Doug Phillips, Director of Investigations for the Texas Education Agency

regarding Carolyn Diane Ross a.k.a. Caroline Ross stating, inter alia, the following: "it is required under 19 Texas Administrative Code Section 249.14, and Texas Education Code, Section 21.006, this letter serves as a report that the Board of Trustees for the Judson Independent School District took action to non-renew Ms. Ross's 2015-2016 term contract on June 7, 2016, *based on evidence that included the possibility of supporting a claim of abuse of official capacity under section 39.02 of the Texas Penal Code.* Ms. Ross's employment with the district will end at the expiration of her current term contract, on June 21, 2016. The Board of Trustees for Judson Independent School District has been notified that this report is being sent to the State Board for Educator Certification, as is Ms. Ross (sic)." [Exh. 24].

In his letter of **July 7, 2016**, the Texas Commissioner of Education stated, "Please be advised that this case has been docketed as an R. 1 teacher nonrenewal under the provisions of Texas Education Code Section 21.301 et seq. (the new code). Section 21.301 of the Texas Education Code calls for Respondent [JISD] to file a Response to [Ross']Petition for Review along with the record of the local hearing within 20 days after the date the Petition for Review.." was filed with the  Commissioner." [Exh. 41].

**On July 7, 2016**, the Texas Education Agency notified

Superintendent Montoya of the Judson Independent School District

("JISD") that the Commissioner of Education had docketed Ms. Ross'

requested review of her contract non-renewal by JISD's Board of Education

"..as docket number 052 – R1 – 06 – 2016", and the substantial evidence

review or appeal to the Commissioner had been "assigned by the

Commissioner of Education as a Chapter 21, Subchapter G appeal

regarding the above referenced matter."

Ross' substantial evidence review by the Texas Commissioner of

Education, was unsuccessful.

The **Decision of the Commissioner of Education**, Exhibit Two

to Defendant's Plea to the Jurisdiction, states, *inter alia*, the following:

1. "The central issue in this case is whether there is substantial

evidence that Petitioner [Ross] violated Respondents [JISD] pre-

established reasons for nonrenewal.";

2. "A significant subsidiary issue is what effect Petitioner's failure to

cite the local record and authority has on this case.";

3. "..once the district cites evidence that appears to be substantial, one

would expect the teacher to come forward with the reasons why such

evidence is not substantial and perhaps citations to the record that show

how the district's assertions as to the facts of the case are not supported by

the record as a whole.";

4. "In the present case, Petitioner's failure to cite to the record and authority in her initial brief and her failure to file a reply brief after Respondent made a prima facia case that its decision was supported by substantial evidence, results in Respondent prevailing.";

5." To the extent that Petitioner contends Respondent's decision is arbitrary capricious and unlawful, **Petitioner has failed to exhaust administrative remedies as to these claims by failing to cite to the local record and authority as to these claims.**";

6. "**Because Petitioner has failed to properly brief her claims that the board's decision is arbitrary, capricious or unlawful, the Commissioner lacks jurisdiction over these claims due to the failure to exhaust administrative remedies**.";

7. "Petitioner has made claims that cannot apply when a school board holds a hearing on the proposed nonrenewal of the teacher's contract. **Numerous courts have determined that due process rights are not at stake when a term contract is nonrenewed**.";

8. "When a school board hears a proposed nonrenewal, the hearsay rules do not apply unless the board by its own policy provides that the hearsay rules apply.";

9. " Respondent [JISD] has not so provided.";

10. " Conclusion  [.] Because petitioner failed to exhaust administrative remedies, the Commissioner lacks jurisdiction over petitioner's claims that respondent's decision to non-renew her contract was arbitrary, capricious, or unlawful. Respondent's decision is supported by substantial evidence.";

11. "Conclusions of Law. 1. the Commissioner has jurisdiction over this case under Texas Education Code 21.301, **except for the claims that respondent's decision is arbitrary, capricious, or unlawful.**" (Emphasis added);

12. " 2. The argument portion of a brief is required to have appropriate citations to the record and authority. 19 Tex. Admin. Code § 157. 1058 (a) (4).";

13. "As the argument portion of Petitioner's brief lacks appropriate citations to the record and authority, **Petitioner has failed to exhaust administrative remedies as to her claims that respondent's decision to non-renew her contract is arbitrary, capricious, or unlawful.** 19 Tex. Admin. Code § 157. 1058 (a) (4).";

14. "4. There is no entitlement to due process protections when a term contract is nonrenewed. Tex. Educ. Code § 21.204 (e)"; and

15. "The hearsay rule does not apply when the school board conducts an evidentiary hearing concerning the nonrenewal of the term contract unless the school board's policy specifies that the hearing per se rule applies. As respondent has no such policy, the hearsay rule does not apply in the to this case. Tex. Educ. Code section 21.207 (b)."

Ross timely filed her Charge of Discrimination within 180 days of the last act of employment discrimination, and since Texas is a dual filing state, her filing was with both the EEOC and the Texas Workforce Commission/Civil Rights Division ("TWC/CRD") pursuant to the Texas Commission for Human Rights Act ("TCHRA") or Texas Labor Code, Chapter 21. Ross requested a right to sue and filed suit within two years of her having been terminated or non-renewed by the JISD Board of Trustees, filing same within 60 days from her receipt of the right to sue, and timely serving same on Defendant.

Defendant, having been less than forthcoming and responsive to written discovery propounded by Ross, provoking a motion to compel, has filed a Plea to the Jurisdiction claiming that because Ross challenged her non-renewal, and receiving an "ostensible" evidentiary hearing-at the election of the JISD Board before the JISD Board of Trustees instead of before an Independent Hearing Examiner appointed by the Texas

Education Agency. The basis of JISD's Plea to the Jurisdiction is the claim that Ross is barred by collateral estoppel from invoking her administrative and judicial remedies under the **Texas Labor Code Chapter 21 et seq**, because she challenged the non-renewal of her term contract according to Chapter 21, §§ 21.207 and 21.208 of the Texas Education Code. JISD's Board which had decided on May 19, 2016, to non-renew Ross and accept the Superintendent's decision to non-renew her contract subject to Ross' challenge of the Board's vote to accept the Superintendent's decision to non-renew.

## 1.  STANDARD OF REVIEW

A plea to the jurisdiction is a dilatory plea that challenges a trial court's authority to decide a case on the merits. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). To have authority to resolve a case, a court must have subject matter jurisdiction. Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 443 (Tex. 1993). A plea to the jurisdiction urges that the court lacks the power to determine the subject matter of the suit. *City of Cleburne v. Trussell*, 10 S.W.3d 407, 410 (Tex.App.-Waco 2000, no pet.). The plaintiff must plead facts which affirmatively show that the trial court has jurisdiction. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993).

Sovereign and governmental immunity from suit deprive a trial court of subject matter jurisdiction. *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). In a suit against a governmental entity, the plaintiff must prove a valid waiver of immunity from suit and must plead sufficient facts to affirmatively demonstrate the court's jurisdiction to invoke the court's subject matter jurisdiction over the claim. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

Absent an allegation that the plaintiff's jurisdictional pleadings are fraudulent, the court must take the allegations in the petition as true and must construe them liberally in favor of the plaintiff when ruling on the plea. *Id.* However, a trial court is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *Bland Independent School Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex. 2000).

## 2. <u>ARGUMENTS AND AUTHORITIES</u>

### A. MS. ROSS HAS EXHAUSTED ALL ADMINISTRATIVE REMEDIES REQUIRED AND HAS RECEIVED HER "RIGHT TO SUE" LETTER

Chapter 21 of the Labor Code deals with employment discrimination. Tex.Lab. Code Ann. §§ 21.001-.306 (Vernon 1996 & Supp.2002). The general purposes of the Commission on Human Rights Act (CHRA) are set

forth in section 21.001. Id.§21.001. One purpose of the CHRA is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (42 U.S.C. Section 2000e et seq.)." Id. §21.001(1). A second purpose of the CHRA is to "secure for persons in this state, including persons with disabilities, freedom from discrimination in certain employment transactions, to protect their personal dignity." Id. §21.001(4). The types of employment discrimination the CHRA is designed to suppress are defined in section 21.051 of the Labor Code. That section provides:

> An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> (1)  fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
>
> (2)  limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee. *Id*. §  21.051.

The CHRA establishes a comprehensive administrative review system to carry out the policies embodied in Title VII. The Supreme Court noted that an important policy of Title VII is exhaustion of administrative remedies prior to litigation. *Schroeder v. Texas Iron Works, Inc.*, 813

S.W.2d 483, 487 (Tex.1991). In furtherance of that policy, the CHRA created the Commission on Human Rights (Commission) and described its powers. Tex. Lab.Code Ann. § 21.003.  The Commission has the power to "receive, investigate, seek to conciliate, and pass on complaints alleging violations" of the CHRA. Id. § 21.003(a)(2). While investigating the Commission has the power to subpoena witnesses for examination and request production of relevant documents and records as evidence. *Id*. § 21.003(a)(4).

Under section 21.201 of the CHRA, a person claiming to be aggrieved by an unlawful employment practice may file a complaint with the Commission. Such a complaint must be filed within 180 days after the date the alleged practice occurred.  *Id*. §21.201(g). A complaint filed later than the 180th day after the date the alleged unlawful employment practice occurred will be dismissed as untimely. *Id*. §21.202.   After the complaint is filed, the Commission is required to investigate that complaint and determine if there is reasonable cause to believe that the employer engaged in an unlawful employment practice as alleged in the complaint. *Id*. §21.204.  If it finds that there is reasonable cause, the Commission must try to eliminate the unlawful employment practice by "informal methods of conference, conciliation, and persuasion." *Id*. §21.207(a).

The CHRA's administrative review system also provides for judicial enforcement.   If the Commission finds reasonable cause to believe that an unlawful employment practice has occurred, and if efforts to resolve the matter through "informal methods" have been unsuccessful, the Commission may bring a civil action against the employer. Id. §21.251.   If the Commission dismisses the complaint, or if within 180 days after the complaint was filed the Commission has not filed a civil action or successfully negotiated a reconciliation agreement, the Commission must so inform the aggrieved employee. Id. §21.208. After receiving such notice, the complainant may request from the Commission a written notice of the complainant's right to file a civil action. Id. §21.252.   If the right-to-sue notice is given, the complainant has 60 days to bring a civil action against his employer.

Here, in the instant case, Ms. Ross has satisfied and exhausted all administrative remedies. Her complaint was filed timely and she received the right-to-sue notice and timely brought this action before the Court.

### B. MS. ROSS IS NOT COLLATERALLY ESTOPPED FROM PURSUING HER DISCRIMINATION CLAIM.

When the Legislature creates an administrative agency, it may grant the agency authority to resolve disputes that arise within the agency's regulatory arena. *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex.

2013). If the Legislature expressly or impliedly grants an agency sole authority to make an initial determination in such disputes, the agency has exclusive jurisdiction, and a party must exhaust its administrative remedies before seeking recourse through judicial review. *Id.* If the party files suit before exhausting exclusive administrative remedies, the courts lack jurisdiction and must dismiss the case. *Rhule*, 417 S.W.3d at 442; see also *Essenburg v. Dallas Cty.*, 988 S.W.2d 188, 189 (Tex. 1998).

The requirement that parties exhaust administrative remedies does not deprive parties of their legal rights. *Rhule*, 417 S.W.3d at 442; see TEX. EDUC. CODE § 7.057(b) (stating that an administrative appeal to the Commissioner of Education "does not deprive any party of any legal remedy"). Instead, it honors the Legislature's intent that the appropriate body adjudicates the dispute first, *Essenburg*, 988 S.W.2d at 189, and thereby ensures an orderly procedure to enforce those rights. *Rhule*, 417 S.W.3d at 442.

By requiring the agency to address the complaints first, the law permits the agency to apply its expertise and exercise its discretion to resolve the issue and to develop a complete factual record if the courts later get involved. See *McKart v. United States*, 395 U.S. 185, 194 (1969); see also Kenneth Culp Davis, Administrative Law Doctrines of Exhaustion of

Remedies, Ripeness for Review, and Primary Jurisdiction: 1, 28 TEX. L. REV. 168, 169 (1949) ("Premature judicial intervention may defeat the basic legislative intent that full use should be made of the agency's specialized understanding within the particular field.").

A party who obtains relief through the administrative process avoids the expense and delay of litigation. *Woodford v. Ngo*, 548 U.S. 81, 89 (2006); McKart, 395 U.S. at 195. And if the outcome of the administrative process leaves the party dissatisfied, it may file suit and have the courts review the agency's decision. *Tex. Water Comm'n v. Dellana*, 849 S.W.2d 808, 810 (Tex. 1993).

## C. MS. ROSS HAS SATISFIED MCDONNEL DOUGLAS BURDEN-SHIFTING FRAMEWORK

Sovereign immunity deprives a trial court of jurisdiction over lawsuits in which a party sues a school district unless the school district's sovereign immunity has been waived. *Mission Consol. Indep. Sch. Dist v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). The Human Rights Act clearly and unambiguously waives immunity for suits brought against school districts under this statute. Tex. Lab. Code Ann. §§ 21.002(4), 21.002(8)(D), 21.051, 21.254 (West, Westlaw through 2015 R.S.); Garcia, 372 S.W.3d at 636. But, the Legislature has waived immunity only for those suits in which the

plaintiff alleges a violation of the Human Rights Act by pleading facts that state a claim thereunder. See Tex. Lab. Code Ann. §§ 21.002(4), 21.002(8)(D), 21.051, 21.254; Garcia, 372 S.W.3d at 636–37.

There are two alternative methods by which a plaintiff may establish a discriminatory treatment case. The first is by proving discrimination through direct evidence of what the defendant did and said. *Garcia*, 372 S.W.3d at 634. Direct evidence of discrimination is evidence that, if believed, proves the fact of discrimination animus without inference or presumption. *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653–54 (Tex. App.—Dallas 2012, no pet.); see also *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

 If an inference is required for the evidence to be probative as to the employer's discriminatory animus in making the employment decision, the evidence is circumstantial, not direct. *Jespersen*, 390 S.W.3d at 653–54; see also *Sandstad*, 309 F.3d at 897–98. Courts have tended to find that insults or slurs against a protected group constitute direct evidence of discrimination. *Jespersen*, 390 S.W.3d at 654. Statements and remarks may serve as direct evidence of discrimination only if they are (1) related to the employee's protected class, (2) close in time to the employment decision, (3) made by an individual with authority over the employment

decision, and (4) related to the employment decision at issue. *Reyes*, 272 S.W.3d at 593; *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

If the alleged workplace comment does not meet these four requirements, the comment is treated as a "stray remark" that, standing alone, is insufficient to establish discrimination. *Reyes*, 272 S.W.3d at 592; *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010).

However, because direct evidence of discriminatory motive is usually hard to come by, the courts created a second method, the burden-shifting mechanism of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Garcia*, 372 S.W.3d at 634. Under this approach, discrimination is presumed if the plaintiff meets an initial burden of establishing a prima-facie case of discrimination. *Id.* A plaintiff proceeding under the McDonnell Douglas approach must meet the requirement of the prima-facie case for the trial court to have jurisdiction. *Id.* at 637. The failure to present the elements of a prima-facie case means the trial court has no jurisdiction and the claim must be dismissed. *Id.*

While such a plaintiff must sufficiently plead the prima facie case of her statutory claim, she will be required to submit evidence only if the defendant presents evidence negating one of those basic facts. See *id*. In this situation, failure to raise a fact issue on a challenged element of the prima facie case means that the trial court has no jurisdiction and the claim should be dismissed. See *id*. In the absence of direct evidence of discrimination, the elements of a prima facie case of discrimination are that Ms. Ross: (1) is a member of a protected class, (2) was qualified for her position, (3) was subject to an adverse employment decision, and (4) was treated less favorably than similarly situated persons not in the protected class. *College of the Mainland v. Glover*, 436 S.W.3d 384, 393 (Tex. App.– Houston [14th Dist.] 2014, pet. denied).

The Supreme Court of Texas has concluded that "employees are similarly situated if their circumstances are comparable in all material respects." *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). The United States Court of Appeals for the Fifth Circuit has articulated a similar standard, saying that employees are similarly situated if their circumstances are "nearly identical." *Perez v. Tex. Dep't of Criminal Justice, Institutional Div.*, 395 F.3d 206, 213 (5th Cir.2004).

Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct. To prove discrimination based on disparate discipline, the disciplined and undisciplined employees' misconduct must be of "comparable seriousness." Although "precise equivalence in culpability between employees is not the ultimate question," the Fifth Circuit has held that to prove discrimination based on disparate discipline, the plaintiff must usually show "that the misconduct for which member of protected class was discharged was nearly identical to that engaged in by a non-protected class employee whom the company retained." *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917–18 (Tex.2005).

Here, in the instant case Ms. Ross is an African American which means she is a member of a protected class. Exhibit _ She also was qualified for her position as she had been employed with the district for approximately 19 years and during her tenure helped revitalize and grow the district. Exhibit _She received official notice that her employment contract was being terminated and non-renewed Exhibit_ and in her Petition to this Court, she described numerous instances of similar situated employees that received more favorable treatment. Exhibit_

## 3.  CONCLUSION

Plaintiff is not collaterally estopped from bringing her claim because she exhausted all the required administrative remedies and received her right to sue letter. Her exercise of exhausting her administrative remedies does not preclude her or waive her legal right to sue in this Court. Plaintiff's pleadings have adequately alleged jurisdictional facts and a prima facie case for discrimination has been made.

The only issues are whether she can show that she but for her protected classes, or either of them she would have been terminated.

## OTHERS OUTSIDE OF ROSS' PROTECTED CLASS WHO HAVE BEEN TREATED MORE FAVORABLY

For example, there were other district administrators, none of whom were African American, who were treated far more favorably than Ross under similar or worse accusations of misconduct. Even in the instances of the other non-African-American administrators/educators, many of the more favorably treated employees actually were admittedly or substantially culpable or responsible for the charges made against them.

In 2015, **Steve Yaklin, Dir. of Maintenance, a white male**, was placed on administrative leave for failure to follow procurement law processes and board policy where he had violated vendor contract rules. JISD publicly rescinded a termination of Yaklin, reinstating him and returning him to duty.

**Marsha Bellinger, former Principal at Park Village Elementary, a white female**, was transferred to Judson Alternative School in 2015 rather than being nonrenewed for alleged leadership issues.

In 2016, the same **Marsha Bellinger, a white female**, again was transferred to a district office level position after being placed on

administrative leave and threatened with nonrenewal; her new position was effectively a promotion carrying with it a raise in salary.

**Elaine Howard, Executive Director of Human Resources, a white female**, in 2013 failed to terminate an employee (Troy Richleau) in the district and Richleau was awarded over $12,000. Elaine Howard's failure to follow proper personnel and district policies and procedures cost the school district thousands of dollars and she was neither terminated nor reprimanded.

In 2014, **Evelyn Cantu (Hispanic)** was not terminated from payroll after her resignation from district employment resulted in an overpayment of over $30,000 to her; however, Marlene Glover, an African-American female, was required to pay back a retention bonus of $1200.

**Cindy Barnhart, a white female, former Principal at Franz Elementary**, allegedly failed to take an action against the teacher who was convicted of having improper sexual contact with students. Ms. Barnhart allegedly had first-hand knowledge of the incidents and was ultimately sued by the victims which resulted in a settlement, yet she was only reassigned to another campus as a Principal and not even threatened with nonrenewal or termination of her employment.

**Greg Milchder, a white male, former Vice-Principal at Judson High School** was reassigned for allegedly requiring teachers to change grades of students and has since been promoted to be the current principal at Park Village Elementary School.

**Kristy Vidaurri, a white female, and former Principle of Judson High School** was reassigned to the districts main office because of her alleged failure in leadership at the campus.

**Barbara Mead, a white female, was reassigned as Executive Director of Judson Educational Foundation** after having been the head counselor at Metzger.  Mead had allegedly disrupted the administration of Tracy Val-Ray, an African American female. It should be noted that the board of JISD was going to replace Ross at Metzger with Beverly Broome, a white female but was told by their consultants not to do so at that time because of Ross's pending claim.  The board was further told

that as soon the Charge of Discrimination by Ross was disposed of they could put Broome in as principal at Metzger.

**Michael Wacker, a white male, was Head Boys Basketball Coach** and was arrested by the police for Driving While Intoxicated, the arrest being widely publicized on area television news; nevertheless, Wacker was merely suspended for one week and returned to his duties.

**Don Pittman, a white male, Principal of Judson High School** was never terminated or nonrenewed even after accusations of violating Judson policies and practices, being merely reassigned to the districts office and then to become Principal of an elementary school where he served for four years before retiring to seek employment in the Northeast ISD.

**Kamara Adams, a white female, Vice Principal at Judson High School** was accused of violating district policy and procedure and transferred to the district office.

**Mr. Joe Gonzales, Hispanic male, Principle of Wagner High School** was transferred to the district office then to Executive Director Student Supply Services, after being accused of violating district policy and procedures.

**Erica Garza, Hispanic female, Principal Rolling Meadows Elementary** was demoted and reassigned to the position of Vice Principal at Kitty Hawk middle school for having allegedly violated district policies and procedures.

**René Briske, a white female, was demoted and transferred from Principal Paschall Elementary to become Vice Principal at Judson Elementary College Academy** and has since been re-promoted to be Principal at Eloff Elementary after allegedly violating district policies and procedures.

Pursuant to Texas state law, Ross pleads a cause of action against JISD for sex, race and age discrimination in violation of the Texas

Commission on Human Rights Act. Tex. Lab. Code § 21.051 ("TCHRA"). The allegations contained in all of the paragraphs of this Petition are hereby reaverred and realleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

JISD terminated/non-renewed Ross from her supervisory position because of her sex (female) in violation of the TCHRA.  JISD effectuated this discriminatory act by and through fluid pretextual and non-specific charges of at first misappropriation of funds, and when there were no accusers who would falsely swear, JISD nimbly shifted to "performance" reasons which were unconstitutionally vague.

Ross has met all procedural prerequisites to bringing this TCHRA claim.  Plaintiff filed TCHRA charges relating to these violations on June 9, 2016, and an amendment and/or second Charge on November 16, 2016. Ross has received Right to Sue letters relating to these charges.  Further, Plaintiff is within all applicable statutes of limitations for bringing this civil action.

**CAUSE OF ACTION AGAINST DEFENDANT:**
**TITLE 42 U.S.C.S. § 1983**

**CAUSE OF ACTION AGAINST DEFENDANT:**
**TITLE 42 U.S.C.S. § 1983**

Pursuant to Title 42 U.S.C.S. § 1983, Plaintiff Caroline Ross asserts that Defendants have violated her right to protected speech when she supported Associate Superintendent Nancy Robinson, and sought from JISD's administration, and received approval for the $15,000.00 three year grant to United Communities to provide social services to the Metzger Middle School and its community, supported Mackey in his vision of a pluralistic and racially mixed teacher corp to mirror the student demographics, and supported the naming of the new high school, the Willis R. Mackey High School. Ross also claims that her First Amendment right to association has been subjected to curtailment by retaliation. Ross claims JISD Defendant has retaliated against her based on her First Amendment right to protected speech and right to association.

Ross alleges that she was subjected to deprivation of her protected Constitutional interests without due process as secured by Fourteenth Amendment, specifically, Liberty and Property.

All violative acts were committed by Defendants under color of state law, and with conscious indifference to Ross' protected speech and her right to association.

**Protected Speech**

Constitutionally protected speech or communication is identified variously by legislative and judicial bodies. In Texas, the Legislature and the state's judicial system have identified protected speech in the Texas Citizens Participation Act as a communication made in concern with a matter of public concern. (2011 Tex. ALS 341, 2011 Tex. Gen. Laws 341, 2011 Tex. Ch 341, 2011 Tex. HB 2973, 2011 Tex. ALS 341, 2011 Tex. Gen. Laws 341, 2011 Tex. Ch 341, 2011 Tex. HB 2973)

"Matters of public concern" as identified by the definitions in the statute, Section 27.001 as matters which are " related to health or safety, environmental economic or community well being, the government, a public official or public figure; or a good product or service in the marketplace."

Here, JISD's counsel asked Ross about protected speech in which **she engaged ("who")**, to which Ross responded [Exh. 50 Depo Ross 149/8-178/2], identifying **that** about which she spoke **("what")**( identifying and justifying having obtained by a JISD grant, community services for her school since the District had stripped gang ridden Metzger of its social worker under the guidance and leadership of former Superintendent Mackey's, former Associate Superintendent Nancy Robinson and she had contracted to grant with "United Communities" to provide the needed social work at Metzger), which speech

occurred at a "special called school board meeting" **("where")** to the JISD Board,

" afew months before [Ross] was sent home" **("when")**. [Id.]

Ross also answered that she **("who")** had supported the naming of the new

high school after "Willis R. Mackey" (**"what")** which was a community debated

matter **("where")** in the headlines from the Fall of 2015 through the Board's

coincidental vote to rename that school and strip Mackey's name from its wall, on

June 7, 2016 **("when")**.[Id.]

Ross supplied other detailed communications on "community well being"

("Citizens United social services {**a good product or service in the marketplace**

}for the "poverty-afflicted-and-Board-limited social service" Metzger school), the

JISD Board's **("government's")** refusal to provide for a free and appropriate

public education for minority kids by denying social services to a school and

community fighting with poverty and the social problems spawned by

impoverishment), and the racially despised naming of the new high school after a

Black Superintendent, Willis R. Mackey **("a public official or public figure")**,

opposed by Bera **(a public official or public figure** )for being unfair to Whites,

and Hispanics, and specifically to JISD Board Member's Arnoldo Salinas' **(a

public official or public figure** ) daughter, suspended Principal and now JISD

Board member herself Dr. Melinda, Dr. Melinda herself **(a public official or

public figure** ), Board Member Renee Paschall **(a public official or public figure**

), and Board Member and public figure Mr. Richard Lafoille **(a public official or public figure )** who was publicized in state media for shooting a gun at a Black family in a car at his LaFoille's Car Wash. a public official or public figure; or a good product or service in the marketplace . In all, by even the rudimentary legislative test of a business oriented civil code TCPA Anti-Slapp, as opposed to the empirical law of the courts, the brief recitation of what Ross answered to Ms. Payne answers the question of examples of what temporally relevant protected speech was engaged in by Ross .

Also protected by the First Amendment are close associations. Willis R. Mackey is a triple whammy in that he represented what Bera ( who was deposed), *and* probably Melinda Salinas, LaFoille, and Salyer apparently most dislike in public education, a Black Male who is a high achiever, aims for a pluralistic teacher corp , to inspire and educate Title I youngsters. Arnoldo Salinas was not served and thus is not a party. The latter three named Board members were not deposed because of scheduling, and Mr. Salyer's health (although Superintendent Montoya recently fresh himself from a "myo infarct" appeared and submitted to the process and a lawyer's health issues, painfully rendering valuable insights into the JISD Board, and Bera, even though his two daughters are Teachers currently employed by the JISD.  For Ross, Mackey was perceived by Bera, Ross' nemesis, to be Ross' blood kin, racial protector and care-taker.

What then is a First Amendment protected association? Again, the TCPA/Texas' Anti Slapp law (presuming as does the Texas Supreme Court that the Texas Legislature carefully chooses its words with understanding and intent), identifies constitutionally protected association as "Exercise of the right of association" to mean "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests."

The United States Court of Appeals for Fifth Circuit, preceding the Texas Legislature's 2011 TCPA, stated the following,

> Although First Amendment protection of social association is not limited to family relationships, it is, at least in many contexts, limited to relationships "that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'"*Board of Directors of Rotary Int'l*, 107 S. Ct. at 1946 (citation omitted). We have held that associations in some private clubs, for example, are protected. *See Louisiana Debating and Literary Assoc. v. City of New Orleans*, 42 F.3d 1483, 1497-98 (5th Cir. 1995), *cert. denied,* 132 L. Ed. 2d 832, 115 S. Ct. 2583 (1995).

> Dickey's motion for summary judgment specified the absence of a material fact--evidence of any kind of intimacy--, and Wallace failed to provide any evidence in response. *See Noyola*, 846 F.2d at 1024 n.2; *cf. Louisiana Debating and Literary Assoc.*, 42 F.3d at 1494 (discussing factors to consider in determining whether private clubs are protected). Further, even if Wallace could have established an abstract First Amendment right of association for some coach-player relationships, the limitations Dickey placed on such a right would be supported by Texas Tech's interest in promoting the efficient coaching of its basketball team. *See Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991) (applying *Pickering* balancing test to free speech claim). The district court did not err in granting [summary judgment in favor of defendants-appellees on this claim.

*Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1051-52 (5th Cir. 1996)

Here, in the perception of Bera and others, Ross was the "nine lives" Principal, the Black "sister" who was shown favorable treatment by the Black Mackey over non-Black employees, and they were suspected by Bera to be blood related since they were Black and  from the same town.

Ross's association with Mackey, especially her supporting his having a High School named after him, supporting his programs and spending the $5,000.00 per year grant to United Communities in the Fall of 2015-2016 school year, which grant had been obtained by former Associate Superintendent Robinson is an association which merits constitutional protection.

The identified speech and associational exercises are protected by the First Amendment, and Ross has endured an adverse action in the loss of her future employment in the District where she was graded as an excellent performer in each of the areas which were generally referenced by JISD to justify Ross' non-renewal. The remaining questions under the First Amendment analysis are whether her protected speech and or protected association were a substantial or motivating cause of her non-renewal and false stigmatization by JISD., and whether but for her exercise of the protected speech and her racial and community, or family association with Mackey, she would have suffered those ignominies. Of those, both are fact questions and defeat JISD's Motion for Summary Judgment. In this

case, Ross *clearly supported* the pluralistic educational program envisioned by

Mackey *and marketed* Mackey's vision by transforming Metzger Middle School

whether with Mackey's and Robinson's hands on help, or by Ross on her own, by

recruiting super-star athletes such as the SPUR'S "00" John Moore [Exh. 13 John

Moore] or the "Glory Road" actor Neville Shed, to teach and mentor Metzger's

students.

> The First Amendment protects the right of all persons to associate together
> in groups to "advanc[e] beliefs and ideas." Put another way, "the [F]irst
> [A]mendment protects the right of all persons to associate together in groups
> to further their lawful interests." When groups gather together for this
> purpose, "it cannot be seriously doubted" that they comprise associations
> protected by the First Amendment. Additionally, "[a] fundamental
> proposition in our constitutional jurisprudence is that government
> employment may not be conditioned upon a relinquishment of a
> constitutional right, including the rights to speech
> and association guaranteed under the First Amendment.

Mote v. Walthall, 902 F.3d 500, 507 (5th Cir. 2018)

**Fourteenth Amendment Due Process**

While Ross does not claim that her term contract can in and of itself supply

an objective expectancy of continued employment in the JISD, that single term

contract certainly can support such an expectancy.

While public employees, especially in public education are less revered in

the halls of the legislature as once upon a time, still, as remarked by Jefferson,

When the Court of Appeals grappled with how fair a governmental body must be when depriving a person—any person—even a public employee of life, liberty or property, they relied on the courts to first define the triggering interests of iberty and property, especially in an educational forum. Since Runnymede due course of law did not distinguish between life, liberty or property. Indictments which divulged the requisite notice which would permit a fair challenge of life or liberty threatening governmental deprivations, were not extraordinary but even minimal, telling the accused who, what, where, when, and why or spelling out the scienter. All of the elements that are currently required of the civil litigant standing as a private attorney general and who takes on government in a First Amendment claim have been accepted as the elements of pillared fairness. To reduce the level of effort to be exerted by state actors or increase the level of discretion which state actors could wield their entrusted power, statements such as "all the process that is due" or "a meaningful hearing". It was into that milieu that the District and Circuit Courts waded in *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970). The appeal court stated,

> The substance of due process requires that no instructor who has an expectancy of continued employment be deprived of that expectancy by mere ceremonial compliance with procedural due process. While he has no right to continued public employment, such a teacher may neither be dismissed or not be rehired for constitutionally impermissible reasons such as race, religion, or the assertion of rights guaranteed by law or the Constitution. This rationale would even apply to a teacher without tenure or an expectancy of reemployment. Pred v. Board of Public Instruction, supra;

Johnson v. Branch, 364 F.2d 177 (4th Cir. En Banc, 1966), cert. den. 385 U.S. 1003, 87 S. Ct. 706, 17 L. Ed. 2d 542 (1967); [**12]  Freeman v. Gould Special School District, supra; *contra*, Jones v. Hopper, 410 F.2d 1323 (10th Cir. En Banc, 1969), cert. den. 397 U.S. 991, 90 S. Ct. 1111, 25 L. Ed. 2d 399 (1970).

In applying these principles to the facts of this case we note that the lower court found that the 15-point "guideline" -- temporary probation document put Dr. Ferguson on notice of the activities on his part that the administration questioned. This however is all that can be correctly said for this procedure. The opportunity that Dr. Ferguson was given to speak in opposition to this document was not a fair opportunity. **The "guidelines" had not been served on him until his arrival at the meeting; this fell short of according him a reasonable opportunity to voice his dissent and opposition. (Emphasis added)**

<u>Ferguson</u>, at 857

Further, the court in *Ferguson* went on to pronounce, albeit some recent

courts have questioned it as dicta,

The rudiments of due process fair play in school administrative proceedings have been well outlined in this circuit with regard to the rights of college students who were subjected to disciplinary suspensions. *HN3* They are entitled to a statement of the charges against them, the names of witnesses, the nature of the testimony of those witnesses and the opportunity of presenting a defense. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961). These same minimum standards are applicable to teachers who have an expectancy of reemployment. However, the standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved.

*HN4* Within the matrix of the particular circumstances present when [**10]  a teacher who is to be terminated for cause opposes his termination, minimum procedural due process requires that:

(a) he be advised of the cause or causes for his termination in sufficient detail to fairly enable him to show any error that may exist,

(b) he be advised of the names and the nature of the testimony of witnesses against him,

(c) at a reasonable time after such advice he must be accorded a meaningful opportunity to be heard in his own defense,

(d) that hearing should be before a tribunal that both possesses some academic expertise and has an apparent impartiality toward the charges. (Note the dictum in Pickering v. Board of Education, 391 U.S. 563, 578, n.2, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).
*Ferguson* at 856

Then came a case frequently and yet cited on various grounds, *Johnson v. San Jacinto Junior Coll.*, 498 F. Supp. 555 (S.D. Tex. 1980). *Johnson* states inter alia,

Plaintiff was demoted from Registrar to history teacher. In order to demonstrate that he was entitled to procedural due process before he could have been demoted, plaintiff must prove that he had a protectible property interest in continued employment as Registrar. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents of State Colleges v. Roth, supra, at 577, 92 S. Ct. at 2699. In Perry v. Sindermann, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972), the Court found that "A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's [**28] claim of entitlement to continued employment unless sufficient "cause' is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a "property' interest in re-employment." Id. 601, 92 S. Ct. at 2699. The Perry Court further explained that a written contract may be supplemented by other agreements implied from custom at the institution, i. e., an "unwritten "common law' in a particular university …." Id. 602, 92 S. Ct. at 2700. See also, Bishop v. Wood, 426 U.S. 341, 344, 96 S. Ct. 2074, 2077, 48 L. Ed. 2d 684 (1976): "A property interest in employment can … be created … by an implied contract." Id. (footnote omitted). Regardless of the source of a property interest, the "sufficiency of a claim of entitlement must be decided by reference to state law." United Steelworkers of America, AFL-CIO v. University of Alabama, 599 F.2d 56, 60 (5th Cir. 1979),

citing Bishop v. Wood, supra.
*Johnson* at 568

Superintendent Montoya recognized the burden on JISD, Hernandez,

Elizondo, or even the Superintendent's office was to be complete and

accurate. [Exh. 11 Depo. Montalvo Pg. 53/8 to 58/8] Montoya further agreed

that the reasons should be reasonably specific and that Ross should be able to

rely on the accuracy of the investigations and the reasons. [Id. Pg. 55/20-

56/28] Here the reasons given to Ross to support the non-renewal were not

reasonably specific and did not constitute constitutionally fair notice; and the

fact that parts of and not  the entire investigation was titrated into evidence

for Ross to see without adequate or reasonable time  to analyze and object

deprived her of a meaningful right to challenge Bera's, Hernandez', Chief

Ramon's and Elizondo's reasons. The fact that the Board opted to go the

Chapter 21 TEC route that denied her subpoena rights prevented her from

producing witnesses such as Hopkins. And the fact that there is significant

reason to believe that Hopkins unavailability or unwillingness or being

withheld from testifying was a ploy to deny Ross access to Hopkins, after all,

Hopkins said that she was given the note to sign and say that she would not

be present at the hearing by JISD's lawyer and didn't know who prepared it.

Further, when looking at the assortment of notes and writing styles attributed to Hopkins and signed by her on February 24, 2016, it is not hard to see others involvement in producing notes for Hopkins to sign in order to inculpate Ross, and become as wary as was Lisa Butler when she objected that JISD's investigation team, specifically Bera was putting words in Butler's mouth to revise Butler's earlier statement.

Once challenged, the accuracy and completeness of the investigation and production of the investigation's results combined become the balance point of the process.

In this case, JISD has a major problem which seems to be dispositive, and that is that state law conditions non-renewal of a contract on consideration of latest evaluations of performance if relevant. Here the Last evaluation of Ross by Associate Superintendent Nancy Robinson on June 11, 2015 was not considered other than being handled and then so dismissively that the signature of Robinson was not even recognized.

*N. Cent. Tex. Coll. v. Ledbetter*, 566 F. Supp. 2d 547 (E.D. Tex. 2006), states,

> Since the Supreme Court's decisions in *Board of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1970) and *Perry v. Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1970), it is settled law that the non-renewal of a non-tenured professor's contract does not invoke the

protection of procedural due process unless the professor shows that she had a property interest in the benefit of continued employment. *See, e.g., White v. S. Park Indep. Sch. Dist.*, 693 F.2d 1163, 1166 (5th Cir. 1982); *Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547, 552 (5th Cir. 1982); *Bradford v. Tarrant County Junior Coll. Dist.*, 492 F.2d 133, 135 (5th Cir. 1974).  [**6] To have a property interest in such benefit, the professor must have more than an abstract need, desire, or unilateral expectation of it. *Roth*, 408 U.S. at 577. She must instead have a "legitimate claim of entitlement" to it deriving from a state or federal statute, municipal ordinance or charter, an express or implied contract, or a contract implied from policies and practices of a particular institution. *Id.*; *see also Cox v. City of Jackson*, 343 F. Supp. 2d 546, 571 (S.D. Miss. 2004).

The operation of these principles is illustrated best by the two Supreme Court cases which established them. The first such case is *Roth*. 408 U.S. at 578. In that case, the Supreme Court held that a non-tenured professor at the University of Wisconsin at Oshkosh did not have a property interest in the renewal of his one-year employment contract where the University, which had employed him for only one year, did have a formal tenure system which he did not qualify for, and where there was no state statute or university rule or policy that secured his interest in re-employment or created a legitimate claim to it. *Id.* at 579. In these circumstances the Court stated, "the [professor] surely had an abstract  [**7] concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give  [*551]  him a hearing when they declined to renew his contract of employment." *Id.*

Alternatively, in a companion case to *Roth*, the Court in *Sindermann* held that a non-tenured professor at Odessa Junior College in Texas did have a property interest in the renewal of his employment where the college did not have a formal tenure system, the professor had served at the college with distinction for ten years, and where the college's official faculty guide stated that: "The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work." 408 U.S. at 601. In such a case, the Court stated:

**A teacher . . . who has held his position for a number of years, might be able to show from the circumstances of his service -- and from other relevant facts -- that he has a legitimate claim of entitlement to job tenure. Just as this Court has found there to be a 'common law of a particular  [**8] industry or of a particular plant' that may supplement**

a collective-bargaining agreement, [citations omitted], so there may be an 'unwritten common law' in a particular university that certain employees shall have the equivalent of tenure. *This is particularly likely in a college or university . . . that has no explicit tenure system even for senior members of its faculty, but that nonetheless may have created such a system in practice.*

*Id*. at 603 (emphasis added).

While the present case appears to reside between *Roth* and *Sindermann*, the court believes that, based on the record before the court, the situation presented is more like that in *Sindermann* than in *Roth*. As an initial matter, like the college in *Sindermann* and unlike the university in *Roth*, the College here has no explicit tenure system even for senior members of its faculty. Pl.'s Ex. A-26 ("The Board may decide by vote or inaction not to offer any employee further employment with the District beyond the term of the contract *for any reason or no reason*.") (NCTC Board Policies) (emphasis added). Similarly, like the professor in *Sindermann* and unlike the professor in *Roth*, Ledbetter had served at the College with distinction  [**9] for a significant period of time, indeed three times that served by the professor in *Sindermann*. Def.'s Ex. 1 at 1. Also as in *Sindermann* and not in *Roth*, the court here finds that the College fostered an "unwritten common law" that certain employees shall have the equivalent of tenure. This finding is informed by a statement made by the College that "[t]ermination and non-renewal procedures *must* contain adequate safeguards for protection of academic freedom" and a statement by Glasscock and the College's Deans that "they believe the evaluation process offers faculty members protection beyond the one-year term." Def.'s Ex. 1 at App. 38; Ex. LLL, App. 194-95 (1999-2000 Institutional Self-Study Report). It is these commonalities with *Sindermann* then, **that have persuaded this court that, at the very least, there is a genuine issue of material fact concerning whether or not Ledbetter had acquired a property interest in having her employment contract renewed for the 2004-2005 academic year.**

In making this observation however, the court is not unaware of the Fifth Circuit's reluctance to recognize similar property interests since its seminal decision in *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970).  [**10] *See, e.g., White v. S. Park Indep. Sch. Dist*., 693 F.2d 1163 (5th Cir. 1982) (finding that the professor had not demonstrated a property interest in continued  [*552]  employment); *Hillis v. Stephen F. Austin State Univ*., 665 F.2d 547 (5th Cir. 1982) (same); *Bradford v. Tarrant County Junior Coll. Dist*., 492 F.2d 133 (5th Cir. 1974) (same); *Skidmore v. Shamrock Indep.*

*Sch. Dist.*, 464 F.2d 605 (5th Cir. 1972) (same); *Singh v. Lamar Univ.*, 635 F. Supp. 737 (E.D. Tex. 1986) (same); *LaVerne v. Univ. of Tex.*, 611 F. Supp. 66 (S.D. Tex. 1985); *Woodward v. Hereford Indep. Sch. Dist.*, 421 F. Supp. 93 (N.D. Tex. 1976); *Chambliss v. Foote*, 421 F. Supp. 12 (E.D. La. 1976) (same). *But see Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679 (5th Cir. 1986) (upholding district court's finding that professor did have a property interest in continued employment); *Lucas v. Chapman*, 430 F.2d 945 (5th Cir. 1970) (finding that a professor's "long employment in a continuing relationship through the use of renewals of short-term contracts was sufficient to give him the necessary expectancy of re-employment that constituted a protectible interest"); *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970) (holding that a non-tenured  [**11] professor may acquire a protectible property interest in continued employment if he has a reasonable expectation of the same); *Yates v. Bd. of Regents*, 654 F. Supp. 979 (E.D. Tex. 1987) (finding that the court could "not rule as a matter of law that plaintiff had no property interest in continued employment").

Every case is unique, and this case is no different. First of all, Ledbetter's service at the College was longer than the service of any professor in any of the cases denying the existence of a property interest. Moreover, the evidence before the court reflects that Ledbetter was held in the highest esteem by her superiors, colleagues and students. Indeed, until she and her husband stated opposition to Glasscock's performing arts center proposal, her record at the College reflects only the most exemplary and dedicated service to both the College and its students. And even when she and her husband did state their opposition to Glasscock's proposal, such opposition was grounded in Ledbetter's belief that it was not in the students' best interest.

For purposes of the procedural due process inquiry, it must be determined whether the procedures employed by the College were sufficient  [**12] to cure any perceived constitutional violation. Under the Fourteenth Amendment, a professor with a property interest in continued employment is entitled to the following minimum due process rights in connection with the termination of his services: (1) to be advised of the cause of the termination in sufficient detail to permit him to show any error that may exist; (2) to be advised of the names and nature of the testimony of the witnesses against him; (3) to be afforded a meaningful opportunity to be heard in his own defense within a reasonable time and (4) before a tribunal that possesses some expertise and an apparent impartiality toward the charges. *Wells v. Dallas Ind. Sch. Dist.*, 793 F.2d 679, 682 (5th Cir. 1986) (citing *Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985)).

In this case, although Bera and Montoya both agree that part of the reason justifying the non-renewal of Ross' claim to future employment in the JISD were Bera's *earlier "write-ups" of Ross* . In truth the "use of earlier write-ups or criticisms made prior to a current term contract period, not specifically permitted by JISD are evidence of arbitrariness.

Ross had protected interests, property in not being foreclosed from future employment opportunities in JISD, unless she had been evaluated each year and the most recent evaluation if relevant had been considered by the Board, and if the reasons for non-renewal were listed -even earlier write-ups in the Board's policies. Chapter 21 Tex. Ed. Code outlines the due process procedures to be afforded to have been afforded to Ross. The topics were there, but no flesh which would have made it possible for Ross to have meaningfully challenged the true causes of the non-renewal. Even Montoya seems to state that had he handled Ross' case - perhaps free from fear of losing his JISD job, or his daughters losing their JISD jobs, he would have made sure there were policies and training.[Exh. 11 Depo. Montoya Pg 79/1 to 6](for denim/jeans that happened on May 30, 2016 [Exh. 48])

When considering the FRCP 56, " **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion."

Here are some of the material questions of fact as to: whether the Board considered the June 11, 2015 evaluation of Ross by Robinson, whether the reasons given for Ross non-renewal were reasonably specific to allow her to meaningfully challenge the non-renewal; whether the reasons given for Ross' non-renewal were legitimate and not pretextual, or whether it was Ross' race that motivated the Board to non-renew her future employment; whether Ross' exercises of speech and association as laid out herein were substantial and or motivating factors of her non-renewal; whether Ross was afforded due process of law.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Ross prays that JISD's denial of subject matter jurisdiction over Ross' Chapter 21 Tex. Lab. Code claims be denied, and that Defendants', Motion for Summary Judgment on Ross' claims grounded in the First and Fourteenth Amendments be denied.

Respectfully submitted,
WATTS & COMPANY, LAWYERS, Ltd.

**/s/ Laurence "Larry" Watts**
Laurence "Larry" Watts
T.B.N. 20981000
P.O. Box 2214
Missouri City, Texas 77459
Tel: (281) 431-1500
Fax: (877) 797-4055
E-mail: wattstrial@gmail.com

*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Larry Watts certify that a true and correct copy of this document has been served on opposing counsel by electronic filing with the clerk of the court, on this the 6th day of September, 2019.

**/s/ Laurence "Larry" Watts**
Laurence "Larry" Watts