# Exhibit

# 11

Ross, Caroline000221JISD

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
CAROLINE ROSS              )
                           )
V.                         ) CA NO. 5:18-CV-269
                           )
JUDSON INDEPENDENT SCHOOL  )
DISTRICT, ET AL            )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

CARL MONTOYA

MARCH 28, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF CARL MONTOYA, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on the 28th day of March, 2019, from 9:17 a.m. to
11:22 a.m., before Holly Wells, CSR, in and for the
State of Texas, reported by machine shorthand, at the
offices of Walsh, Gallegos, Trevino, Russ & Kyle, P.C.,
1020 NE Loop 410, Suite 450, San Antonio, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

RELIABLE COURT REPORTING
(409)832-1776

## Page 2

```
 1              A P P E A R A N C E S
 2  ATTORNEY FOR THE PLAINTIFF:
 3      MR. LAURENCE "LARRY" WATTS
        WATTS & ASSOCIATES, P.C.
 4      POST OFFICE BOX 2214
        MISSOURI CITY, TEXAS  77459
 5      (281) 431-1500
        WATTSTRIAL@GMAIL.COM
 6
 7  ATTORNEY FOR THE DEFENDANT:
 8      MR. CRAIG WOOD
        WALSH, GALLEGOS, TREVINO, RUSS & KYLE, P.C.
 9      1020 NE LOOP 410, SUITE 450
        SAN ANTONIO, TEXAS  78209
10      (210) 979-6633
        CWOOD@WABSA.COM
11  ALSO PRESENT:
12      MS. CAROLINE ROSS, PLAINTIFF
        MR. MARCO GARCIA, ASSISTANT SUPERINTENDENT
13      MR. KEITH MONTGOMERY, MR. WATTS' LEGAL ASSISTANT
14
15
16
17
18
19
20
21
22
23
24
25
```

RELIABLE COURT REPORTING
(409)832-1776

## Page 3

```
 1              I N D E X
                                          PAGE
 2  CARL MONTOYA
 3      Examination by Mr. Watts . . . . . . . . . . . .4
 4  Signature . . . . . . . . . . . . . . . . . . . .83
 5  Court Reporter's Certificate. . . . . . . . . . .85
 6          E X H I B I T S
 7  NO.  DESCRIPTION                              PAGE
 8   1   Campus Accountability Data 2006-2018 . . . . . .4
 9   2   Ms. Ross' Judson ISD Certificate of Appreciation .4
10   3   Motion One and Motion Two. . . . . . . . . . . .4
11   4   Agenda of Regular Board Meeting, May 19, 2016. . .4
12   5   Dr. Chavez's e-mail to Mr. Montoya . . . . . . .4
13   6   Practicum Plan . . . . . . . . . . . . . . . .39
14   7   Principal Appraisal Summary Sheet of Ms. Ross. . 39
15   8   Letter to Ms. Ross from Mr. Montoya, First Page. 39
16   9   Letter to Ms. Ross from Mr. Montoya, Second Page.39
17  10   T?ESS Timeline 2015-2016. . . . . . . . . . . .39
18  11   Ross File . . . . . . . . . . . . . . . . . . .39
19  12   Letter from Mackey to Ross. . . . . . . . . . .39
20  13   Probationary Contract of Ms. Ross . . . . . . .39
21  14   Letter from Black to Ross . . . . . . . . . . .39
22  15   Caroline Ross Summative 2014-2015 . . . . . . .39
23
24
25
```

RELIABLE COURT REPORTING
(409)832-1776

## Page 4

```
 1          (EXHIBIT NOS. 1-5 MARKED)
 2              CARL MONTOYA,
 3  having been first duly sworn, testified as follows:
 4              EXAMINATION
 5  BY MR. WATTS:
 6      Q.   State your name, please.
 7      A.   Dr. Carl Montoya.
 8      Q.   And, Dr. Montoya, my name's Larry Watts.  You
 9  and I've never met, I don't believe.
10      A.   No, sir.
11      Q.   And so you're -- you have -- you don't have a
12  PhD, but you have a doctorate of education?
13      A.   EdD, correct.
14      Q.   And so give me a little bit about your --
15  well, first of all, what is your date of birth?
16      A.   January 27th, 1950.
17      Q.   And where were you born?
18      A.   I was born in a town called Las Vegas,
19  New Mexico.
20      Q.   And where did you attend public schools?
21      A.   That city, Las Vegas, New Mexico.
22      Q.   And when did you graduate?
23      A.   1968.
24      Q.   So upon graduation, what did you do?
25      A.   I ended up going to the University of
```

RELIABLE COURT REPORTING
(409)832-1776

1  New Mexico in Albuquerque as -- getting a degree --
2  well, several degrees there.
3      Q.   All right.  So you got your baccalaureate's
4  there?
5      A.   Bachelor's, master's and an education
6  specialist certificate.
7      Q.   And then what did you do?
8      A.   And then I ended up being a teacher in a town
9  in West Las Vegas.  It had two school districts.  So I
10  taught just less than a year.  Went back.  Got a degree
11  at University of New Mexico and ended up in the
12  Albuquerque public schools as a teacher first.
13     Q.   And so how long were you in the Albuquerque
14  public schools?
15     A.   Probably a total of about six years.
16     Q.   And then what did you do?
17     A.   And then I -- basically, in the process, I got
18  my doctorate down in Las Cruces, New Mexico, New Mexico
19  State University in education.
20     Q.   And then what did you do?
21     A.   And I actually got that while I was a high
22  school principal.  I was a high school principal.
23     Q.   And that was where?
24     A.   In Las Cruces.  Opened a brand new high
25  school, Onate High School.  I was literally the first

1  principal.  Tried to pass the bond, which we did.  And
2  first staff.  First everything.  That's where I was.
3      Q.   And then when did you leave Las Cruces?
4      A.   Well, to be honest, before that, right before
5  that, I was administrator in Gallup-McKinley School
6  District.  And they have a whole reservation right on
7  the border.  Unfortunately -- and I'll say it -- a
8  principal killed the superintendent, and I was there.  I
9  was his assistant principal when all that happened.  And
10  I thought, you know, something -- this is one of a kind
11  in the history of American education when an event like
12  that happens.  Of course, there was a big trial in, of
13  all places, a city called Truth or Consequences in
14  southern New Mexico.  Right after that, that's when I
15  left Las Cruces to open the new high school.
16     Q.   And so when did you come to Texas?
17     A.   Approximately 22 years ago.
18     Q.   And so what was your first position of
19  employment in Texas?
20     A.   Dallas, ISD.  I started as a director for the
21  counseling operations in Dallas, and then the
22  superintendent sent me to --
23     Q.   Would that have been Nolan?
24     A.   No, it was right after.  And what happened was
25  they used me to basically put out fires.  They assigned

1  me different assignments.
2      Q.   Excuse me.  How long were you in the Dallas
3  Independent School District?
4      A.   Approximately -- approximately about seven
5  years, approximately.
6      Q.   And then where did you go?
7      A.   And then from there, I went to Aransas Pass,
8  Texas, near Corpus.
9      Q.   How long were you in Aransas Pass?
10     A.   Approximately -- approximately about six
11  years.
12     Q.   So where were you first a superintendent in
13  Texas?
14     A.   Aransas Pass.
15     Q.   And when you left Aransas Pass, where did you
16  go?
17     A.   I went down too the Valley, Brownsville,
18  Texas.  I got there as an assistant superintendent, and
19  then I was superintendent about five years from there.
20     Q.   Who was superintendent when you were there?
21     A.   It was Hector Gonzales.
22     Q.   And so did you know Mr. Besteiro?
23     A.   No.
24     Q.   Do you know who Besteiro was?
25     A.   No.

1      Q.   He was a long-time superintendent in
2  Brownsville that was very popular down there.
3           So then you were superintendent there in
4  Brownsville for five years?
5      A.   Yes, sir.
6      Q.   And then what did you do?
7      A.   Then from there, I went to Judson.  Then
8  superintendent about three and a half years.
9      Q.   And until you retired?
10     A.   Yes.
11     Q.   Now, tell me how is the -- how is retirement
12  calculated?  It's the two best years of your salary?
13     A.   No.  I think it's the three.
14     Q.   Three best years?
15     A.   I believe, I think.
16     Q.   So you finished out your three best years at
17  Judson?
18     A.   Yes.
19     Q.   And education -- is your wife a teacher?
20     A.   No.  She was a clerk, secretary in special ed
21  for about 25 years.
22     Q.   And did she ever work at Judson?
23     A.   No.
24     Q.   But she did work at Brownsville?
25     A.   Yes.

## Page 9

1   Q.   And you have two daughters?

2   A.   Correct.

3   Q.   And they're teachers?

4   A.   They're both teachers.

5   Q.   Are they teaching in Judson?

6   A.   Yes.

7   Q.   And when did they start teaching in Judson?

8   A.   Right after I got there.  Right after I got

9   there.

10   Q.   So I guess they had friends in high places?

11   A.   Well, their skill level.  One is heavy duty

12   special ed teacher, life skills.  I mean, there's not a

13   massive population rushing to be a life skill teacher,

14   plus she's a coach.  And the other one was in law

15   enforcement.  She was a probation officer and then

16   eventually became a teacher in Brownsville in that area,

17   criminal justice and all that.

18   Q.   What does she teach here?

19   A.   Criminal justice, different classes.

20   Q.   At Judson?

21   A.   Yes.  Judson ISD.

22   Q.   So when did you arrive in Judson?

23   A.   Well, it would have been four -- what, about

24   four years ago.  So if you'd subtract out of 2019, I

25   guess about, what, 2015, 2014, somewhere there.

## Page 10

1   Q.   Well, so you came on the heels of

2   Willis Mackey?

3   A.   Correct.

4   Q.   And I think Dr. Mackey was superintendent

5   through the -- through -- through the school year of

6   2014-15?

7   A.   I believe so.  I'd have to look it up, but I

8   believe so.

9   Q.   Now, have you ever given your deposition

10   before?

11   A.   No.  Not for this case.  I've given seven

12   depositions and been to court three times including a

13   murder of a superintendent.  So that background.

14   Q.   So far that hasn't happened here.

15   A.   No.

16   Q.   And nor have any lawyers been fearful, I

17   think, at this point.

18   A.   44 years is what I put in education.  Ten

19   years principal, 15 as a superintendent and 44 total.

20   It was time for me to retire.

21   Q.   Well, I don't know.  I've been doing this for

22   51 and a half years, and I enjoy it.  So I'm not going

23   to give it up.  The -- as long as there are issues like

24   this to deal with, I pray God gives me the strength to

25   deal with them.

## Page 11

1   A.   That's good.

2   Q.   The -- to the point, though, when you arrived

3   at -- when you arrived at Judson Independent School

4   District, what was the status of the district?

5   A.   It was going well, I think.  I think

6   Dr. Mackey, my opinion of course, I think overall he was

7   doing a good job.  I mean, I understood he had upset

8   some people, board members and certain administrators, I

9   guess.  That was his style.  You know, he upset them.

10   But I didn't use any of that in any way.  I just said,

11   well, that's the past.

12   Q.   Who did he upset on the board?

13   A.   I don't know, but that's what I heard is that

14   he had some people he'd upset.

15   Q.   Did you hear who he had upset on the board?

16   A.   No.

17   Q.   Did you hear who in the administration he had

18   upset?

19   A.   Well, some principals is what I heard, at

20   meetings, his style of leadership and stuff.

21   Q.   Did he upset Elida Bera?

22   A.   I think he did.  I think he did, but I don't

23   know the specifics.

24   Q.   Yeah.  So did she ever talk to you about

25   that?

## Page 12

1   A.   Not really, other than they were not the best

2   of friends; but she didn't really elaborate.

3   Q.   He had removed her -- some of her duties at

4   one time?

5   A.   That's what I heard, yes.

6   Q.   For instance, she had been a middle school

7   assessor and had been the supervisor of Ms. Ross.  And

8   he had, I think she told us -- we were down in

9   Kingsville the other day.  And I think she told us that

10   he had reassigned some of those duties so that

11   Nancy Robinson took over.

12   A.   That's correct.

13   Q.   And did -- when you got there, though -- and

14   so -- when you got there to Judson, it was -- its

15   academic status was what?

16   A.   Well, it was acceptable and above, and above.

17   Yeah, depending on the schools and -- some of them did

18   very well, and then there were others that were right on

19   the edge.

20   Q.   But there were none that were --

21   A.   Not that I'm aware of.  Not that I'm aware of.

22   Q.   And the -- what was the fun balance like?

23   A.   It was -- what I understand, it was okay, but

24   there was going to be issues.  You know, the CFO, who

25   retired from there also, as we talked over time, said

Page 13

```
 1   that things had -- you know, we were losing enrollment
 2   to the charter schools.  The State, IE the State of
 3   Austin, was not funding, of course not just Judson, but
 4   in general.  So I think it was acceptable; but as I
 5   visited with our CFO -- which same CFO -- before I got
 6   there, he was already saying things are coming, things
 7   are not good.
 8       Q.   And his name?
 9       A.   Jose Elizondo.
10       Q.   Jose Rangel Elizondo, Jr.
11       A.   I don't know what his middle name is.
12       Q.   Okay.
13       A.   I just know Jose Elizondo.
14       Q.   And so did he retire, as well?
15       A.   Yes, sir.
16       Q.   When did he retire?
17       A.   I believe this fall.  I think December-ish
18   this last fall.
19       Q.   So the -- of course you probably recall back
20   in 2011 when the not overly wise legislature of the
21   state of Texas ripped 4 billion dollars --
22       A.   Correct.
23       Q.   -- 5 billion dollars out of the educational
24   fund?
25       A.   Correct.
```

Page 14

```
 1       Q.   I think they did that for practice.
 2       A.   Well...
 3       Q.   So then the school, though, the fun balance
 4   was solid and stable.  It wasn't -- there might be
 5   problems on funding in the future, but when you got
 6   here, you had no financial problems and you had a stable
 7   staff and you had --
 8       A.   Other than predictions were it was already --
 9   our enrollment had dropped a little bit, again, it
10   appeared to charter schools, you know, that type of
11   thing.
12       Q.   Yeah.
13       A.   So already when I walked in, that was -- the
14   enrollment was dropping.
15       Q.   And so you selected Judson.  And what drew you
16   to Judson?
17       A.   It began with, first of all, my daughter went
18   to St. Mary's University.  So I used to come all the
19   time to San Antonio.  And, over time, I just said, you
20   know, this is a nice city.  And then I heard Judson was
21   a good district.  Of course, athletically, what can I
22   say, a powerhouse in Texas.  But it wasn't because of
23   that.
24       Q.   Yeah.
25       A.   That was maybe a side product.  But it was
```

RELIABLE COURT REPORTING
(409)832-1776

Page 15

```
 1   just a good district.  And what I had heard was there
 2   were good people.  And I'd go to conferences, meetings
 3   here in San Antonio and Austin, and, you know, if the
 4   opportunity ever presented itself, that I could apply
 5   and see if there was a possibility.  And so that's kind
 6   of the background.
 7       Q.   What were the demographics like in Judson when
 8   you arrived?
 9       A.   It's --
10       Q.   Amongst the students.
11       A.   It's mostly Hispanic, I mean heavy Hispanic.
12   It's about -- and, again, this is just an estimate.
13   It's about 60 percent Hispanic, about 20 -- less than
14   20 percent African American, about less than 20 percent
15   white, if you use that in a generic way.
16       Q.   Yeah.  And so what was your -- what was your
17   faculty like, your professional educators?
18       A.   I think, what I heard and what I saw, it was
19   heavy white, to be honest.  It was heavy white.
20       Q.   Disproportionately white?
21       A.   Well, I don't know if it's disproportionate;
22   but it was more whites, you know, that type of thing.
23       Q.   Uh-huh.  And what did you attribute that to?
24   To what did you attribute that?  I'm sorry.
25       A.   That, I don't know.  I mean, obviously there
```

Page 16

```
 1   was a former superintendent who was African American.
 2   But, you know, outside of that, I don't know if it was
 3   the applicant pool or what it was.
 4       Q.   Or the board?
 5       A.   Or the board or, you know -- and, again, you
 6   have to go with what the applicant pool looks like.
 7       Q.   Yeah, you do.
 8       A.   Some people will apply.  They like the
 9   district or they think salaries are worse or better.
10   You know, there's a lot of factors.  A lot of factors.
11       Q.   Now, when you took over, both Willis Mackey,
12   who had been superintendent, and Nancy Robinson, I
13   understand, had resigned the same night.
14       A.   Yeah.
15       Q.   Is that your recollection?
16       A.   Something like that.  I know they were very
17   good friends.  They also had kind of a company together
18   that they did out in schools; they would get hired to do
19   certain presentations.  And so they were very close, but
20   I don't remember when they resigned.
21       Q.   Well, is it -- is my recollection accurate
22   that Nancy Robinson was a professor at Trinity?
23       A.   Correct.
24       Q.   Is she still there?
25       A.   That, I don't know.  I'll be honest, I don't
```

RELIABLE COURT REPORTING
(409)832-1776

Electronically signed by Holly Wells (201-190-228-3461)
Electronically signed by Holly Wells (201-190-228-3461)

Page 17

1  know.
2      Q.   And she had a -- she and Dr. Mackey formed
3  some form of --
4      A.   Yes.
5      Q.   -- as you say, a partnership or business --
6      A.   Correct.
7      Q.   -- where they consult with school districts?
8      A.   Correct.
9      Q.   Principally low performing school districts?
10     A.   Correct.
11     Q.   And so under Nancy Robinson and
12 Willis Mackey's leadership, Judson had become sort of a
13 show place, had it not, for success in --
14     A.   Well, it was successful, but as far as
15 San Antonio ISD schools, it was somewhat comparable to
16 several.  And, of course, there were some ahead of
17 Alamo Heights and certain northeast schools that were
18 ahead of Judson.
19     Q.   And so you had five middle schools?
20     A.   I believe so, yes.
21     Q.   And amongst those five middle schools, you
22 had -- those five principalships, you had five
23 principals.  What were their races?
24     A.   They were probably on the heavy side Hispanic
25 or white.

Page 18

1      Q.   And how many African Americans did you have?
2  You had Ms. Battle?
3      A.   Yes.
4      Q.   And you had Ms. Ross?
5      A.   Ms. Ross, correct.
6      Q.   And so the -- by the way, when you got here,
7  what was Elida Bera's position, her assignment?
8      A.   She was executive director.  Just -- I mean,
9  she had several assignments.  Executive director of
10 schools, if you will, but she had several duties.
11     Q.   How did you -- how did you use her?  What did
12 you --
13     A.   I ended up having her -- because she had
14 direct contact with the schools.  She was out there much
15 more than I was visiting campuses, even though I visited
16 campuses.  So she kind of was the general supervisor, if
17 you will, of a lot of the principals that were out there
18 at the campus level.
19     Q.   She was your -- she was your designee in the
20 field?
21     A.   Correct.
22     Q.   So that then she would come back and report to
23 you how the principals were doing?
24     A.   That would be correct, from that angle.
25     Q.   And so that if there were any -- any

Page 19

1  recommendations that had to do with discipline actions
2  regarding principals, you looked to somebody to guide
3  you?
4      A.   I would, if it had to do with general
5  operations and curriculum, correct.  If it was finance,
6  I would depend very heavily on the CFO.
7      Q.   Elizondo?
8      A.   Yes, sir.
9      Q.   And so the leadership of Judson was
10 principally, then, you as the general superintendent;
11 and then on the academic side, Bera; and then on the
12 financial side, Elizondo?
13     A.   Yes.  But we also had a couple of other
14 directors in curriculum because curriculum and finance
15 are really the bottom line in education in a public
16 school.  So I had some other directors that would work
17 the curriculum piece.
18     Q.   Now, was Bera a director?  Or was she --
19     A.   She was an executive director and then went
20 from there.
21     Q.   Okay.  And so the other directors, did they
22 report directly to you?  Or did they report to Bera?
23     A.   We would meet weekly literally.  We would meet
24 weekly where they would go through, we hope, positive
25 issues, which sometimes there was obviously, or any

Page 20

1  negative things that they might see as they were out
2  doing their jobs, curriculum, finance, et cetera, et
3  cetera.  So every week we had a meeting and you call
4  that the cabinet meeting.
5      A.   Yes.
6      Q.   And so the cabinet was composed of the
7  directors -- you, the directors and the CFO?
8      A.   Yes.
9      Q.   Okay.  Now, you would -- you also had interns
10 that were working on their superintendents'
11 certificates, right?
12     A.   The -- I had -- I can't remember the number --
13 probably three or four that were out there.  And they
14 would ask, Can we sit in on a cabinet meeting?  And as a
15 general rule, I had no issues with that, except every
16 now and then, there'd be some confidential discussion
17 on an issue at a campus.  I would say they would not sit
18 in one of those.  But if it was something general, to
19 me, there was not an issue because sometimes we could
20 get information from the intern that would help us.
21 But, at the same time, you want to groom a future
22 generation, we hope.
23     Q.   Of leadership?
24     A.   Of administrators, yes.
25     Q.   And one of those interns or mentees was

Page 21

1  Caroline Ross, right?
2      A.   That's correct.
3      Q.   So when did you first meet Caroline Ross?
4      A.   In probably -- obviously it would have been at
5  one of the beginning-of-the-year principal meetings that
6  we had once a month.  So it would probably be there.
7  And then I would go to her campus.  You know, I'd visit
8  several campuses.  Just talk to her.  See how things
9  were going.  Plus, I liked the fact, to be honest, that
10  she spoke Spanish.  So we would have some nice practice
11  conversations in Spanish.  So it was -- it was good that
12  way.
13      Q.   And so with regard -- did she seem to
14  assimilate well with the Hispanic students, the Hispanic
15  population?
16      A.   I believe so.
17      Q.   I understand, from talking with Ms. Bera, that
18  Ms. Ross was a very proficient disciplinarian and ran a
19  tight ship at her school?
20      A.   That's correct.
21      Q.   And, of course, that's the key to learning,
22  isn't it, discipline?
23      A.   Yes.  You've got to have good discipline, yes.
24      Q.   So I wanted to talk about some of your -- the
25  cabinet meetings.  Did -- did Ms. Bera ever say anything

Page 22

1  to you about Caroline Ross being present in a cabinet
2  meeting?
3      A.   I don't think so.  I don't recall, to be
4  honest, but I don't think so.
5      Q.   I was thinking that -- and both Mr. Garcia and
6  Mr. Wood were present with a court reporter when we
7  talked to Ms. Bera, but I was thinking Ms. Bera said
8  that she was surprised when Caroline Ross was in a
9  cabinet meeting?
10      A.   And I don't -- I don't recall.  She may have
11  been.  She may not have been.  I don't recall.
12      Q.   And by the way, have -- did you have any hand
13  in selecting who would be an intern?
14      A.   No.  Usually the intern would sign up at a
15  university for a class and -- or graduate-type stuff,
16  and I guess their professor would tell them that they
17  had to do certain pieces.  And then, of course, at that
18  point, after the fact, they would come and visit with me
19  and say, Can we do these things?  And the intern might
20  come to meetings or they needed a project of some kind.
21  And, you know, again, that was tied, I believe, to their
22  university program, I think.
23           MR. WATTS:  All right.  Hold on just a
24  moment.
25           (DISCUSSION OFF THE RECORD)

Page 23

1      Q.   By the way, do you know Billy Reagan,
2  Dr. Billy Reagan?
3      A.   I don't recall, but I suppose if I visually
4  saw him because sometimes I go to meetings.
5      Q.   He's changed a little bit over the years.
6  He's 88, but he was -- he was superintendent at
7  Alamo Heights years ago.  And then he was deputy
8  commissioner of education under one of the presidential
9  administrations back in the Seventies.  And then he was
10  in Houston for 12 years.  He was the longest serving
11  superintendent that Houston has had in the last -- I
12  guess in the last two centuries or the last century and
13  a half.  So I was just thinking, Ms. Bera had knew him
14  and I thought you might.
15      A.   No, I don't recall.  I met him maybe at a
16  meeting some time or a conference, but I don't recall.
17      Q.   They named a school after Dr. Reagan?
18      A.   Okay.
19      Q.   He's a reading expert.
20      A.   Okay.
21      Q.   And still doing research in the area.
22           So when you -- well, can you identify
23  Montoya 5?
24      A.   Identify?
25           MR. WATTS:  And I don't have a copy, but

Page 24

1  we can make a copy of it.  It's not one from the -- that
2  you've produced.
3      A.   Yeah, I know Dr. Chavez very well.  He was
4  obviously a superintendent, several districts.  I
5  believe he retired, and he would come by on a couple of
6  interns.  I think we had two or three that he -- and I
7  don't know if he supervised or something like that.
8      Q.   Do you recall that Dr. Chavez wrote you that
9  e-mail to introduce to you Caroline Ross as --
10      A.   I'm sure he did, but I just don't recall
11  offhand.
12      Q.   Okay.  But you don't dispute its
13  authenticity?
14      A.   No.
15      Q.   So now was Caroline -- how would that
16  mentorship work?  How would a -- would Caroline -- would
17  she shadow you?
18      A.   The door was open for that if she wanted to
19  did that.  But at the same time, I believe they were
20  given some projects or something like that that they had
21  to do either on their campus, their community or the
22  district level; but I don't remember offhand what her
23  project was.  I'm sure she was doing something, I know,
24  but I don't know what it was.  I don't remember.
25      Q.   Dr. Chavez says in this e-mail, that he wrote

1  to you and copied Caroline and Donald Stewart on, he
2  said, My name is Jesus H. Chavez.  And I'm fortunate to
3  be the Texas State University supervisor for
4  superintendent interns, Carolyn Ross and Donald Stewart,
5  during practicum this year.  What is a practicum?
6      A.  It's supposed to be actual activity of some
7  kind, but that's a huge definition of what a practicum
8  looks like.  But basically it's not research, totally,
9  or reading, even though that may be part of it; but it's
10  doing something of some kind.
11      Q.  He went on to say, I'm looking forward to
12  meeting you and working with Carolyn, David -- Donald,
13  excuse me, to ensure they have a meaningful, productive
14  internship that serves the need of Judson ISD in the
15  process.
16          Now, my question is:  What needs of
17  Judson ISD did the interns, Carolyn Ross and
18  Donald Stewart, serve?
19      A.  It would come from two angles.  One angle
20  would be the practicing administrator.  For example, a
21  campus might say to me, I notice these are some issues,
22  weaknesses.  And I would ask them, Maybe you could
23  develop a project or an activity tied to resolving that
24  type of thing.  From my perspective, the two things I
25  always harped on was trying to do well on test scores.

Electronically signed by Holly Wells (201-190-228-3461)
Electronically signed by Holly Wells (201-190-228-3461)          caas7f88-730c-43e1-ee8f-c0a77f3acb4b

1  I mean, that's all a given.  I hate to say it.  It's
2  across the state.
3      Q.  Right.
4      A.  The other one was get your -- if you will,
5  student attendance, make sure that's up there, because
6  we get funded.  One way of funding for the schools is
7  that part.  So that was another one.  And then my other
8  theme was try to work with your parents in a very
9  positive way, your population on your campus, that type
10  of thing.  So those are my themes, but the intern might
11  create a project tied to those three.  But at the same
12  time, they might create a project that was more unique
13  to their campus, their needs at that campus, because
14  obviously campuses sometimes are similar, but they're
15  also different.
16      Q.  Do you happen to recall what Carolyn Ross's
17  project was?
18      A.  I hate to say this.  No, I don't recall.
19      Q.  Then Dr. Chavez went on to say Carolyn and
20  Donald will be in contact with you soon about the
21  practicum expectations, but I also wanted to make
22  contact and share the syllabus with you, which you will
23  find attached.  Within the next few weeks, once you have
24  school under way, Carolyn, Donald and I will schedule an
25  initial meeting with you to discuss the practicum

Electronically signed by Holly Wells (201-190-228-3461)          caas7f88-730c-43e1-ee8f-c0a77f3acb4b

1  requirements and finalize their plans.  Did he do
2  that?
3      A.  Yes.  He was there and we met, yes.
4      Q.  He then goes on to say:  In the meantime,
5  attached please find the practicum syllabus which
6  includes the expectations of the superintendent mentor.
7  Now that's you, right?
8      A.  Yes.
9      Q.  I hope you have a great start to the year.
10  Thank you for agreeing to be Carolyn's and Donald's
11  mentor through this process.  I am looking forward to
12  supporting you and Lee in this work.
13          Now Lee is?
14      A.  Who's Lee?  I don't recall offhand.
15      Q.  Okay.  So now Dr. Chavez, he's a PhD?
16      A.  Correct.
17      Q.  And highly respected?
18      A.  Correct.
19      Q.  So now did he -- did he, from time to time,
20  get reports from you about how Ross and Stewart were
21  doing?
22      A.  He would more or less come by.  He would
23  visit.  I guess he had a set of interns in several
24  school districts is what I understand.  But he would
25  come by and take a short time to talk verbally about

Electronically signed by Holly Wells (201-190-228-3461)
Electronically signed by Holly Wells (201-190-228-3461)

1  interns or how they're doing.  Is there any problems?
2  Or just in a generic-type conversation.
3      Q.  And did you ever report to him that there were
4  any problems -- now this started in August of 2015.  So
5  that would have been Caroline Ross's last year at the
6  district, '15-'16, right?
7      A.  I believe so.
8      Q.  So did you ever tell Dr. Chavez that there
9  were any problems that you were aware of regarding
10  Ms. Ross's internship or her leadership?
11      A.  I don't recall, in general, talking about
12  that.  I think maybe after -- and I'm going to say after
13  the fact.
14      Q.  After she had been fired?
15      A.  Yes.
16      Q.  Or non-renewed?
17      A.  Then I reported to him, Here's what happened,
18  you know, that type of thing.  But before, no.
19      Q.  Have you had any -- any communications --
20  anyone in education reach out to you since Ms. Ross was
21  involuntarily separated from Judson asking you for
22  recommendations on her?
23      A.  I think I had one.  I believe I had one, but I
24  can't remember.  The problem -- and I'm going -- you
25  know, we're being honest here.  The problem was I was

Electronically signed by Holly Wells (201-190-228-3461)
Electronically signed by Holly Wells (201-190-228-3461)          caas7f88-730c-43e1-ee8f-c0a77f3acb4b

Page 29

1  still superintendent.  The board had approved her
2  firing.  I believe -- and this is my thought -- that if
3  I had done that reference, it would have jeopardized me
4  and my job.  Because the board:  Here's the decision.
5  Why are you doing this?  You know, that type of thing.
6       Q.   Why are you giving her a positive reference?
7       A.   Yes.
8       Q.   But you would have given her a positive
9  reference?
10      A.   Well, I think, overall, she was a good
11 principal.
12      Q.   Thank you, sir.  Thank you, sir.  I wanted to
13 show you something else, if I may.  Not that, sir.  But
14 here.  I've got a series of documents that you will
15 probably recognize.
16           MR. WATTS:  And, again, Craig, would you
17 like to take a break --
18           MR. WOOD:  Why don't we take a break so
19 we can get copies of whatever we need.
20           MR. WATTS:  Why don't we do that.  Let's
21 do that.
22           (BREAK FROM 9:50 A.M. TO 10:00 A.M.)
23      Q.   (By Mr. Watts)  So I'm going to read you some
24 names.
25      A.   Okay.

RELIABLE COURT REPORTING
(409)832-1776

Page 30

1       Q.   And I'm going to ask if these names -- well,
2  you remember the name Jerome Johnson?
3       A.   Yes.
4       Q.   Jerome Johnson was black -- or is black?
5       A.   Correct.
6       Q.   And was a head principal?
7       A.   Correct.
8       Q.   Dan Brooks, black?
9       A.   Correct.
10      Q.   Head principal?
11      A.   Yep.
12      Q.   Ted Haynes?
13      A.   Yes.
14      Q.   Black?
15      A.   Correct.
16      Q.   Head principal.  Tracey Valree?
17      A.   Correct.
18      Q.   Black, head principal?
19      A.   Correct.
20      Q.   And Mary Toppen?
21      A.   Okay.
22      Q.   Black and head principal, correct?
23      A.   Correct.
24      Q.   Now, let me ask you.  Did those people --
25 those were all head principals in the Judson district at

RELIABLE COURT REPORTING
(409)832-1776

Page 31

1  the time you came in?
2       A.   Correct.
3       Q.   Did -- did they leave after the first year
4  that you were there?
5       A.   It's a combination, I think.  If you really --
6       Q.   Or are they still there?
7       A.   Couple of them are still there, Haynes and
8  Valree.  Valree replaced Carolyn at Metzger.  That's
9  where we put her.  She's still there.  Mr. Haynes is
10 still there.  The other ones, it was a combination of,
11 partly, I think, in talking to them, they wanted to
12 leave, but also at least one of them -- at least one --
13 and I don't want to get one-on-one here because this is
14 not about them.  There were some issues, to be bluntly
15 honest.
16      Q.   Did -- did Ms. Bera -- by the way, you've --
17 you have been -- you've probably experienced
18 discrimination in your own professional life.
19      A.   Yes.
20      Q.   Discrimination because of the fact that you're
21 Hispanic?
22      A.   Correct.
23      Q.   And so have you ever seen levels of racial
24 animus between not only Anglos or whites and Hispanics
25 but also African Americans, blacks, and Hispanics?

RELIABLE COURT REPORTING
(409)832-1776

Page 32

1       A.   Oh, yeah.  I've seen that.
2       Q.   And of course that's something that -- I guess
3  that's America's constant challenge?
4       A.   Unfortunately, yes.  It shouldn't be that way,
5  but that's the reality.
6       Q.   Did you ever sense that Ms. Bera was racist?
7       A.   No, not at all.  She was just kind of black
8  and white on issues.
9       Q.   That's what I mean, black and white.
10      A.   Well, no, not racist, though.  You follow this
11 rule or you don't follow it.  There's no gray area.
12      Q.   Did she ever tell you that -- by the way, have
13 you ever heard -- have you ever heard the black jargon,
14 the terms "bro" or "sister" or "brother" or "sister"?
15      A.   Oh, yeah.
16      Q.   Now, I don't hear those terms in Hispanic
17 culture.  Do you?
18      A.   Not really.  There's some other phrases which
19 are probably similar, but not that.
20      Q.   And one of the things that I noted about
21 Ms. Bera, one of several things that I noted about
22 Ms. Bera when I first met her, she recalled four or
23 five, six years ago that Willis Mackey had recruited a
24 retired African American superintendent to come to
25 Metzger.  And according to her spontaneous recollection

RELIABLE COURT REPORTING
(409)832-1776

## Page 33

1 was Mackey said that he did so to get this man to help
2 the sister, talking about Caroline Ross as the sister.
3 Now, when she said that, it just sort of hit me that
4 that was a very racial term. Sister is a racial term.
5 Wouldn't you agree?
6 A. Well, again, how is it used? How was it used?
7 Q. To help the sister.
8 A. In that story, I'm not at all familiar with
9 it, to be honest. That one, I don't know a thing about.
10 Q. Well, I'm not going to probe you on that.
11 Then she said that -- another thing, that
12 Mackey thought she was black, thought Bera was black or
13 had African American blood because she came from
14 Louisiana. And that was -- that was, apparently -- the
15 way she said it, sort of extemporaneously just throwing
16 it on the table, it seemed that she was sort of offended
17 by that. Did she ever mention that to you?
18 MR. WOOD: Objection; form.
19 A. No. She never mentioned any of that at all,
20 at all.
21 Q. And then she mentioned that -- in one of her
22 answers, that Mackey seemed to, as she thought about it,
23 favor African Americans over Hispanics. Did she ever
24 comment about that to you?
25 MR. WOOD: Objection; form.

## Page 34

1 A. Not to me, she didn't.
2 Q. Did you ever hear anything about that about
3 Mackey?
4 A. No.
5 Q. Now, did Bera ever give you any -- okay. So
6 when you came here, Nancy Robinson and Mackey are up and
7 gone?
8 A. Correct.
9 Q. And so that leaves you with a little bit of a
10 structure vacuum?
11 A. Uh-huh.
12 Q. And you had to try to plug those holes,
13 right?
14 A. Correct.
15 Q. You might want to hand me those for just a
16 second.
17 A. (Tendering.)
18 Q. Thank you.
19 A. No, that's correct.
20 Q. And so you didn't know Ms. Bera before you
21 came here?
22 A. Never knew who she was, correct.
23 Q. And so you interviewed with her probably and
24 learned that at one point in time she had done all the
25 assessments on the principals?

## Page 35

1 A. Correct.
2 Q. And so what you did is reinstated her to
3 that prior role?
4 A. Correct.
5 Q. And so that in '15-'16, your first year,
6 and -- after Mackey's departure, Bera then became the
7 person who would supervise or assess all the principals,
8 including Caroline Ross?
9 A. Correct.
10 Q. Now -- and so you would, you were looking to
11 make sure that the district lost no ground? That was
12 your --
13 A. In general, yes.
14 Q. And, number two, to try to increase the
15 enrollment?
16 A. If possible, yes.
17 Q. And, number three, stabilize the staff and the
18 faculty so that there would be as little turnover as
19 possible?
20 A. And, actually, there was another one. We were
21 in the middle of trying to pass bond issues. So there
22 was --
23 Q. Boy, that's a daunting task for a brand new
24 superintendent, wasn't it?
25 A. And I had to pass two of them. When I was

## Page 36

1 there -- thank God it happened -- we were able to pass
2 two bond issues. And you're right; that is a very
3 difficult area for obviously many reasons. I mean, the
4 public doesn't want their property taxes up. There's
5 issues. But we were fortunate in being able to pass
6 those two bond issues.
7 Q. Usually you're going to see superintendents do
8 that after they've been in a district for a number of
9 years?
10 A. Correct.
11 Q. Because that becomes a marketing tool for them
12 to be able to go into another district?
13 A. And it was kind of an immediate. As soon as I
14 walked in the door, that was a priority kind of thing.
15 Q. That could have made you a one-year
16 superintendent?
17 A. Yes, correct. Good point.
18 Q. So did -- and that was -- that was a pretty
19 big task, I imagine, having to go into the community and
20 talk to the different service clubs and --
21 A. Yes.
22 Q. -- organizations to tell them why it was
23 necessary for the school district to have a bond
24 issue --
25 A. That's correct.

## Page 41

1  non-renewal or, as you say, termination -- I've said it,
2  too -- the non-renewal or termination of
3  Caroline Ross?
4      A.   Only at the very end when, in all honesty, the
5  CFO's team had, quote, unquote, done their
6  investigation.  I believe somebody from HR also went
7  over there.  And I don't know if it was -- I know it
8  wasn't Mr. Garcia.
9      Q.   Irma?
10     A.   Yes.  Irma Hernandez, who's interestingly
11  working with Clark County in Las Vegas, Nevada, but
12  that's a different issue.  Anyway, she went as a
13  director.  And then we had, I believe, our police
14  department send somebody, our district police
15  department.  So when all of that was on the table, the
16  recommendation was there.  And I believe Ms. Bera said,
17  Yeah, this is probably what needs to happen.  But
18  outside of that, it was at the very end, if you will,
19  that -- that issue.
20     Q.   I'm interested in that because I think
21  Ms. Bera said she made no recommendations one way or the
22  other regarding Ms. Ross's employment?
23     A.   And I don't recall the specifics.  But, again,
24  it would have come because several groups went over
25  there and said, Here's what we found and we verified the

## Page 42

1  evidence and double verified and all of the above and
2  here it is.  So...
3      Q.   Of course, at the end of the day, there -- and
4  you're talking about the audit?
5      A.   The audit and -- yeah, investigation audit,
6  whatever term you want to use.
7      Q.   So -- but I understood at the end of the day
8  that there were no missing or unaccounted for monies?
9      A.   Well, I don't know.  What I got was there were
10  issues with money and signing, I guess, of checks.  I
11  don't know the specific.
12     Q.   That's right.  Were there any charges pressed
13  against Lauren Hopkins?
14     A.   Not that I --
15     Q.   Do you remember the name Lauren Hopkins,
16  secretary to --
17     A.   No.  No, I do not recall any of those --
18     Q.   All right.  Lauren Hopkins was the young
19  secretary to Ms. Ross, and a school secretary also
20  serves as a school book keeper, correct?
21     A.   Correct -- well, it depends.  Some, yes, and
22  others they have a direct book keeper.  So yes.
23     Q.   But at Metzger, it was your understanding that
24  Ross's secretary was also the school book keeper?
25     A.   I believe so.

RELIABLE COURT REPORTING
(409)832-1776

## Page 43

1      Q.   Yeah.  So was anything done with regard to --
2  by the way, do you recall that it was Lauren Hopkins who
3  signed Ms. Ross's name?
4      A.   I believe I was told a secretary that was
5  signing.  They weren't supposed to be signing or
6  something like that, from the CFO.
7      Q.   Were there any charges ever filed against the
8  secretary?
9      A.   I don't recall, but I don't think so.  But I
10  don't recall.
11     Q.   Was she terminated?
12     A.   I don't know.  I don't know.
13     Q.   Did the -- did you ever hear any information
14  about any of the interviews that had been conducted, if
15  any, with the secretary?  And I think the secretary's
16  name is Lauren Hopkins.  I think she lives here in
17  San Antonio.
18     A.   I did not.  The only thing I got was at the
19  tail end -- at the end.
20     Q.   After the termination?
21     A.   No.  Right before.
22     Q.   Right before.
23     A.   The recommendation, in general, this is what
24  has been happening that shouldn't have been happening,
25  that is probably illegal and it didn't follow, I guess,

## Page 44

1  district policy and procedures.  At that point, after
2  they did their audit investigation, here's the
3  recommendation.  Here it is.
4      Q.   And do you -- do you recall who presented that
5  information to you?
6      A.   It would have been more one on one.  I
7  believe -- and I can't remember, but I think it was
8  Mr. Elizondo or somebody from his office, the business
9  office, but they're the ones that did this initial --
10     Q.   Ms. Bera?
11     A.   Well, I know she went over there, but I don't
12  recall specifics on her.  I just remember the business
13  piece.
14     Q.   Mr. Ruso with this office?
15     A.   I don't know.  I don't recall.
16     Q.   So now I'm going to hand to you what's been
17  marked Montoya 6.  This is sort of a thick little
18  packet.  And I want you to look through it and see if
19  you can identify it, please.
20          MR. WOOD:  Which packet is it so that I
21  can likewise --
22          MR. WATTS:  The practicum.
23          THE WITNESS:  Practicum.
24          MR. WOOD:  Mr. Watts, has this material
25  been disclosed?

RELIABLE COURT REPORTING
(409)832-1776

1    Q.    -- and greater tax rate?

2    A.    Correct.

3    Q.    So you pretty much left the day-to-day

4  operations on the management of the principals to Bera,

5  the curriculum to the directors --

6    A.    CFO, correct.

7    Q.    -- and the financial to Elizondo?

8    A.    Correct.  I was, again -- in the 15 years as a

9  superintendent, you've got to keep your board happy and

10  communicated with.  So you spend a lot of your time

11  doing that.  And I was working heavy duty on the bonds.

12  And I think there was another area.  The district is a

13  good district from the career ed area.  There's a lot of

14  career ed programs.  I can't remember the exact number.

15  I think there's like 33 career ed programs throughout

16  the district that kids sign up to go learn career ed

17  beyond college.

18              So I was kind of meeting with different

19  groups.  Plus, we had a pretty good set-up with a

20  community college.  It's tied very closely with the

21  Alamo Community College.  So I was meeting very heavy

22  with their presidents and chancellors.  So there was a

23  lot of stuff I was doing and I had to depend on the team

24  to --

25    Q.    You were really out of your office quite a

1  bite, weren't you?

2    A.    It was a lot, doing those support areas for

3  the district.

4    Q.    You almost needed a golf cart?

5    A.    Yes.  Yes.

6    Q.    So here we are.  And did you notice that when

7  Bera became the person in charge of the administrative

8  staff -- the principals and so forth, did you notice

9  that there appeared to be a black flight from the

10  district when -- that coincided with Bera's assuming

11  that role?

12    A.    It could be.  I don't have direct evidence of

13  that.  What we heard, because I know -- I believe HR did

14  some surveys because the board wanted to find out, Why

15  are we losing people?  The biggest reason was salary.

16  People could cross the line, two streets down the line

17  to Schertz-Cibolo northeast schools, even some

18  San Antonio.  And within a matter of one day or

19  whatever, they'd get a three- to five-, six-,

20  seven-thousand-dollar raise.  So that was part of it.

21              And then we did have some people who told

22  us, I don't want to drive across town to Judson when I

23  can go a mile here versus seven miles that way.  So

24  there was some stuff going on from that angle is what we

25  heard.  I mean, I'm sure there was more.  There always

1  is more, but that was a big issue.

2    Q.    Well, it was -- the interesting thing about

3  it, though, on salary discontent -- and I've been

4  involved with the various teachers' groups, TCTA and

5  Federation of Teachers over the years.  And salary

6  discontent, though, you were -- by the bond issue, you

7  were going to be able to free up a lot of maintenance

8  dollars by new construction and protect that

9  general fund by the new bonds, weren't you?

10    A.    Well, that, yes.

11    Q.    Have it available for salaries?

12    A.    Well, but, remember, salaries are recurring

13  every year.  If it was a one-shot deal, it would have

14  been easy.  But the problem with salaries, they recur

15  every year so you've got to make sure you have extra

16  funds somewhere.  Otherwise, you're going to be --

17  you're going to end up in a bad way.

18    Q.    Yeah.  So let me show you some other stuff

19  here.

20              (DISCUSSION OFF THE RECORD)

21              (EXHIBIT NO. 6-15 MARKED)

22    Q.    So did you ever see any evaluations that had

23  been performed on Caroline Ross by Ms. Bera?

24    A.    I did see some of it after the fact, yes.

25    Q.    But nothing while Ross was in her job?

1    A.    I think it was -- any time they did

2  evaluations, I would ask -- I would ask Ms. Bera two

3  things:  Is there any issues out there?  And I also just

4  want to quickly look at some of the evaluations.  I

5  didn't sit there and look at them in depth or let me

6  read them line by line, but I just want to see, in

7  general, how they were going.

8    Q.    What was Bera's -- what did she say to you

9  about Ross, the first year, before Ross -- before all

10  the charges?

11    A.    She was not negative, that I remember, because

12  I would have picked that up right away, to be honest.

13  Because obviously, in the end, I'm going to be held

14  accountable to some of this.  But what I remember, she

15  was not -- Ms. Bera was not, you know, Here's the -- the

16  sky's falling or any of that.  So, that, I don't recall

17  in any way.

18    Q.    So what did she tell you was involved when

19  Mackey had removed her from assessing Ross?

20    A.    She didn't really detail -- I had heard, you

21  know, from her and a board member that, Yeah, they

22  removed her or something.  But nobody would -- she

23  wouldn't tell me.  Nobody else.  I didn't want to

24  question it.  I just left it.

25    Q.    Did she make any recommendations about the

Ross, Caroline000233JISD

Page 45

1          MR. WATTS:  You know, I asked the same
2    question.  I thought -- I left so early this morning, I
3    didn't get the disk.  So I don't know.  I presume it
4    was.  I hope it was.  If it wasn't, it is now.
5          A.   That was the other area.  When I got hired,
6    that board wanted me to get the high school high
7    school program going.  And in all honesty, we did.  I
8    did.  The problem is the new board said there was too
9    much money there.  We need to cancel the program because
10   it was a little bit expensive.  Early college versus
11   dual credit.  There's two ways that, really, kids can
12   get credit for college at the high school level.  Dual
13   credit, which is good, there's nothing wrong with it, or
14   early college, which some school districts had.  So when
15   I got there, it took me about a year -- well, this was
16   part of it -- to get it going, which we did.
17              But, again, the new board that got
18   elected after I got there pretty much said, We don't
19   want that program.  It's costing too much.  Let's focus
20   on early college.  And even though that still cost
21   money, to be honest.  So the early college came and
22   went, I guess, within about a year, a year and a half.
23        Q.   What was early college, generally?
24        A.   It allows kids, mainly at the high school,
25   that they take -- as an example, let's say they're

Page 46

1    taking high school English.  That class would also
2    count, let's say, at the community college for one of
3    their classes and as a high school credit.  So,
4    technically, when they graduate from high school,
5    they're able to get a high school diploma, which is the
6    normal process, but they'd also be getting early college
7    credit, which might be the community college.  So they'd
8    have a head start if they decide to go to college after
9    they graduate.
10        Q.   So I'm going to show to you now Montoya 7.
11   That's about the time you came on board in June of 2015.
12        A.   Okay.
13        Q.   Do you recognized that?
14        A.   I remember looking at them, in general.  I
15   don't remember specifics because I would look at some of
16   the ones obviously from the different principals, but I
17   don't remember specific.
18        Q.   Now, I don't want to ever hear anybody say
19   that doctors and lawyers have terrible signatures
20   because -- do you recognize the appraiser's signature?
21        A.   That one I can't be honest.  I don't know.
22   Carolyn might know who the appraiser was.
23          MS. ROSS:  Nancy Robinson.
24        Q.   Nancy Robinson.
25        A.   Okay.

Page 47

1        Q.   The guru.
2        A.   Okay.
3        Q.   And so it says it's June of 2015.
4    Nancy Robinson says, Ms. Ross has built a strong
5    instructional team.  She's led the school to once again
6    grow in terms of student achievements.  Shows reading at
7    plus 10 -- what -- can you tell me, what does that mean?
8    Just go through there and explain that to me, Doctor.
9    What do the Es mean, by the way, at the top?
10        A.   No.  It basically means that the person being
11   evaluated did an excellent job.
12        Q.   Okay.  And so what are those other numbers on
13   there mean?  What is that?
14        A.   It's just probably a ratio from zero up to a
15   higher number that says, This is what it would be in
16   terms of what this person did.  Zero meaning they didn't
17   do very well, all the way up to --
18        Q.   And here are tens and so forth.
19        A.   Okay.
20        Q.   Thank you, Doctor.  Now -- and, by the way,
21   did -- have you ever worked with Nancy Robinson?
22        A.   Very briefly.  That was her boss for such a
23   short time when she came on board.  Literally, I don't
24   even remember.  It might have been a few months kind of
25   thing, but just very briefly.

Page 48

1        Q.   So now I'm going to show you two pages, and
2    they're each marked separately to keep them together so
3    that we don't have two pages that are unstapled
4    wondering around, 8 and 9.  And this is the June 9th,
5    2016.
6        A.   Okay.
7        Q.   I'm going to go through this as quickly as I
8    can.  I think this is the second Page 9 you signed.
9    Would you look at these and see if you can recall that.
10          MR. WOOD:  What's this one marked?
11          MR. WATTS:  8 and 9.  June 16th, 2016.
12   Yeah, I remember these.
13        Q.   And so this exhibit is -- this is a letter
14   that you signed off on?
15        A.   Correct.
16        Q.   June 9th.  I said June 16th.  June 9th, 2016.
17        A.   Correct.
18        Q.   This is the non-renewal of contract notice
19   that the State tells you to send out to an employee --
20        A.   Correct.
21        Q.   -- or professional educator to be
22   non-renewed?
23        A.   Correct.
24        Q.   Now, as I understand it, non-renewal is where
25   an educator has a contract which is not going to be

08/30/2019                          Ross, Caroline000234JISD

Page 49

1   extended for the next school year?
2       A.   Correct.
3       Q.   And the state law says that you're required to
4   give notice within so many days before the end of the
5   school year to that employee?
6       A.   Correct.
7       Q.   So you wrote on June the 9th, 2016, regard to
8   Caroline Ross and to the gentleman who was helping her
9   in her grievance, James Conolly, regarding non-renewal
10  of term contract.  And you wrote, Dear Ms. Ross.  Now,
11  I'm going to ask you some questions as we go through
12  here.
13      A.   Okay.
14      Q.   Now, I understand this is pretty much a --
15      A.   A standard.
16      Q.   -- a standard, scripted letter?
17      A.   Yes, correct.
18      Q.   At a properly convened board meeting held on
19  June 7th, 2016, the Judson Independent School District
20  Board of Trustees voted to non-renew your contract with
21  the district.  Now, I'm -- had Caroline Ross been -- to
22  your knowledge, had a conference for the record or been
23  notified prior to that time of June 7th, 2016, that you
24  were going to make a recommendation of non-renewal to
25  the board?

Page 50

1       A.   I don't recall.  I don't know.  I don't
2   recall.
3       Q.   Okay.  And then it goes on to say, This
4   correspondence constitutes the board's notification to
5   you that your 2015-16 contract with the district has
6   been non-renewed.
7            Now, what that means is, as I understand
8   it, and according to Chapter 21 of the Texas Education
9   Code, is that a board will accept your recommendation to
10  non-renew and if the employee wants to challenge that,
11  then they have to file an appeal, correct?
12      A.   Correct.
13      Q.   And if they don't file the appeal, then --
14      A.   It stands.
15      Q.   -- the non-renewal stands?
16      A.   Correct.
17      Q.   Okay.  But in this case, Ms. Ross filed an
18  appeal?
19      A.   Correct.
20      Q.   So it went on to say, Your employment with the
21  district will end at the expiration of your current
22  contract on June 21st, 2016.
23           Did she have a one-year contract or a
24  two-year contract?
25      A.   Oh, boy.  I don't recall.  I know

Page 51

1   administrators, some were one and two and stuff like
2   that.  I don't recall hers.
3       Q.   Did most of the principals at Judson, when you
4   were superintendent, Dr. Montoya, did they have one-year
5   contracts or two-year contracts?
6       A.   They had one.  Every year it had to be renewed
7   and approved by the board.
8       Q.   By way of background, pursuant to the
9   provisions of Section 21.206 of the Texas Education
10  Code, Policy DFBB, legal, Policy DFBB, local.
11           Those are the policies that this private
12  organization calls TASB?
13      A.   Yes.
14      Q.   You're familiar with TASB?
15      A.   Very.  We were working with them directly,
16  yes.
17      Q.   Well, you belong -- you pay the subscription
18  dues?
19      A.   Correct.
20      Q.   It's not a governmental organization?
21      A.   No, it isn't.
22      Q.   Okay.  But they have the monopoly on Texas
23  policy?
24      A.   Yeah.
25      Q.   By way of background pursuant to the

Page 52

1   provisions of Section 21.206 of the Texas Education
2   Code, et cetera, your employment contract with the
3   Judson Independent School District, the Board of
4   Trustees voted to propose non-renewal of your contract
5   at a board meeting held on May 19th, 2016, pursuant to
6   the provisions of Section 21.207 of the Texas Education
7   Code.  On May 20th, 2016, through Irma Hernandez as my
8   designee, you were provided with written notice of the
9   proposed non-renewal.
10           Now, I'm right, am I not, that HR is a
11  support unit of the school district, and HR does not --
12  I've never seen HR make recommendations on their own to
13  non-renew someone, have you?
14      A.   I have seen them investigate and say, Here's
15  what we found.  In other words, whatever that issue was,
16  they would investigate also and not necessarily make a
17  recommendation but say, Here's what we found.  And then
18  here it is, the facts, the data.
19      Q.   And then you would make the recommendation one
20  way or the other?
21      A.   Well, it would come, in this case -- this
22  case, it would come because of the CFO's business office
23  and what they recommended and found out.
24      Q.   Now, you would agree with me that all
25  investigation -- the Judson Independent School District

Page 53

1   is an arm of government, right?
2       A.   Correct.
3       Q.   And all governmental investigations -- I think
4   we've learned that in spades with the Trump matter, but
5   all governmental investigations are supposed to be
6   accurate and complete, correct?
7       A.   Correct.
8       Q.   And certainly the -- every investigation that
9   was conducted by Ms. Hernandez's office, now
10  Mr. Garcia's office, or the CFO's office or the chief of
11  police's office --
12      A.   Correct.
13      Q.   -- or your office was supposed to be accurate
14  and complete?
15      A.   That's correct.
16      Q.   Because you're not going to take anybody's job
17  or livelihood or career away from them on inaccurate or
18  incomplete investigations, correct?
19      A.   That is correct.
20      Q.   All right.  And Ms. Ross had a right to expect
21  that, didn't she?
22      A.   That's true, too.
23      Q.   So it goes on to say, third paragraph,
24  Subsequently you requested to have a hearing before the
25  board.  And that hearing was, as noted above, conducted

RELIABLE COURT REPORTING
(409)832-1776

Page 54

1   on June 7th, 2016.  At your request, the hearing was
2   held in open session.  Now, each party was -- and each
3   party was afforded the opportunity to present evidence
4   including oral testimony and documentary evidence and to
5   cross-examine witnesses.  A record of the hearing was
6   made and a certified transcript can be prepared, if
7   necessary.
8            And of course it has been provided.
9       A.   Correct.
10      Q.   In fact, I can go online and read that, can't
11  I?
12      A.   Correct.
13      Q.   When was the last time you've been online to
14  read that, what all those lovely people had to say about
15  my client?
16      A.   Well, once I retired, I didn't read anything
17  about anybody.  I've had other priorities.
18      Q.   And so now -- so now, the -- I want to go
19  through those elements.  You're familiar with the term
20  due process?
21      A.   Yes.
22      Q.   And you know that that's a constitutional
23  term?
24      A.   Yes.
25      Q.   That's not a term that's created by the

RELIABLE COURT REPORTING
(409)832-1776

Page 55

1   legislator or the Texas education commissioner or even
2   TASB?
3       A.   Correct.
4       Q.   It's created by the founding fathers and
5   specifically we see it through the 14th amendment
6   because it came along during the time when we decided
7   that slavery should be killed and no longer exist.  So
8   here we have due process -- well, actually it goes back
9   to the Magna Carta, but that's an aside.  I withdraw
10  that.
11           So now we go on and we see that due
12  process, you've probably heard at the various TASB --
13  you go to the TASB conventions, the TASB workshops?
14      A.   Yes.
15      Q.   And you've probably heard TASB quote the late
16  great Justice Huvil Black who said that due process is
17  no more or less fundamental fair play.  You agree with
18  that, don't you?
19      A.   Yes.
20      Q.   Now, we know then that for a hearing -- that
21  due process in its procedural side, its process side,
22  that due process is -- it's supposed to give notice,
23  advanced notice to the person who is in trouble, that
24  here are the reasons that you're standing in risk right
25  now, correct?

RELIABLE COURT REPORTING
(409)832-1776

08/30/2019                    Ross, Caroline000236JISD

Page 56

1       A.   Correct.
2       Q.   And then -- and you give -- you want that --
3   those reasons to be so reasonably specific so that the
4   person can prepare a defense to those reasons, right?
5       A.   (Moving head up and down.)
6       Q.   Would you agree?
7       A.   Yeah, I think so.
8       Q.   Okay.  And you're right.  And then the next
9   thing that you want is the person has a right to know
10  under the -- under the Supreme Court decisions, has a
11  right to know who the witnesses are that the district
12  is -- Mr. Ruso was your lawyer that night, wasn't he?
13      A.   I believe so, yes.
14      Q.   And you have -- Ms. Ross had a right to know
15  what witnesses were going to be called by Mr. Ruso to
16  present evidence against her and what they might tend to
17  say, correct?
18      A.   Yeah, as far as I understand, yes.
19      Q.   That was how you understood the proceeding was
20  to go?
21      A.   Yes.
22      Q.   Okay.  And then you understood that Ms. Ross
23  had the right to cross-examine those witnesses, right?
24           MR. WOOD:  Counsel, I'm going to state a
25  standing objection here because all these questions that

RELIABLE COURT REPORTING
(409)832-1776

Electronically signed by Holly Wells (201-190-228-3461)
Electronically signed by Holly Wells (201-190-228-3461)
caaa7193-730c-43e1-ae8f-c0a77f3acb4b

Page 57

1   you're asking to him call for a legal conclusion.  So
2   I'm objecting to all these questions.
3       MR. WATTS:  No, no.
4       MR. WOOD:  I don't want to interrupt you
5   and do each one.
6       MR. WATTS:  No, no, that's fine.  And I
7   have no problem.
8       THE WITNESS:  Do I answer or no?
9       Q.  (By Mr. Watts)  No, you do answer, but he has
10  to make that objection for the record.  So now -- so
11  here's the point, though:  In order to be a
12  superintendent -- and you're not only a superintendent
13  in New Mexico --
14      A.  Correct.
15      Q.  -- but you're a superintendent in Texas,
16  right?
17      A.  Correct.
18      Q.  And in order to be a superintendent in
19  Texas -- now, I don't know about New Mexico.  But in
20  order to be a superintendent in Texas, you're required
21  to take school law?
22      A.  Correct.
23      Q.  And part of the -- my former partner,
24  Dick Strahan used to teach it in Houston.  And one of
25  the things I remember Dr. Strahan telling me is that his

RELIABLE COURT REPORTING
(409)832-1776

Page 58

1   course was in two parts; state and federal law.  Do you
2   remember that?
3       A.  Yes.
4       Q.  Where did you take school of law?
5       A.  It was at the University of New Mexico and
6   New Mexico State University in Las Cruces.
7       Q.  So you had it before you got to Texas?
8       A.  That's correct.
9       Q.  And you remember that you took courses in the
10  meaning of due process and term contracts and all of
11  those things?
12      A.  It was imbedded in the course.  I would say it
13  wasn't a direct class by itself.  It was more of --
14      Q.  You heard it on a daily basis?
15      A.  Yes.  And within a class, that was one of the
16  topics that was talked about.
17      Q.  Sure.  And it was probably taught by -- you
18  had to have -- the State required you have that course
19  in order to be certified as a superintendent.  Is that
20  correct?
21      A.  That's correct.
22      Q.  Okay.  Now, on -- after -- after
23  cross-examining witnesses -- and I've got a
24  question about -- by the way, Lauren Hopkins,
25  Lauren Hopkins didn't testify I don't think.  I looked

RELIABLE COURT REPORTING
(409)832-1776

Page 59

1   at the transcript, and I don't think she testified.
2       A.  I don't know.  I don't recall.
3       Q.  And do you remember that somebody told you
4   that Lauren didn't want to testify and so they weren't
5   going to make her testify and she couldn't be
6   subpoenaed?
7       A.  I don't recall that at all.  I don't recall
8   that.
9       Q.  You probably didn't have heavy hands on -- you
10  didn't testify?
11      A.  No.
12      Q.  So you probably didn't have heavy hands-on
13  responsibility in the hearing at all, did you?
14      A.  That's correct.
15      Q.  You had done your job when you had received
16  the information, and based upon the recommendations that
17  you'd received from Bera, Irma Hernandez, the --
18  Elizondo and the police, you'd -- based upon their --
19  those recommendations, you made your recommendation to
20  non-renew?
21      A.  That's correct.  And then using a standard
22  letter that -- as you said earlier, that's the standard
23  letter.
24      Q.  Right.  And you had no personal knowledge of
25  any of those things?

RELIABLE COURT REPORTING
(409)832-1776

08/30/2019

Page 60

1       A.  Not personal until after the fact that they
2   shared it with me.
3       Q.  And then even then, it wasn't personal; it was
4   something that you were told?
5       A.  No, no, no.  I was -- it was based on, quote,
6   unquote, evidence and their accounting, looking into it,
7   investigation and that type of thing.
8       Q.  That's right.  In large part, you had to rely
9   upon what they told you to be true and accurate, didn't
10  you?
11      A.  Well, yeah.  You rely on the team.  You hope,
12  again, that they did a good, quote, unquote, audit
13  investigation and went from there --
14      Q.  And you hope they didn't have any personal
15  agendas?
16      A.  That's correct.
17      Q.  But only God knows?
18      A.  Well, as we know, based on the way the world
19  is, yes.
20      Q.  So then we go and we see that the fourth
21  paragraph, After considering the testimony of the
22  witnesses with the exhibits admitted before the board
23  and all relevant laws and district policies, a motion
24  was made in open session to non-renew your contract with
25  the district.  The motion was seconded and passed with a

RELIABLE COURT REPORTING
(409)832-1776

Ross, Caroline000237JISD

Page 65

1  receive school supplies from the school district like
2  notebooks or pencils?
3      A.   I think they should have.  I'll leave it at
4  that.
5      Q.   And so if the evidence was that a school staff
6  member, where there were repeated losses of notebooks by
7  a student -- I mean, it didn't happen just once but a
8  bunch of times -- was charging the student for those
9  notebooks, would that have been against the rules as you
10 understood it?  Just taking that discreteness.
11     A.   I don't know.  I don't want to answer that
12 because I don't know.
13     Q.   Fair enough.  Fair enough.  And then if
14 charging teachers if they want to -- now, I thought it
15 was odd.  Teachers could wear jeans on Friday.  It was
16 called Spirit Day.  Is that right?
17     A.   That's correct.
18     Q.   Now, I have an assistant who's a young lady
19 from Catalonia, and she's a lawyer from Barcelona.  And
20 so she was -- I was going through this testimony with
21 her, and she said, Mr. Watts, why do they say that
22 females wearing jeans was Spirit Day?  And I said, I
23 don't know.  I thought, That's an interesting question,
24 Alexandra.  I'll ask the superintendent.  Why do they
25 call it Spirit Day?  Did it raise the spirits?  Or --

RELIABLE COURT REPORTING
(409)832-1776

Page 66

1          MR. WOOD:  Objection; form.
2      A.   Well, we were hoping -- we were hoping Fridays
3  that schools would be allowed a little bit less formal;
4  and we also encouraged, if possible, like college shirts
5  and college oriented T-shirts, you know, to kind of
6  encourage kids, we hoped.  You know, and of course it
7  went campus by campus.  You know, principals were more
8  autonomous as to what they're going to do or not do.
9      Q.   So Ms. Ross who's just wrote me a note and
10 said that since 1990 all schools had charged for jeans.
11 Was that true?
12     A.   I can't answer that.  I don't know.
13     Q.   So now did -- did you ever call Ms. Ross in as
14 her mentor to discuss concerns that you may have had
15 with her in any of these categories?
16     A.   I don't think tied to those areas.  I don't
17 think I called her in.
18     Q.   Did you know that Lauren Hopkins had --
19 Ms. Ross's secretary had worked for Mr. Elizondo?
20     A.   No, I didn't know that.
21     Q.   Do you know who suggested to Lauren Hopkins
22 that she become Ms. Ross's secretary and book keeper?
23     A.   No, I didn't know that.
24     Q.   So you don't know whether that was a
25 suggestion that was made by Ms. Bera or not?

RELIABLE COURT REPORTING
(409)832-1776

Page 67

1      A.   No.  And a lot of that would have been up to
2  the principal, who they hire obviously as teacher, a
3  secretary, as clerk.
4      Q.   Sure, yeah.
5      A.   So it comes heavy from the principals' area.
6  And sometimes good principals want to hire supposed
7  veteran, knowledgeable people in certain areas, whether
8  it's finance, curriculum or dealing with parents or
9  whatever.
10     Q.   But you knew, did you not, that Ms. Ross had
11 been -- had been the teacher --
12         MS. ROSS:  Principal.
13     Q.   -- principal at one time of Lauren Hopkins?
14     A.   No, I didn't know that.
15     Q.   And that that had been known to Ms. Bera?
16     A.   No, I did not know this.
17     Q.   Did you -- I'm going to hand to you what's
18 been marked as Montoya 10.
19     A.   Okay.
20     Q.   All right, sir.  So now can you tell -- it
21 says 2015-2016 TPESS Timeline.  What is a TPESS
22 timeline?
23     A.   Well, part of it's set by the State to school
24 districts on evaluating people, you know, follow these
25 deadlines in terms of the overall evaluation process or

RELIABLE COURT REPORTING
(409)832-1776

Page 68

1  if there's concerns or positive or whatever, you know,
2  those types of things.
3      Q.   Now, since that was Ms. -- and you were
4  working, as you say, heavy duty on the bond issue in '15
5  and '16 and all the other new tasks and duties that you
6  had assumed as superintendent?
7      A.   That's correct.
8      Q.   That was Ms. Bera's responsibility to do -- to
9  perform the TPESS timeline schedule?
10     A.   It would have been that type of thing, yes.
11     Q.   She was the one in charge of that?
12     A.   Yeah.  Dealing directly with the principals,
13 yes.
14     Q.   Do you know whether Ms. Bera ever met with
15 Ms. Ross during the 2015-16 school year?
16     A.   I don't know.  I mean, the assumption is that
17 she would have met sometime with the principals.  But,
18 to be honest, I don't have a calendar or schedule.  I
19 don't know.
20     Q.   I understand.  Fair enough.  And I notice that
21 at the top of 10, it comes from the office of the
22 assistant superintendent, Elida Bera?
23     A.   That's correct.
24     Q.   So you have no knowledge about whether this
25 schedule was followed by Bera or not?

RELIABLE COURT REPORTING
(409)832-1776

08/30/2019                    Ross, Caroline000238JISD

Electronically signed by Holly Wells (201-190-228-3461)
Electronically signed by Holly Wells (201-190-228-3461)          cass7198-730c-43e1-ae8f-c0a77f3acb4b

Ross, Caroline000239JISD

Page 69

1    A.   No.

2    Q.   I want to show you what's -- well, wait a

3  minute.  Before I do that, this Exhibit 10, this would

4  have related directly to Ms. Ross's performance,

5  wouldn't it?

6    A.   It should have related, yes.

7    Q.   That's why these different things are set up

8  to do by Bera so that she would be able to assess the

9  performance of the principal, correct?

10    A.   It should have been that way.

11    Q.   Yes, sir.  Thank you.  Now, I want to show you

12  what's been marked as Montoya 11.  Now, this is marked

13  as Ross's file.  And if you would, please, sir, look at

14  that and just go through it.  Now, don't do it real

15  quickly, but quickly enough that we can move on through

16  so I can finish up.

17    A.   Okay.

18         MR. WATTS:  While you do that, could I be

19  excused with my client just for a minute?

20         MR. WOOD:  Sure.

21         (BREAK FROM 10:57 A.M. TO 11:03 A.M.)

22    Q.   (By Mr. Watts)  I'm going to show you what's

23  been marked -- you looked at it -- Montoya 11.

24    A.   Yes --

25    Q.   This is a growth plan that had been placed on

RELIABLE COURT REPORTING
(409)832-1776

Page 70

1  Ms. Ross, and the cover letter says that -- to

2  Caroline Ross from Nancy Robinson, associate

3  superintendent.  Now, there's a difference between an

4  associate superintendent and an assistant

5  superintendent?

6    A.   It's a little bit of a fine line.

7    Q.   Associate is a little higher up in pecking

8  order?

9    A.   Correct.  Correct.

10    Q.   Okay.  It's dated August 12th, 2014,

11  professional growth plan.  It says, This memo is to

12  notify you that we are removing you from the growth plan

13  written and signed on June 24th, 2014.  It is our

14  decision, once the plan was reviewed, that the formal

15  nature of the activities and measures are not warranted

16  at this time.  This document will be removed from your

17  records.  As you know, we expect that all of our

18  administrators continue learning and communicating

19  respectfully with parents and staff.  Please let us know

20  if there's anything we can do to provide you with

21  support in your learning.  Signature acknowledges

22  agreement and acceptance.  And it's signed by Ms. Ross

23  on August the 12th, 2014.

24         Now, the assessor -- now, you knew -- you

25  know Debbie Grady?

RELIABLE COURT REPORTING
(409)832-1776

Page 71

1    A.   Yes, I do.  Yes, I do.

2    Q.   Debbie's a great person, isn't she?

3    A.   Yes, she is.

4    Q.   And so she came in for a period after Ms. Ross

5  had been fired, didn't she?

6    A.   Correct.

7    Q.   She was there for a year and then --

8    A.   Approximately, yes.

9    Q.   And do you remember why you appointed her?

10  Was it because she was black?

11    A.   No.  Because she had the skills in terms of

12  dealing with people and curriculum and we were always

13  focused on curriculum and she seemed to be the one that

14  had done some in central office and she was the most

15  logical.

16    Q.   Did she -- did she ask to be -- did she ask to

17  be removed from the Metzger, that she wanted to go back

18  to elementary school?

19    A.   She wanted -- she knew up front it was

20  temporary because we were going to try to find somebody

21  else for Metzger.  So it was -- from day one, Please go

22  out there and carry on and then you'll be back.

23    Q.   And the -- do you remember who had been

24  instrumental in putting Ms. Ross on that growth plan?  I

25  know you weren't here.  You had been -- you were back --

RELIABLE COURT REPORTING
(409)832-1776

Page 72

1  about that time you were in Brownsville?

2    A.   It would have obviously been Nancy Robinson as

3  the assistant superintendent.  She would have led the

4  final word on that.  But, to be honest, I don't know.

5    Q.   Would it have been Bera?

6    A.   I don't know.

7    Q.   Okay.  And I'm going to show to you what's

8  been marked as Montoya 12.  This is a letter from a copy

9  I think is in her personnel file.

10    A.   Okay.

11    Q.   And the letter, do you remember that this

12  is -- that Ms. Bera said the other day in her deposition

13  that she had recommended to Dr. Mackey, that Ms. Ross be

14  non-renewed.  Do you -- did you know that?

15    A.   I never saw that letter and did not know that.

16  The only thing I heard -- heard was that Ms. Ross had

17  done something with a child at her school that she

18  shouldn't have done, and it was vague.  But beyond that,

19  that's it.  I did not hear anything else or see the

20  letter or Ms. Bera or Mackey.  Nobody brought -- never

21  seen it.

22    Q.   So did you -- and did you -- so did you learn

23  that, in fact, after Ms. Bera had prepared the letter

24  for Dr. Mackey to send to Ms. Ross and after it had been

25  delivered by Ms. Bera to Ms. Ross, that Dr. Mackey

RELIABLE COURT REPORTING
(409)832-1776

Page 61

1    vote of 5 to 1.  That means that there were six board
2    members there that night; five voted to involuntarily
3    separate Ms. Ross from her employment, and one voted in
4    her favor.
5        A.    That's correct.
6        Q.    Do you remember who voted in her favor?
7        A.    Well, I remember it was Jose Macias.
8        Q.    Did he -- do you remember what he said were
9    the reasons that he opposed the termination of her?
10       A.    I don't recall.  I'm sure he had some, but I
11   just don't recall.
12       Q.    It said, The motion approved by the board was
13   founded upon your performance.  Now, this letter was
14   prepared for you to sign, wasn't it?
15       A.    Yeah.  It's a standard letter, yes.
16       Q.    And it was prepared for you to sign by your
17   legal counsel probably?
18       A.    I believe so, yes.
19       Q.    So do you recall what parts of the performance
20   of Ms. Ross was at issue that night?
21       A.    I think, again, it goes back to what happened,
22   that stuff with money, the funding.  Because, again,
23   principals are in charge and held accountable at the
24   campus level for what happens or doesn't happen, whether
25   it's curriculum, issues with parents, finance issues.

Page 62

1    And as far as I remember, obviously based on the
2    evidence that came in, it was that whole finance issue.
3    And, you know, she was held accountable for what
4    happened or didn't happen.
5        Q.    Now, I'm going to share with you -- and I'm
6    going to ask you to assume that what I'm going to tell
7    you is true.  Mr. Garcia and Mr. Wood were both present
8    with me and the court reporter when we were in
9    Kingsville.  So assume what I'm going to tell you is
10   what Ms. Bera said.  But Ms. Bera said that she recalled
11   that -- when I asked her why Ms. Ross was non-renewed or
12   terminated -- I may have used the word "terminated" --
13   she said that because of the checks that Lauren had --
14   her secretary had been taught how to forge Ms. Ross's
15   name on the checks.  And I think she actually --
16   Ms. Bera made sort of a symbol or a sign showing how
17   that was done.  No. 2, that Ms. Ross had charged for
18   students to attend pep rallies.
19       A.    Okay.
20       Q.    And that was against policy of the district.
21   No. 3, that Ms. Ross had charged -- and I think this may
22   have come in a little later in the conversation -- in
23   our discussion, but that she had charged for notebooks
24   that students were given, something like 50 cents -- I
25   don't know if 50 cents came up, but a charge for

Page 63

1    notebooks.  And she said that Ms. Ross had charged
2    teachers to wear jeans during the school day, and that
3    Ms. Ross -- and the history of Ms. Ross's negative
4    evaluations at the hands of Ms. Bera.  Ms. Bera had,
5    before being removed as her assessor, given her negative
6    evaluations during Mackey's administration.  And I think
7    that's the reasons she gave for non-renewal.  Do you
8    remember any other in addition to those?
9              MR. WOOD:  Objection; form.
10             THE WITNESS:  Still answer, right?
11             MR. WOOD:  Yes, sir.
12       A.    The only one beyond that that I had heard was
13   something about the deposits were supposed to be
14   deposited, I think, in a timely matter on a campus; and
15   supposedly, I think, they weren't.  Something like that.
16   That's the only one I kind of heard.  Of course,
17   specifics, obviously the CFO's people -- because that
18   was their area -- would know that answer.
19       Q.    (By Mr. Watts)  That's Mr. Elizondo's area?
20       A.    Yes.
21       Q.    And he's going to be here today, I think,
22   isn't he?
23             MR. WOOD:  Yes.
24       Q.    Okay.  So the -- did anybody ever tell you
25   that actually it was -- that the coaches were charging

Page 64

1    the students to attend last period pep rallies so
2    that -- as a fundraiser?
3        A.    No, I didn't hear that.  I didn't hear that.
4        Q.    Would that have made a difference in your
5    judgement?
6        A.    Well, if you take it to the highest level, did
7    the principal know and should it have continued or not.
8    Because in the end, it's not going to be the coach; it's
9    going to be the principal that's going to be held
10   accountable.
11       Q.    No coaches were ever disciplined, though, in
12   this matter that you recall?
13       A.    I don't recall on that one.
14       Q.    So was it against the rules for coaches to
15   charge admission or receive donations, or however it was
16   phrased, from students who attended pep rallies as a
17   matter of fundraiser, a method of fundraising?
18       A.    I can't answer that.  I don't know.  I don't
19   know.
20       Q.    All right.  Good.  Fair enough.  In terms of
21   the -- the notebooks, charging students, if the evidence
22   was that a school staff member who had responsibility
23   for -- and, by the way, was Metzger a Title 1 school?
24       A.    I believe it was.
25       Q.    And so were students at Metzger, did they

Page 73

1  changed his mind, withdrew the letter and did not make
2  the recommendation?
3      A.   No.  I didn't know any of those interactions
4  at all, literally.  Didn't see any letters, memos,
5  verbal, nothing.
6      Q.   Did you ever learn that Ms. Bera had -- had
7  made a -- registered her significant disagreement with
8  Dr. Mackey's refusal to recommend Ms. Ross for
9  non-renewal?
10     A.   None.
11          MR. WOOD:  Objection; form.
12     A.   And, again, that was none of.
13     Q.   You didn't hear that part of the story?
14     A.   Didn't hear it.  Didn't read it.  Didn't see
15  it.  None of it.
16     Q.   Okay.  Did you -- the -- on Montoya 13, this
17  is a part of that sequence of events.  Did you ever --
18  you've never seen that either?
19     A.   Never seen or was aware of the background on
20  that one, no.
21     Q.   So you had no idea --
22     A.   No.
23     Q.   -- that that was the way that Dr. Mackey
24  satisfied Ms. Bera?
25     A.   None.

RELIABLE COURT REPORTING
(409)832-1776

Page 74

1          MR. WOOD:  Objection; form.
2      Q.   By the way, you know Dr. Mackey still lives in
3  San Antonio?
4      A.   Oh, yeah.  He lives a few blocks from where I
5  live.
6      Q.   Do y'all see each other?
7      A.   No.  He used to take a lot of walks, but I
8  haven't seen him in several months.  So it's been
9  awhile.
10     Q.   I think he has a ranch that he spends a lot of
11  time at.
12     A.   Yeah, he has a ranch that he's had for several
13  years.
14     Q.   He loves those momma cows.
15          This is a letter -- I'm going to --
16          MR. WATTS:  I left the yellow tag on
17  here, Craig, so that it gives you an idea what we
18  consider important.
19     Q.   But I'm going to show to you Montoya 14.  It's
20  a letter that was written on my birthday, November 19th,
21  2013, by Dr. Willy Black, director of human resources,
22  to Carolyn Ross regarding unprofessional conduct, and
23  this was at a grievance hearing.  And see if you have
24  seen that one.
25          MR. WOOD:  Are you marking that as a

RELIABLE COURT REPORTING
(409)832-1776

Page 75

1  separate Exhibit?
2          MR. WATTS:  Yes.
3          MR. WOOD:  What's the number on that one?
4          MR. WATTS:  That's 14.
5      A.   No, I've never seen that one or heard about it
6  either.
7      Q.   (By Mr. Watts)  Okay.  Well, what it says,
8  just for the record, Dear Ms. Ross, is a follow-up to
9  our conversation on November 15th, 2013, in the
10  superintendent's office.  I submit this communication as
11  formal documentation of the recent incident regarding
12  your behavior at the board meeting held on
13  November 14th, 2013.  During a Level 3 grievance hearing
14  on November the 14th, 2013, which you were present as
15  part of the administration, you were observed to respond
16  unprofessionally during and after the proceedings.
17  Though we respect your right to have an opinion
18  regarding how the matter was handled, your actions and
19  comments were made in the presence of students, staff
20  and guests in a formal educational setting.  Your public
21  comments do not align with the district's expectations
22  for professionalism in our communication stake holders.
23          According to DEC, local legal, your
24  behavior regarding this incident is deemed
25  unprofessional and unacceptable.  You are hereby

RELIABLE COURT REPORTING
(409)832-1776

Page 76

1  directed to conduct yourself professionally in all
2  school settings, to direct complaints in accordance with
3  district's policies and procedures and refraining from
4  making disparaging comments about school board members
5  publicly.
6          She apparently said something about a
7  school board member.
8          Your failure to comply with this letter
9  of reprimand may result in further disciplinary action
10  up to and including corrective action and/or
11  recommendation for dismissal.  Sincerely Dr. Willy
12  Black, director of human resources.
13          And do you know whether or not -- well,
14  you don't know anything about this.
15     A.   I know none -- I never saw or knew any of
16  that.
17     Q.   All right.  We'll take Mr. Elizondo's
18  deposition; we'll find out about that maybe.
19          All right.  I'm going to show to you now
20  what's been marked as the Carolyn Ross Summative
21  2014-2015.  And if you would, look through that.
22          MR. WOOD:  I didn't hear what the number
23  was on that one.
24          MR. WATTS:  15.
25     Q.   Have you ever seen the summative for the

RELIABLE COURT REPORTING
(409)832-1776

1  2014-15 school year?
2      A.   I probably looked at it, but I don't recall
3  the specifics.  It's been awhile, several years.
4      Q.   No, I understand.  So were you aware of the
5  fact that Ms. Bera did not evaluate principals in the
6  TPESS system?
7      A.   No, I was not aware.
8      Q.   Ms. Ross and you had a good relationship,
9  didn't you?
10     A.   I believe so.
11     Q.   She respected you and looked -- and looked up
12 to you and you respected her?
13     A.   That's correct.
14     Q.   Now, Mr. Wood has told me that it's the
15 position of the people that I'm deposing, Bera and then
16 you and people today, that you liked Ms. Ross and had a
17 good relationship with her.
18         MR. WOOD:  I'm going to object to the
19 question, form.
20     Q.   Well, is it true that you liked Ms. Ross, had
21 a good relationship with her and that -- that this --
22 she just became the victim of an unfortunate
23 situation?
24     A.   I think a descriptor would be that I had a lot
25 of respect for her.  It think she was a good principal.

1  She did a lot with the community.  She just, in my
2  opinion, based on the evidence that was shared with me
3  by others, did something she wasn't supposed to do.
4  Quote, unquote, it was unethical.  Didn't follow
5  procedure, policy, maybe illegal.  I don't know.  And we
6  had to deal with that.
7      Q.   And the basis for your decision is what you
8  were told by -- by your staff, Bera, Hernandez, Elizondo
9  and probably legal counsel, correct?
10     A.   Yes.  If you put the whole picture together,
11 they said this is probably the right --
12     Q.   And but for what you were told by those folks,
13 you would not have recommended her non-renewal?
14         MR. WOOD:  I'm going to object to any
15 questions regarding what was told to him by legal
16 counsel.  That's obviously attorney-client.
17     Q.   Leave legal counsel out of it.  But for what
18 you were told, you would not have recommended
19 non-renewal?
20         THE WITNESS:  I can answered that, right?
21         MR. WOOD:  Yes.
22     A.   I probably would have handled it differently.
23     Q.   I'm sorry?
24     A.   I would have probably handled it
25 differently.

1      Q.   How would you have handled it?
2      A.   Put in policies for sure.
3      Q.   Training?
4      A.   Training, some discussions and counseling.  I
5  mean, it could have been several things that could have
6  been on the table.
7          MR. WATTS:  Thank you very much, Doctor.
8  I appreciate your being here today and taking time out
9  of your retirement.  And I'm sorry it's under these
10 circumstances.
11         THE WITNESS:  Yeah.  And whatever the
12 outcome, it is what it is.  And, again --
13         MR. WATTS:  It's in God's hands?
14         THE WITNESS:  Yes.
15     Q.   (By Mr. Watts)  Wait a minute.  See here.  I
16 was just so enamored by what -- I want to show you
17 couple of other exhibits.  Exhibit 1, do you know what 1
18 is?
19         MR. WATTS:  Craig was simply saying --
20     A.   It's a summary, yep.
21     Q.   And what does that indicate?
22     A.   Well, again, it's tied to the State testing
23 results in general.  You know, did they -- were they
24 acceptable or not?  Or I guess some years the State
25 didn't use certain measures.  So basically that's what

1  it is.
2      Q.   I'm going to show to you what's been marked as
3  Montgomery 2 (SIC).  Is that your signature on that?
4      A.   Yes, it is.
5      Q.   And what does that say?
6      A.   It's a certificate we would give to
7  administrators for their work and, you know, in terms of
8  what they accomplished that year or that time period.
9      Q.   And that would have been for the year of
10 '14-15?
11     A.   I believe so.  I believe so.
12     Q.   And Elida Bera signed off on that, too, didn't
13 she?
14     A.   That's correct.
15     Q.   Did you ever consider re-assignment of
16 Ms. Ross as one of the other ways this could have been
17 handled?
18     A.   We didn't look at any of those.  It seems to
19 me that at the time -- and I'm going to share things
20 here, I guess -- the board was very, if somebody does
21 something, they probably need to be gone.  And I'm not
22 going to be specific, but we had a white male
23 administrator who is not in the district -- I don't want
24 to go beyond that -- who had a two-dollar -- I think it
25 was a $1.98 issue.  And in the end, he was going to be

Page 81

1  dismissed, but he resigned and moved on.  And I'll leave
2  it at that.
3      Q.   So you feel like that white male
4  administrator's two-buck issue was related to what
5  happened to Ms. Ross?
6      A.   Well, it has to do with what the board --
7      Q.   Push back?
8      A.   -- and investigators would perceive as
9  something not following policy or illegal or not
10 correct.
11     Q.   So that if he was going to be held
12 accountable, she should be held accountable?
13     A.   Well, all administrators.
14          MR. WOOD:  Objection; form.
15     Q.   I'm sorry.  Is that a fair way --
16     A.   All administrators, that was the view.
17     Q.   If you're going to do it to one; do it to
18 all?
19     A.   To all administrators, it doesn't matter
20 background.  If you have the evidence based on several
21 people auditing or investigating, there it is.
22     Q.   What's good for the goose is good for the
23 gander.  Is that right?
24     A.   I guess so.  I guess so, yes.
25     Q.   I'm going to show to you Exhibit 3 and

RELIABLE COURT REPORTING
(409)832-1776

Page 82

1  Exhibit 4.
2      A.   Okay.
3      Q.   Just identify those and --
4      A.   Yeah.  These are pretty standard forms that
5  we've used.
6      Q.   Thank you very much.
7           All right, Holly.  I'm going to --
8           Doctor, I don't have any questions.  He
9  might have some more.
10          MR. WOOD:  We'll reserve our questions
11 'til the time of trial.
12          MR. WATTS:  Thank you, sir.
13          THE WITNESS:  Anything else?
14          MR. WATTS:  No.
15          THE REPORTER:  Read and sign?
16          MR. WOOD:  Yes.
17      (DEPOSITION CONCLUDED AT 11:22 A.M.)
18
19
20
21
22
23
24
25

RELIABLE COURT REPORTING
(409)832-1776

Page 83

1           CHANGES AND SIGNATURE
2               CARL MONTOYA
2             MARCH 28, 2019
3  PAGE LINE   CHANGE              REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

RELIABLE COURT REPORTING
(409)832-1776

Page 84

1      I, CARL MONTOYA, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5
6
7
8  _____
   CARL MONTOYA
9
   THE STATE OF _____    *
10
   COUNTY OF _____     *
11
12         Before me, _____, on this day
13 personally appeared CARL MONTOYA, known to me (or proved
14 to me under oath of through _____)
15 (description of identity card or other document) to be
16 the person whose name is subscribed to the foregoing
17 instrument and acknowledged to me that they executed the
18 same for the purposes and consideration therein
19 expressed.
20         Given under my hand and seal of office
21 this _____ day of _____, _____.
22
23         _____
           NOTARY PUBLIC IN AND FOR THE STATE
24 OF_____
25

RELIABLE COURT REPORTING
(409)832-1776

Page 85

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3   CAROLINE ROSS                  )
                                    )
 4   V.                             ) CA NO. 5:18-CV-269
                                    )
 5   JUDSON INDEPENDENT SCHOOL      )
     DISTRICT, ET AL                )
 6

 7              REPORTER'S CERTIFICATION
             ORAL DEPOSITION OF CARL MONTOYA
 8                   MARCH 28, 2019

 9

10        I, Holly Wells, Certified Shorthand Reporter in and

11   for the State of Texas, hereby certify to the following:

12        That the witness, CARL MONTOYA, was duly sworn by

13   the officer and that the transcript of the deposition is

14   a true record of the testimony given by the witness;

15        That the deposition transcript was submitted on

16   _____ to the witness or to the

17   attorney for the witness for examination, signature and

18   return to me by _____;

19        That the amount of time used by each party at the

20   deposition is as follows:

21        Mr. Watts - (01Hr:49Min)
          Mr. Wood - (00Hr:00Min)
22

23        That pursuant to information given to the

24   deposition officer at the time said testimony was taken,

25   the following includes all parties of record:
```

RELIABLE COURT REPORTING
(409)832-1776

Page 86

```
 1   ATTORNEY FOR THE PLAINTIFF:
          MR. LAURENCE "LARRY" WATTS
 2        WATTS & ASSOCIATES, P.C.
          POST OFFICE BOX 2214
 3        MISSOURI CITY, TEXAS  77459
          (281) 431-1500
 4        WATTSTRIAL@GMAIL.COM
     ATTORNEY FOR THE DEFENDANT:
 5        MR. CRAIG WOOD
          WALSH, GALLEGOS, TREVINO, RUSS & KYLE, P.C.
 6        1020 NE LOOP 410, SUITE 450
          SAN ANTONIO, TEXAS  78209
 7        (210) 979-6633
          CWOOD@WABSA.COM
 8

 9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties or

11   attorneys in the action in which this proceeding was

12   taken, and further that I am not financially or

13   otherwise interested in the outcome of the action.

14        Further certification requirements pursuant to Rule

15   203 of TRCP will be certified to after they have

16   occurred.

17        Certified to by me this the 22nd day of April,

18   2019.

19

20

21        _____
          HOLLY WELLS, CSR #9084
22        Expiration Date: 12/31/19
          RELIABLE COURT REPORTING
23        2626 Calder, Suite 205
          Firm Registration No. 164
24        (409) 832-1776
          (409) 832-1019
25        reliabledepo@aol.com
```

RELIABLE COURT REPORTING
(409)832-1776

Electronically signed by Holly Wells (201-190-228-3461)
Electronically signed by Holly Wells (201-190-228-3461)
caes7198-730c-43a1-ae8f-c0a77f3acb4b
Electronically signed by Holly Wells (201-190-228-3461)
caes7198-730c-43a1-ae8f-c0a77f3acb4b

Page 87

```
 1        FURTHER CERTIFICATION UNDER RULE 203 TRCP

 2        The original deposition was/was not returned to the

 3   deposition officer on _____;

 4        If returned, the attached Changes and Signature

 5   page contains any changes and the reasons therefor;

 6        If returned, the original deposition was delivered

 7   to _____, Custodial Attorney;

 8        That $_____ is the deposition officer's

 9   charges to Plaintiff for preparing the original

10   deposition transcript and any copies of exhibits;

11        That the deposition was delivered in accordance

12   with Rule 203.3, and that a copy of this certificate was

13   served on all parties shown herein on and filed with the

14   Clerk.

15        Certified to by me this the _____ day of

16   _____, 2019.

17

18

19

20

21        _____
          HOLLY WELLS, CSR #9084
22        Expiration Date: 12/31/19
          RELIABLE COURT REPORTING
23        2626 Calder, Suite 205
          Firm Registration No. 164
24        (409) 832-1776
          (409) 832-1019
25        reliabledepo@aol.com
```

RELIABLE COURT REPORTING
(409)832-1776

08/30/2019                     Ross, Caroline000245JISD

Electronically signed by Holly Wells (201-190-228-3461)
Electronically signed by Holly Wells (201-190-228-3461)
caes7198-730c-43a1-ae8f-c0a77f3acb4b

# Exhibit

# 12

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CAROLINE ROSS,                    §
        *Plaintiff,*              §
                                  §
                                  §
v.                                §    CA NO.: 5:18-cv-269
                                  §
JUDSON INDEPENDENT                §    JURY TRIAL DEMANDED
SCHOOL DISTRICT, DR. CARL         §
A. MONTOYA, ELIDA BERA,           §
DR. MELINDA SALINAS,              §
RENEE PASCHALL, RICHARD           §
LAFOILLE                          §
        *Defendant.*              §

### AFFIDAVIT OF JUNE ADAIR

1. My name is June Adair, and my date of birth is June 18, 1956. I am
   an African American female.

2. I am married and the mother of six sons.

3. I was elected to the Board of Trustees of Judson Independent School
   District on two separate occasions.

4. My first term was from May 2004 until May 2010, and my second
   term was from May 2011 until May 2015. While serving on the
   Judson ISD School Board, I encountered differential treatment both
   on campuses and personnel issues related to race.

5. I was on the Board when Dr. Willis Mackey announced his intention
   to retire, and when Dr. Carl Montoya was hired to replace Dr.
   Mackey.

6. Mrs. Elida Bera (Hispanic) was later promoted by Dr. Montoya to
   Nancy Robinson's former position as Deputy Superintendent. It was
   well known that Mrs. Bera wanted Caroline Ross removed as

Principal from Metzger Middle School and replaced by Lisa Guerrero
(Hispanic). The final actions that took place removed an African
American male (Mr. Ted Haynes) from Judson Middle School and
transferred him to Masters Elementary. The African American
female (Ms. Valree) was removed from Masters Elementary and
transferred to Metzger Middle School. Lisa Guerrero (Hispanic) was
given Judson Middle School. This eliminated the overall appearance
of replacing an African American woman that was successful in her
campus with an assistant principal that was Hispanic. I also heard
that Mrs. Bera was circulating rumors that Caroline Ross was Dr.
Mackey's cousin.

7. I was not on the Board when Ms. Ross was non-renewed in June
   2016. However, during my tenure on the Judson ISD School Board,
   Ms. Ross' campus was held in the highest of regard. Numerous
   visitors were taken to her campus, both from the US and Canada, to
   observe her leadership qualities and abilities because of the success of
   her campus students.

8. The foregoing facts are true and correct to my personal knowledge.

Signed on the 28ᵗʰ day of August 2019.



June Adair

Subscribed and sworn to on her oath before me, the undersigned
authority, by June Adair, a person known to me on the 28ᵗʰ day of
August 2019.

Rebekah Sepulveda

Notary Public

REBEKAH SEPULVEDA
Notary Public, State of Texas
Comm. Expires 08-01-2023
Notary ID 132591846

[ SEAL ]

1                                        2

# Exhibit

# 13

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| CAROLINE ROSS, § | |
| *Plaintiff,* § | |
| § | |
| § | |
| v. § | CA NO.: 5:18-cv-269 |
| § | |
| § | |
| JUDSON INDEPENDENT § | JURY TRIAL DEMANDED |
| SCHOOL DISTRICT, DR. CARL § | |
| A. MONTOYA, ELIDA BERA, § | |
| DR. MELINDA SALINAS, § | |
| RENEE PASCHALL, RICHARD § | |
| LAPOILLE § | |
| *Defendant.* § | |

AFFIDAVIT OF JOHN MOORE

1. My name is John Moore.

2. My date of birth is March 31, 1958.

3. I am African American.

4. I currently work for Judson Independent School District ("Judson") at Candlewood Elementary.

5. I have worked for Judson for the past six years; my first year I served as support staff, I've been an educator for the last five years.

6. I attended the University of Texas at Austin and played college basketball. I had a professional basketball career with the San Antonio Spurs for ten years,

7. I have played and coached basketball at various levels for the past 20 years.

8. I started my Judson career as a support staff of Metzger Middle School. I went to Miller's Point Elementary for two years and this is my first year at Candlewood Elementary.

9. Ms. Ross was the reason I came into the education system; I was inspired from the professional relationship that I developed with her.

10. I was hired by Ms. Ross as a support staff for my first year, I spent all day at Metzger Middle School.

11. Ms. Ross encouraged me to get my teaching certification and that is how I was brought on as a Special Education Teacher after I completed my certificate.

12. I never witnessed Ms. Ross drinking or acting as if she was under the influence.

13. I was present at the Bridging Over Ceremony and in close proximity to Ms. Ross. I noticed no signs of her being under the influence or any scent of alcohol on Ms. Ross.

1                                                            2

14. I was never witness to any situation where Ms. Ross was unprofessional or acted in conduct not becoming of an educator.

15. I've been with her in social settings and on campus and I can attest that Ms. Ross has always comprised herself in a professional manner.

16. I can attest to Ms. Ross having a good reputation for truthfulness and honesty in the workplace. To my knowledge, I never heard of any money issue personal issues with employees.

17. I was employed as a Special Education teacher when Ms. Ross was suspended in early 2016, Mr. Nato James was appointed Interim Principal, shortly after Ms. Debbie Grady was brought in as the Interim Principal until the end of the 2015/2016.

18. In the beginning of the 2016/2017 school year, I had a prior commitment to take a group tour to China during the first week of school. Ms. Ross agreed I could begin in the second week of school.

19. I came in on the second week and I tried to get back up to speed.

20. From my absence that first week, I had an issue Ms. Duke-Thomas, the head of Metzger Middle School Special Education Department.

21. I had completed my certification and was familiar with the campus, but a lot of what I was needing was on the job training.

22. Ms. Duke-Thomas was unwilling to provide instruction and guidance that a department head is asked.

23. Aside from Ms. Duke-Thomas, I had no issues with any faculty, staff, or students.

24. Ms. Duke-Thomas continued to attack and harass me within the special education department.

25. Ms. Duke-Thomas reported that I was being disrespectful in the way that I approached her and the way I spoke to her. She noted that she was afraid of me, and I was rude to her and that I was taking photographs of documents within the special education department.

26. I attest that I was professional in all communication to each and every faculty member at Metzger Middle School.

27. I began documenting my interactions with Ms. Duke-Thomas.

28. After Ms. Ross had been suspended and Ms. Debbie Grady replaced Mr. Nato James as Interim Principal, my issues continued.

29. Ms. Duke-Thomas brought her issues to Debbie Grady who dismissed them for lack of substance.

30. Ms. Debbie Grady was removed at the end of the 2016/2017 school year as Interim Principal and replaced by Ms. Tracey Valree.

3                                                            4

Ross, Caroline000251JISD

31. Ms. Duke-Thomas continued allegations of issues with me and brought them to Principal Valree.

32. There was nothing every filed against me in regard to insubordination or unprofessional educator conduct.

33. I spoke with Ms. Valree to explain that these allegations were not true and offered my documentation against Ms. Duke-Thomas' allegations. Ms. Valree said she would look into it and do her own investigation.

34. Ms. Valree asked me to sign a memorandum with Ms. Duke-Thomas' allegations to my conduct. I refused to sign and contacted my union representative to call a meeting and file a grievance on Ms. Valree and Ms. Duke-Thomas.

35. The allegations ceased after I filed a formal grievance.

36. I was cleared and Ms. Valree and Ms. Duke-Thomas were instructed to leave me alone and allow me to continue my job and help these students.

37. I can attest that Ms. Valree attempted to eliminate most of the staff that Ms. Ross had put in place.

38. My relationship with Ms. Ross played a role with my removal from Metzger Middle School by Ms. Valree.

5

39. The foregoing facts are true and correct to my personal knowledge.

Signed on the 28th day of August 2019.



John Moore

Subscribed and sworn to on her oath before me, the undersigned authority, by John Moore, a person known to me on the 28th day of August 2019.

REBEKAH SEPULVEDA
Notary Public, State of Texas
Comm. Expires 08-01-2023
Notary ID 12881946

Rebekah Sepulveda
Notary Public

[ SEAL]

6

# Exhibit

# 14

Ross, Caroline000253JISD

Fᴀx (877) 797-4055



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CAROLINE ROSS, §
*Plaintiff,* §
§
§
v. §  CA NO.: 5:18-cv-269
§
§
JUDSON INDEPENDENT §  JURY TRIAL DEMANDED
SCHOOL DISTRICT, DR. CARL §
A. MONTOYA, ELIDA BERA, §
DR. MELINDA SALINAS, §
RENEE PASCHALL, RICHARD §
LAFOILLE §
*Defendant.* §

**AFFIDAVIT OF DEBBIE GRADY**

1. My name is Debbie Grady.

2. I am an African American female, born March 6, 1959.

3. I have been asked to denote the races of the persons referred to by me in this affidavit.

4. I live in San Antonio, Bexar County Texas.

5. I commenced employment with Judson Independent School District ("Judson") in December 2009, when I was hired by Dr. Willis Mackey (African American).

6. I retired from Judson at the end of the 2017-2018 school year.

1

7. Immediately before working in Judson, I was employed by the San Antonio Independent School District ("SAISD").

8. I was employed by Judson from or about December 2009 – August 2018.

9. Prior to Judson I was employed by San Antonio Independent School District ("SAISD") for 10 years.

10.      At the time I resigned from the SAISD to accept employment in Judson, I was SAISD's Senior Coordinator for K-12 Math.

11. I arrived at Judson under Dr. Willis Mackey (Superintendent), Nancy Robinson (Associate Superintendent), and Elida Bera (Assistant Superintendent).

12. At the time I began working at Judson, Nancy Robinson (White) was the Associate Superintendent and Elida Bera (Hispanic) was the Assistant Superintendent.

13. Dr. Mackey evolved my role at Judson to include the duties as Director of K-8 Curriculum and Instruction.

14. Ms. Bera made was clear and open about her dislike of Dr. Mackey, whatever directives he promoted she opposed.

15. Ms. Bera was openly known to go to certain board members and parents to discredit Dr. Mackey's initiatives and thwart his efforts.

2

16. Associate Superintendent Nancy Robinson was in charge of Elementary and Secondary Principles.

17. I began as the Director of K-12 Curriculum & Instruction from 2010 - 2016 school year.

18. Dr. Mackey and Nancy Robinson retired from Judson in 2015.

19. I remained as a Director in Judson until April 2016.

20. In 2015, when Dr. Mackey resigned, my supervisor, Associate Superintendent Nancy Robinson also resigned and left with Mackey.

21. Before she left office and we were discussing Judson's various learning initiatives in which she and I were both interested, Ms. Robinson asked me, "Are you going to stay at Judson?"

22. I replied, "Well yeah...", to which Ms. Robinson replied, "Well, you know Bera is going to go after you...".

23. I responded, "I bet she will."

24. When Dr. Montoya became superintendent, Elida Bera became Associate Superintendent and Ms. Hernandez remained Assistant Superintendent, in charge of various Directors, including Angela Jolivette (African American).

25. When Ms. Bera became Associate Superintendent, negative things started happening around me resulting in a hostile work environment,

3

which led up to my retirement, because Ms. Berra was a very vindictive person.

26. Ms. Elida Bera and Ms. Kathy Hernandez both oversaw the interviewing process when Tori Austin (White) and I were both considered for the position which was given to Ms. Austin as my supervisor.

27. Ms. Austin and I had both worked at Educational Service Center 20 in San Antonio, Texas, I was very familiar with her qualifications.

28. Ms. Austin and I both applied for the same position, and she had no experience in either the Central Office with Curriculum and Instruction, or as a Principal.

29. Ms. Austin and I had both applied for the position to which she had been appointed, and she had been chosen by the Judson Board, even though she was less qualified.

30. In order for Ms. Austin to get the position for which we both applied Judson had to reduce the required job qualifications for the position and reduce the title of the position to Executive Director.

31. I knew that Tori Austin did not meet any of the qualifications for the position she had no prior experience as a Principal and perceived she

4

had been hired to be my supervisor because of her open friendship with Ms. Bera.

32. I could perceive from Ms. Bera's attitude, comments and behavior that Ms. Bera did not want me in the position, and she did want Ms. Austin in that position.

33. On or about February 2016, Ms. Caroline Ross (African American female over 40 years of age), Principal of Metzger Middle School was suspended and replaced by Assistant Principal Nato James (African American male under 40 years of age).

34. In early April 2016 Ms. Irma Hernandez (Hispanic), Assistant Superintendent Human Resources called me into her office and discussed temporarily reassigning me to Metzger Middle School as the Interim Principal.

35. I knew that when Ms. Caroline Ross had been removed as Principal of Metzger Middle School, and a African American male, Metzger's Assistant Principal Nato James had been named Interim Principal in February 2016, and I was taken aback by Ms. Hernandez' statement.

36. Ms. Hernandez explained that my being assigned to Metzger would not be a permanent assignment but only an Interim Assignment for a short -term basis.

37. I immediately told Ms. Hernandez that I couldn't accept the assignment because I had a *new supervisor* for the 2015-2016 school year, Tori Austin (White) who had just started in Judson who had issued a written reprimand against me not quite a "growth plan" but a reprimand calling for "growth opportunities" for me.

38. I told Ms. Hernandez that I did not think I could accept the Interim Principal's position because of all of the assignments given to me by Ms. Austin had to be fulfilled under Ms. Austin's reprimand as a condition of my retaining employment at Judson.

39. I pointed out to Ms. Hernandez that Ms. Austin's reprimand was the first reprimand I had received in 30 years of education.

40. Ms. Hernandez acted shocked at the news of the reprimand and said she had no idea that Ms. Tori Austin had issued a reprimand to me, even though the reprimand was a documented action which would have required involvement of Human Resources and would have been sent to Ms. Hernandez.

41. I went on to tell Ms. Hernandez that I did not think I could be interested in the Metzger Middle School assignment because I would not be able to fulfill the expectations set for me by Ms. Austin.

5

6

42. Ms. Hernandez immediately said that we should discuss the matter of the reprimand with Superintendent Dr. Carl Montoya (Hispanic).

43. We met with Superintendent Dr. Montoya and he also claimed he didn't know anything about Ms. Tori Alston's write up or reprimand of me, but he seemed very desperate to send me to Metzger Middle School as the Interim Principal.

44. I was afraid they were going to remove me from the Curriculum and Instruction position which I enjoyed very much; but instead Dr. Montoya said, "Well, what if I just removed the reprimand?"; I was astounded and replied, "Well, certainly because you know I have a clean record and I certainly want that reprimand erased because I feel that it was frivolous in nature in the first place, and had discussed with you at the outset, if I am assigned as Interim Principal at Metzger, am I going to be permanently assigned to Metzger ? Am I coming back Curriculum and Instruction?"

45. Dr. Montoya quickly assured me, "At the end of June (2016) or middle of June (2016), when all of the staff have gone off contract you will return to your office in Curriculum and Instruction and I will even agree to put that in writing."

46. I agreed to the terms and he put his promise in writing that he was going to remove the reprimand and I would at the end of the school year be returning to central office and would not be demoted etc.

47. After I left Dr. Montoya's office, I was still so concerned that I called one of my professional representatives to see if that was a "kosher" offer and was told the superintendent can reassign you at any time and he can agree to remove the reprimand at any time.

48. I notified Dr. Montoya and Ms. Hernandez that I would accept the temporary assignment of Interim Principal of Metzger for the rest of the 2015/2016 school year, and I wore multiple hats of responsibility.

49. In April 2016 I was reluctantly assigned to the position of interim Principal of Metzger Middle School ("Metzger"), succeeding Mr. Nato James, who initially replaced Ms. Ross.

50. Over the 2016 Summer school period I managed Metzger Middle School, oversaw the hiring of summer school principals, and met monthly with instructional coordinators.

51. At the beginning of the 2016/2017 school year I was transitioned back to a district administrator, I was promoted to Executive Director of Elementary Schools.

7

8

52. Ms. Tracey Valree (African American) was promoted from Master's Elementary School.

53. Metzger Middle School was Ms. Valree's first transition to secondary education.

54. Ms. Valree was at Metzger Middle School for a short period of time, there was an issue with her ability to run the school and she was sent back to Master's Elementary to serve in as an Assistant Principal.

55. Ms. Loretta Davidson (African American), a younger woman, was put in place as the Principal of Masters Middle School to replace Tracey Valree.

56. I was reassigned for the 2017/2018 school year to Executive Director of Special Programs where I finished my career with Judson.

57. I retired in August 2018.

58. The foregoing facts are true and correct to my personal knowledge.

Signed on the 28 day of August 2019.

*Debbie Grady*
Debbie Grady

Subscribed and sworn to on her oath before me, the undersigned authority, by Debbie Grady, a person known to me on the ____ day of ____ August 2019.

*Rebekah Sepulveda*
Notary Public

[ SEAL]

REBEKAH SEPULVEDA
Notary Public, State of Texas
Comm. Expires 09-01-2033
Notary ID 129891645

9                                                        10

# Exhibit

# 15

Exhibit

12

Ross, Caroline000258JISD

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CAROLINE ROSS,                §
    *Plaintiff,*               §
                              §
                              §
    v.                        §       CA NO.: 5:18-cv-269
                              §
                              §
JUDSON INDEPENDENT            §       JURY TRIAL DEMANDED
SCHOOL DISTRICT, DR. CARL     §
A. MONTOYA, ELIDA BERA,       §
DR. MELINDA SALINAS,          §
RENEE PASCHALL, RICHARD       §
LAFOILLE                      §
    *Defendant.*              §

AFFIDAVIT OF ANGELA JOLIVETTE

1. My name is Angela Jolivette.

2. My date of birth is September 7, 1957.

3. I am African American.

4. I previously worked for Judson Independent School District ("Judson") as the English Language Arts Specialist at the district office.

5. I worked beginning in 2010 through 2017.

6. Prior to Judson I spent 20 years in the classroom as an English Language Arts and Reading teacher.

1

7. After Judson I moved for Northeast Independent School District where I served as the Dean of English.

8. At Judson my responsibilities included writing curriculum, ensuring a framework for grades K – 12 in the English Language Arts field. I was responsible for writing benchmark assessments for the campuses to use to determine whether their students were ready for the statewide assessments. I also provided monitoring at schools.

9. I would go to schools and monitor the teachers during instruction in their classroom and provide feedback. I would also provide professional development training for all of the teachers within the district.

10. I served under Debbie Grady and was assigned to Metzger Middle School.

11. Upon a school visit to Metzger Middle School, I would first check in with the Principal each and every time that I would go in.

12. I would sign in, and then I would speak to the Principal, Ms. Ross, and make sure she knew I was on campus.

13. I was always made to feel very welcome on campus.

14. I was sent to the English Language Arts sixth, seventh, and eighth

2

grade classrooms. I would go in to monitor and spend maybe a day or half a day there, and then I would come back and provide feedback if the principal was available.

15. To my knowledge, Ms. Ross was available almost every time, I was able to share the feedback as to what was going on in the classroom, what we needed to work on, and what could be done to improve instruction.

16. I can attest that Ms. Ross has a good reputation for truthfulness and honesty in the workplace at Judson, and it was good. Ms. Ross is very warm and authentic; she is a genuine individual who embraced me from the day I walked onto Metzger Middle School campus.

17. I never saw Ms. Ross behave in any way that inappropriate or unprofessional on the Metzger Middle School campus.

18. I was learning from Ms. Ross, I watched her ever move and decision she made. I would ask why she would do certain things and she would explain.

19. I was going to school to become a principal during my time as a specialist and I wanted to learn everything I could from Ms. Ross.

20. I never witnessed Ms. Ross drinking or acting as if she was under the

3

influence. I've been with her in social settings and on campus and I can attest that Ms. Ross has always composed herself in a professional manner.

21. I witnessed Ms. Ross bring up Metzger Middle School's test scores. Her benchmark scores were consistent, and Ms. Ross would make it a point to follow up about the student grades and performance.

22. I saw that Metzger Middle School scores were on an upswing under Ms. Ross and I started to see a dip in the Metzger scores each semester after Ms. Ross had left.

23. I would visit Metzger Middle School 1-2 times per week.

24. I witnessed Metzger Middle School faculty and staff respond to Ms. Ross' leadership. I never received and negative feedback about Ms. Ross.

25. I can attest that Metzger Middle School was very well run in terms of discipline under Ms. Ross. It is widely known that Metzger is a school that can get out of control, under Ms. Ross students were always respectful.

26. I never heard any profanity in the halls or witnessed the school untidy. Ms. Ross kept a clean and respectful campus where I was respected as a person and in my professional capacity.

4

Aug 28 19, 10:58p     June                    2105909520              p.15        Aug 28 19, 10:58p     June                    2105909520              p.16

27.  I can attest that once Ms. Ross left; I did not feel the same level of
respect on the campus under the new leadership.

28.  I was often invited and encouraged to work on campus, Ms. Ross
told me I was welcome anytime if I needed a place to work. I would
sign in and check to see if Ms. Ross was in her office, if not, Ms. Ross
was almost always in the hallways working with students and faculty.

29.  I left Judson because I was being attached and harassed by a new
Assistant Superintendent, Kathy Hernandez.

30.  I was hospitalized due to high blood pressure as a result.

31.  I went on FMLA in April 2017 and returned in May 2017 at which
point in time I resigned from Judson.

32.  I informed Assistant Superintendent, Kathy Hernandez, upon my
resignation that "I felt like I was under attack," Kathy replied, "well,
just so you know, I was told to do that."

33.  I can attest to Ms. Ross having a good reputation for truthfulness
and honesty in the workplace at Judson.

34.  To my knowledge, I never heard of any money issues or personnel
issues with employees.

35.  The foregoing facts are true and correct to my personal knowledge.

5

Signed on the ___28th___ day of August 2019



Angela Jolivette

Subscribed and sworn to on her oath before me, the undersigned authority,
by Angela Jolivette, a person known to me on the ___28th___ day of
August 2019.

REBEKAH SEPULVEDA
Notary Public, State of Texas
Comm. Expires 09-21-2022
Notary ID 129891645

[SEAL]

Rebekah Sepulveda
Notary Public

6

# Exhibit

# 16

Ross, Caroline000261JISD

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CAROLINE ROSS, §
   *Plaintiff*, §
§
§
v. § CA NO.: 5:18-cv-269
§
§
JUDSON INDEPENDENT § JURY TRIAL DEMANDED
SCHOOL DISTRICT, DR. CARL §
A. MONTOYA, ELIDA BERA, §
DR. MELINDA SALINAS, §
RENEE PASCHALL, RICHARD §
LAFOILLE §
   *Defendant*. §

### AFFIDAVIT OF LISA BUTLER

1. My name is Lisa Butler.
2. My date of birth is October 4, 1979.
3. I live in Bexar County, Texas.
4. I am African American.
5. I am married and the mother of children, three whom live at home with me.
6. I first met Caroline Ross while my son was in 6th grade at Metzger Middle School, during Ms. Ross's first year as Principal of Metzger.
7. My impression of Ms. Ross was at the time and after I got to know her as a great principal.
8. I say that because prior to Ms. Ross, Metzger had a new principal every year or two, and they could not handle the student population at Metzger which was a tough group of students on the Southside of Judson Independent School District (JISD), Ms. Ross not only handled the students but gained their respect and admiration.
9. The JISD population was predominately African American.
10. I had the opportunity to work closely with Ms. Ross after she asked me to serve as President of the Metzger Parent Teacher Organization (PTO) when no other parent would volunteer or agree to take the tough position.

1

11. I met Elida Bera during the investigation process when the administration was going after Ms. Ross, I did not know Ms. Bera before.
12. I knew Dr. Mackey as the Superintendent because over the years I had occasional problems and complaints at different principals and different teachers, and all of my complaints or grievances were escalated to the superintendent's office
13. My complaints were not simply those of the complaining mother but incidents of unprofessionalism where my daughter was being harassed at school, and incidents of a principal who was harassing me which resulted in he no longer being employed with JISD.
14. The principal was Kenneth Matthews, an African-American male, who was at Metzger and insisted that even though the children had hoods on their jackets and did not wear them on over their heads, they could not come to school with those jackets because the hoods were part of the anti-hoodie policy.
15. My child was affected so I went to the administrator who wrote the policy, Mr. Albert (Associate Superintendent) an African American, and discuss the policy with him. Mr. Albert told me that the policy was meant only to prevent students from wearing a hood or hoodie on their heads at school/school property and that if the hood or hoodie was attached to their clothing and they didn't wear it was perfectly alright.
16. Mr. Albert contacted Mr. Matthews and told him that my daughter and niece who was living with me at the time were allowed to wear their leather jackets even though they had hoods so long as they didn't put the hoods on their heads.
17. When I met Dr. Mackey there was another principal at Candlewood Elementary whose name was Christopher Galloway, Caucasian male.
18. The problem I had with Mr. Galloway was that there was a teacher at Candlewood who was allowing her entire class to sleep for 30-45 minutes every two hours calling it "meditation time," and I did not send my child to sleep.
19. I went to Mr. Galloway and told him I wanted my child out of that class and he refused to take her out of that classroom. I went above his head to talk to Mr. Jose Gonzalez and ask him to inquire to see if I was right and if so, I wanted my daughter removed from the class.
20. There was a meditation policy, and Mr. Gonzales determined that the teacher was abusing the meditation policy. From that moment on,

2

Mr. Galloway became very angry because I had gone above him, and he had been overruled.

21. Mr. Galloway began taking his anger out on my daughter and I filed a formal grievance against him. Mr. Galloway told the teachers that I was deliberately talking bad about them. Again, I went to Mr. Gonzalez and again he investigated the matter and found out that I was being harassed and that Mr. Galloway was himself spreading false statements about me, gossiping maliciously.
22. Mr. Galloway also left that district, during Dr. Montoya's Superintendent tenure.
23. Regarding Ms. Ross when she asked me to be the Metzger PTO President, I had known her as principal at Metzger for three years.
24. I never saw her act unprofessionally or rudely to any child or adult and it was very clear that she was never under the influence of alcohol. Ms. Ross was the perfect role model for the children, her teachers, her staff, and the parents.
25. I was only president of the PTO at Metzger middle school for one year which was the last year Ms. Ross was principal.
26. I knew Lauren Hopkins because she was Ms. Ross's secretary/bookkeeper and I worked closely with Lauren Hopkins on PTO related activities.
27. My duties as the PTO president were fundraising and encouraging involvement of parents and members of the community in school activities, the main event being the organization and the financial success of the Fall Festival.
28. During the time that I was PTO president I was at Metzger 2-3 hours every day. During the time that I was at Metzger during the school year of 2015/2016 Mr. Ross was principal and on duty about half the time and then on administrative leave the other half of the year.
29. I knew Channel Gomez who was an assistant principal. Ms. Gomez was openly critical of Ms. Ross and frequently stated that she personally did not like Ms. Ross.
30. I asked Ms. Gomez why she did not like Ms. Ross because Ms. Ross seemed to like her, and Ms. Gomez never said she didn't like Ms. Ross.
31. From what I could see, Ms. Gomez's personality and jealousy of Ms. Ross's positive upbeat attitude. Ms. Gomez was a negative person.
32. As to specific occasions when Ms. Gomez would speak out against Ms. Ross and Ms. Ross was never present when Ms. Gomez made

3

those comments. On three occasions Ms. Gomez said, "I can't stand Ross," while inside the office.
33. I remember one-time Ms. Ross said something about a student who had been taken out of class by Ms. Gomez should be returned to class because the infraction was minor, and she wanted the student back in class for education and not in the office or sent home. Ms. Gomez was the assistant principal and she insisted, "no, that student needs to call her mother." Ms. Ross overruled Ms. Gomez and said, "no, send her back to class and we will deal with this later."
34. Ms. Ross was very firm that she wanted the children to be in class and if they couldn't behave, she would come to the class and make them behave. After that incident I remember Ms. Ross walked out and Ms. Gomez turned to me and said, "I cannot stand her."
35. I remember that Ms. Gomez said she didn't like Ms. Ross when I was with Lauren Hopkins before the fall festival. Lauren went into Ms. Gomez's office to get her to sign or countersign one of the school checks that Lauren was wanting for some supplies for the festival. Lauren said she has asked Ms. Gomez to sign the check and Ms. Gomez said, "No. Where is Ross's signature? Ross's signature is not on the check," Lauren explained that that Ms. Ross wasn't present at the time, Ms. Gomez said, "she ain't never here, I can't stand her. You need to get her signature first and I'll sign it second."
36. Lauren walked out of Ms. Gomez's office and said, "I can't stand Gomez, I'm not getting her to sign any more checks, I'm not dealing with Chanel," and went back into her office.
37. I did see Lauren Hopkins sign Ms. Ross's name, it happened numerous times. Lauren didn't want to go looking for Ms. Ross so she would just sign her name. I started to say something to Lauren about it, but I never did.
38. I started to say something to Ms. Ross, but I never did. Lauren signed the checks like she had the authority to sign them, but I never saw her ask Ms. Ross if she could sign her name and I never saw Ms. Ross tell Lauren to sign her name.
39. I never saw Lauren Hopkins go to the window and trace Ms. Ross's name.
40. I first found out that accusations were being made against Ms. Ross when I went down there to her office to talk to her. But before that happened, I remember that in December, Ms. Ross had come to me and said, "look Lisa, I think I'm going to need you to coach girls cheerleading, because Ms. So-and-So said she doesn't want to coach

4

5

this next year," I said. "Okay, well I'll talk to you about that later." I went to the school two days in a row and Ms. Ross wasn't there. I finally asked where she was and no one in the office would say.

41. I asked Ms. Dixon in the counseling office where Ms. Ross had been the past two years. I had come up there, Ms. Dixon said, "Well, Ross got suspended. She's in trouble."

42. I asked Ms. Dixon what Ms. Ross did to get suspended, Ms. Dixon said, "She stole that money from Yall's PTO." I asked how that is possible and Ms. Dixon said, "I don't know. Lauren was in there signing checks with Ms. Ross's name so there was..."

43. I remember after the Fall Festival 2015 we made so much money that everyone was excited. It was for the school community; it was so much cash then we had need clear trash bags and filed them up with... caught up in it.

44. Lauren Hopkins and I were in charge of collecting and counting the cash because I wanted to see how much money we made. After the festival ended, I told her that we should go and count the cash because... cash because I wanted to see how much money we made.

45. Lauren Hopkins told me it was too late to count the cash and asked me to come back on the following Monday and we would count the money together. The cash belonged to the PTO and is in two different monies together.

46. Lauren explained that we could leave the money at the office since it would be locked, and no one would enter if on Monday.

47. I came in and left the 5-6 clear trash bags full of cash under her desk and locked the door to the office.

48. I went to Metzger the following Monday to meet with Lauren and she asked me to come back on Tuesday, tomorrow.

49. I went back to Metzger on Tuesday and Lauren said she was too busy to do and count cash. Lauren told me to come back the next day.

50. I went back to Metzger on Wednesday for the third day in a row and Lauren said she had already counted the cash and she didn't mean the to be there for the signature. Lauren said she counted the money Tuesday afternoon after I left, which I found to be very strange.

6

51. I asked Lauren how much money had been raised and she told me she didn't have the exact amount and she would run me later. But she never gave me more than $2000+/-.

52. I told Lauren that PTO had at least 200-300 paying $3 a piece just for entry tickets and we had to have raised much more than $3000+.

53. I also had the day take the back the accounts she had used to write the checks for all the up-front costs of supplies and... all that went to the PTO was $300.

54. I did not go and speak with Ms. Ross directly about this issue, I thought it was strange and incorrect. Don't I wanted to create an issue and didn't want to create one.

55. After Christmas 2015, the investigation started I either January or February. I remember hearing about it and I asked where Lauren had been. I was informed that she had also been suspended with Ms. Ross.

56. I texted Lauren and asked she was going on. Lauren, text me in response. "They suspended me, but I'm not supposed to talk about it."

57. I was confused and asked what she meant by that, Lauren replied, "Those checks that I was writing for the Fall Festival?" I remember those checks that I was writing for the Fall Festival. I thought it was strange that Ms. Ross was telling you to write the checks but they were written and now Ms. Ross is...

58. I responded to Lauren Hopkins, "I'm not going to lie for you. I just want to save my job."

59. Lauren said, "Oh, I'm not going to lie, I'm asking you to... you know I was helping you out with the Fall Festival and I had to pay back the money for the checks the were written and now Ms. Ross is doubting me to know what I am going on. But I will not lie for you."

60. I asked Lauren, "did Ross know about the checks?"

61. I texted Ms. Ross, "I hope everything is okay." Ms. Ross replied, Lauren replied, "well, I told her."

62. Two days after texting Lauren and Ms. Ross I got a phone call from the CFO of JISD, Mr. Elizondo.

7

63. Mr. Elizondo asked me if I could meet him at Metzger and ask some questions regarding the PTO.

64. I went to meet with Mr. Elizondo and there was another lady that was there transcribing the conversation between us.

65. Mr. Elizondo asked me questions regarding whether I saw Ms. Ross sign checks, if I ever received the cash, if I gave permission to Lauren to write the checks, what where the checks for, how much money did I believe the PTO made at the Fall Festival, how much money did Lauren see me give to the PTO, and if I knew of any other money did.

66. I told Mr. Elizondo that, "no, I never saw Ms. Ross give Lauren permission to write checks and I was the recipient of some of those checks such as Home Depot and Wal-Mart. And Lauren would get cash back on the checks and keep it."

67. After answering the questions, Mr. Elizondo and the woman tried to tell me that I was wrong, and maybe I did hear Ms. Ross say that Lauren had the authority to sign her name. I told them both that I never saw Ms. Ross give Lauren permission.

68. The woman said, "well maybe Lauren went into Ms. Ross's office and explained that everything I witnessed happened in Lauren's office and I was positive that Ms. Ross never gave any permission that I was aware of.

69. The woman who was the head of HR told me there was an investigation and they would let me know if they needed anything else.

70. They called me and asked me if I could come back and write a statement and sign the paper that she had transcribed of the conversation when I had been in the office. I agreed and went in to read the statement and sign it.

71. I read through the statement the girl transcribed and I said, "You're putting words in my mouth, I didn't say half of this." They told me, "you can just go ahead and sign it." I said, "I'm not signing this statement.

72. I refused to sign the statement and then after a while I called Ms. Ross and told her what happened. A few days later Ms. Ross had her lawyer contact me and they asked if I would go before the Board and be a witness.

73. At the time my children were participating in Junior Olympics and we were in Detroit, MI so I was unable to attend in person.

74. I agreed to attend via telephone and testify for the Board.

8

75. The Woman who was with Mr. Elizondo asked me to lie to and sign a statement that was altered as to my transcription was Irma Hernandez, the head of JISD HR.

76. The foregoing facts are true and correct on my personal knowledge.

Signed on the ____ day of August 2019.

Lisa Butler

Subscribed and sworn to on her oath before me, the undersigned authority, by Lisa Butler, a person known to me on this ____ day of August 2019.

Notary Public

[ SEAL ]

# Exhibit

# 17

Ross, Caroline000264JISD

Aug 26 2019 05:37PM High Energy Better Health 2106531226   page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CAROLINE ROSS, §
Plaintiff, §
§
v. § CA NO.: 5:18-cv-269
§
JUDSON INDEPENDENT § JURY TRIAL DEMANDED
SCHOOL DISTRICT, DR. CARL, §
A. MONTOYA, ELIDA BERA, §
RENEE PASCHALL, RICHARD §
LAPOLLE §
Defendant. §

### AFFIDAVIT OF BARBARA MEADE

1. My name is Barbara Meade.

2. I am a Caucasian female.

3. I am a professional school counselor and I currently serve at the Judson Learning Academy.

4. I worked with Caroline Rose at Metzger Middle School from 2010 – 2016. During this time, Metzger housed a program called Invent.

5. The invent program allowed for students who were extremely disruptive in their classrooms towards students and teachers, to be moved out and into a self-contained program. The program brought a teacher in and that teacher taught the subjects instead of moving the students around.

6. During the 2011/2012 school year, I needed a way for the Invent students to receive grades and have the class in the school schedule. I worked with the district data processor so that I could have the students receive report cards.

7. I needed self-contained classes for the students to receive grades. The only self-contained classes available at a middle school level are Special Education classes.

8. I didn't realize that by coding the students in that way that we would face any issues with funding.

page 1

---

Aug 26 2019 05:37PM High Energy Better Health 2106531226   page 2

10. This oversight was fully on my part; Caroline Ross didn't know anything about the coding.

11. I set up the coding with the assistance of the data processor as a way for these students to receive a report card.

12. I was unaware and ignorant of the fact that using these numbers and red flags in terms of funding.

13. Immediately following Caroline Ross and myself were set on administrative leave, I had no idea what was going on until I was going to send red flags in terms of funding.

14. I did not know of any funding issues; I was just looking for self-contained classes to put these students in so they could receive grades and a report card.

15. I did all the coding with the data processor and totally outside of the knowledge of Caroline Ross.

16. Caroline Ross has no clue about my coding, and it had nothing to do with Caroline Ross attempting to acquire funds in a deceptive way.

17. I was initially called in for interrogation by Human Resources and questioned by a female HR associate. I was told I would be contacted, had my keys and ID taken and was sent home.

18. Immediately following, I was sent on administrative leave; I had no idea what was going on until I was called in and interviewed by Nancy Robinson and Elida Bera.

19. I was interrogated by Nancy Robinson and Elida Bera, Nancy handled more of the questioning. Both Robinson and Bera acted as if I knew exactly what I was doing and had inappropriately intentionally, Special Education funds to fund something else.

20. Robinson and Bera attempted to implicate the fact that I was misappropriating funds to that Caroline Ross could have them for some reason, that it was clear I was not acting alone.

21. If I had to I could tell Caroline Ross about the coding before, none of this would have happened.

22. Caroline Ross was an excellent principal, she had her weakness and her limitations, but Caroline Ross ran a tight ship and always helped her assistant principals and those under her.

23. At no point in time did I ever see Caroline Ross implicated in school,

24. The foregoing facts are true and correct to my personal knowledge.

Signed on the _____ day of August, 2019.

page 2

---

Aug 26 2019 05:37PM High Energy Better Health 2106531226   page 3

Barbara Meade

Subscribed and sworn to on her oath before me, the undersigned authority, by Barbara Meade, a person known to me on the _____ day of August 2019.



Notary Public

page 3

08/30/2019   Caroline000265JISD

# Exhibit

# 18

Ross, Caroline000266JISD

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CAROLINE ROSS, §
*Plaintiff*, §
§
§
§
v. §  CA NO.: 5:18-cv-269
§
§
JUDSON INDEPENDENT §  JURY TRIAL DEMANDED
SCHOOL DISTRICT, DR. CARL §
A. MONTOYA, ELIDA BERA, §
DR. MELINDA SALINAS, §
RENEE PASCHALL, RICHARD §
LAFOILLE §
*Defendant*. §

**AFFIDAVIT OF RENEE LAFRENIERE**

1. My name is Renee Lafreniere.
2. I live in Tacoma, Washington.
3. I presently serve as the Career and Technical Education Program Specialist for the Office of the Superintendent for Public Instruction of Washington state.
4. I previously served as the Director of Career and Technical Education for JISD from March 2007 – July 2019.
5. I originally began my tenure at JISD as the Assistant to the Superintendent and School Board.
6. During my time at JISD the student population was predominately African American and Hispanic, the number of Caucasian students had been steadily declining over the mid to late 2000s.
7. The teacher demographics did not necessarily represent the student demographics. The number of African American and Hispanic teachers had declined while the number of Caucasian teachers continued to rise.
8. When Dr. Mackey began his tenure at JISD, he and the Executive Director of HR made it a goal of the district to ensure that teaching staff mirrored the students in demographics.

1

9. While I was still in my role under the Superintendent, Dr. Mackey hired Elida Bera.
10. Elida Bera's husband was a retired superintendent. Dr. Mackey later brought Mr. Bera in on a consultant basis periodically over several years.
11. Elida Bera often made comments that she felt Dr. Mackey was giving African Americans preference.
12. Elida Bera resented the preferential treatment she perceived Dr. Mackey gave to African Americans.
13. Elida Bera clearly did not like Ms. Ross. Bera felt that she was given preference, that she was treated differently, that she should be fired or removed from her position, and that Dr. Mackey would specifically not do that; it was Ms. Bera's belief that they were related (as they came from the same home town).
14. Specifically, it was well known that Ms. Bera wanted to remove Ms. Ross from her position as Principal of Metzger Middle School and even fire Ms. Ross.
15. Ms. Bera was open about her dislike of Ms. Ross being Principal of Metzger Middle School.
16. Later, Ms. Bera was also open about her views that she wanted to replace Ms. Ross as the Principal of Metzger with either Lisa Guerrero (Hispanic), or Loretta Davidson (Caucasian).
17. In fact, it was very apparent that Ms. Bera, who was the administrator in charge of the principals at Judson ISD, not only because of her role as *Associate* Superintendent, but also because of Dr. Montoya's illness, was moving principals around the District to position Lisa Guerrero or Ms. Davidson as successor to Ms. Ross, but she was following legal advice to move slowly as long as Ms. Ross had an active legal dispute with the District over being terminated.
18. It was well known that Ms. Grady did not want to be Interim Principal or Principal of Metzger Middle School, but that she was placed in that position after Ms. Ross was suspended because she was African-American and legally acceptable to Ms. Bera as a post-Caroline Ross "place saver" at Metzger Middle School for Ms. Guerrero or Ms. Davidson.
19. After Ms. Ross was fired and Ms. Grady openly discussed her temporary status to staff and parents alike, Ms. Bera appointed Tracee Valree, another African-American administrator who was an principal at Masters Elementary School, yet had no administrative experience in the secondary schools of Judson ISD.

2

20. Under Principal Ross, Metzger Middle School, which had been a celebrated and exemplary middle school both nationally and even internationally under Ms. Ross' leadership, began to sink into a grievances between staff and Principal Valree, locally known for student fights and poor discipline, and by the time I resigned in the summer of 2019, the campus had received a failing grade, an "F" from the Commissioner of Education.
21. With Ms. Bera being separated from the Judson ISD and having been herself the center of a costly personal harassment complaint (longtime secretary, Sharon Jansky), both Liza Guerrero and Tracee Valree were demoted, and Loretta Davidson finally appointed as Principal of Metzger Middle School.
22. Two racial discrimination claims have been filed against Judson ISD in recent years, in addition to the lawsuit filed by Ms. Ross.
23. Former Assistant Principal Andrea Johnson (African American) had a grievance but was finally promoted to a principal position; and Alton Crain (African American) who lost his lawsuit but was reportedly paid back salaries.
24. I knew Ms. Ross from her time at Judson High School (Gray campus), Judson Alternative campus, Judson Learning Academy, and frequent, ongoing interaction with her while she was principal of Metzger.
25. Ms. Ross was well respected by her students and staff.
26. Ms. Ross had a challenging group of kids, many from displaced households, considered the south end of the district, economically disadvantaged; students who were experiencing difficult social and emotional environments.
27. Ms. Ross's students respected her and saw her as a figure that they could look up to and feel safe.
28. I was able to see the mutual respect from the way students interacted with her and she interacted with them.
29. Ms. Ross is well known to be very passionate about struggling students, and she advocated to make decisions that were in the best interests of her students; however, Ms. Bera accused her of "being too focused on only African-American boys and not all students."
30. Ms. Ross was a firm and flexible principal, through the implementation of programs and initiatives, scores began to improve at Metzger.
31. I witnessed the JISD administration bring outside groups to showcase Metzger and promote the campus improvements.

3

32. I witnessed JISD administration used Ms. Ross and the Metzger campus as a location to reassign administrators who weren't doing well and needed more guided, one-on-one mentoring. If an administrator wasn't doing well at another campus, administration would place them with Ms. Ross.
33. These administrators eventually went onto other promotions to be used elsewhere after Ms. Ross had worked with them for a time—they went on to become successful at other locations.
34. I never heard Chanel Gomez make negative comments directly to Ms. Ross. I was aware of comments, made behind closed doors, that Ms. Gomez was not happy about where she was at Metzger and with Ms. Ross.
35. Nato James was not respected in JISD from administration as well as fellow coworkers, he was well known to be a flirt and constantly be soliciting the females he worked with.
36. Ms. Ross agreed to take Mr. James on when he was being considered for non-renewal.
37. Ms. Ross did not select Mr. James for Metzger, it was a JISD administration decision to reassign him to Ms. Ross.
38. Ms. Ross was used by JISD administration as a sort of a "parole officer" to help struggling administrators.
39. During Dr. Mackey's administration, many people who Elida Bera felt were her friends/allies at the Cabinet level were leaving JISD. Elida Bera felt quite alone and grew to dislike Dr. Mackey.
40. Dr. Mackey would ignore Ms. Bera, discount any input that she had at cabinet meetings; and in general, he did not treat her well even in public. Ms. Bera was often embarrassed, demeaned, disrespected, and would come to tears as a result of Dr. Mackey's treatment.
41. Elida Bera carried that dislike onto Ms. Ross because in her opinion, Ms. Ross should have been removed or fired but Dr. Mackey liked her and would protect her.
42. It was well known Ms. Bera never attempted to mentor or guide Ms. Ross, rarely visiting the Metzger campus specifically, which was her role as the associate superintendent of schools and secondary principal supervisor.
43. Ms. Bera was quick to point out things Ms. Ross had done wrong or not done in accordance to whatever the initiative or project was priority at the time, but reluctance to give her credit for growth or improvements as administrators did.

4

44. I never observed Ms. Bera offer guidance, mentoring or opportunity for improvement to Ms. Ross.
45. Ms. Bera was also quick to take Ms. Ross's shortfalls to HR or the superintendent. However, Ms. Bera would be frustrated that Dr. Mackey, as she claims, would not support her in disciplining Ms. Ross or developing an improvement plan for her.
46. Two things shifted; Dr. Mackey and Nancy Robinson (No. 2 in JISD) left JISD and Dr. Montoya came on board as the new JISD Superintendent; and also, the Director of HR position changed several times until Irma Hernandez was hired.
47. At that point in time, Ms. Bera felt like finally the shift was happening in the demographics of the Cabinet and administrative staff were shifting to a Hispanic majority rather than African American. As a result, things Ms. Bera wanted to implement, as well as becoming the #2 in position at JISD, were now possible.
48. Mr. Urbanowitz was a Caucasian-male assistant principal at Judson High School (JHS), he had been moved around the district a couple times and was not very well respected as a leader or administrator on the campus.
49. I was the CT Director at the time, and he had been the assistant principal placed over the oversight of the CT programs. So, he and I worked together quite a bit.
50. I noticed that Mr. Urbanowitz wasn't around the school because we have several pending student issues to deal with.
51. One of the students in the Agriculture program informed me that he had been placed on administrative leave for stealing hot dogs.
52. I went to speak with JHS principal due to the pending student issues. The principal confirmed that Urbanowitz was on administrative leave and showed me a flier that a business across the street from the high school had posted on the windows of their business.
53. The flier was a picture of Mr. Urbanowitz holding a hot dog. There was writing on it. It was almost like a missing child flier. The flier had his picture, and a message, "If you've seen this individual or know who this is, please report it to the business because he is stealing hot dogs.
54. The business was a convenience store directly across from JHS. Students often leave campus during the day against school policy.
55. Administrators were frequently sent out to police the area to see if students were leaving the building and going across the street to the convenience store to buy lunch or to go to the restaurants in the area to buy lunch.

56. Further investigation found that the hot dogs were an ongoing issue with Mr. Urbanowitz. During his policing of the property and students, he was going into this convenience store and helping himself to hot dogs without paying.
57. Rather than actually fire him, I believe HR convinced Urbanowitz that it was in his best interest to resign. This was under Dr. Montoya's superintendent tenure and prior to Ms. Ross's suspension.
58. Metzger had improved under Ms. Ross's guidance. Prior to Ms. Ross going to Metzger, when she was at Judson Learning Academy (JLA) around 2009/2010, Ms. Ross was nominated for administrator of the year.
59. There were always racial dynamics in play at JISD. Evident by who JISD placed at Metzger after Ms. Ross left.
60. Debbie Grady was only at Metzger as an interim and she was not happy about being placed back on leave.
61. JISD really wanted to place Liza Guerrero (Hispanic) or Loretta Davidson, (Caucasian), at Metzger to replace Ms. Ross.
62. To avoid perception of this being a racial bias, JISD moved Davidson to the new high school and placed an African American woman whose only experience was elementary level at Metzger.
63. While not unusual to move an elementary principal, who has done well, up to the middle school level; this principal had not been particularly outstanding at the elementary level.
64. I witnessed Metzger scores plummet within two years of Ms. Ross's removal; most recently, JISD removed the elementary principal and placed Loretta Davidson at Metzger.
65. I received a call from Ms. Ross informing me that she had been called out of a leadership meeting. My office was next to Ms. Bera's office, Ms. Ross called to ask if I knew what was going on and why she was being called out of this meeting.
66. I had no idea why she was being called out of the meeting, for some reasons I was not present at that meeting, usually I would attend all the leadership meetings.
67. Ms. Ross called me later in the day to tell me that she had been placed on administrative leave.
68. Over the next few weeks, Ms. Bera was careful not to say anything around me in regard to Ms. Ross. Ms. Bera made comments, "well, I know you guys are friends," and I reminded her that had absolutely nothing to do with my job.

5

6

69. I called Ms. Ross a few weeks later to ask her the status of her administrative leave and to see if she had taken the normal recourse to file a grievance. I told her it was very unusual for anyone to be on admin leave for so long.
70. I found out through appointment in Ms. Bera's office that there was an investigation going on and that JISD soliciting various people and campuses for interviews.
71. JISD administration was building a case against Ms. Ross.
72. I found some of the things that were being investigated unusual.
73. Ms. Ross was being accused of charging faculty and staff at Metzger to wear jeans.
74. All administrators did the "jean thing." So, it then made sense why the "Monday Memo" following Ms. Ross's leave, Elida Bera declared that principals could no longer charge for jeans--that it was against JISD policy.
75. I witnessed the jean charge within the district by principals on many campuses as far back as I could remember.
76. The Monday Memo is a weekly newsletter of information and communication sent to all principals and assistant principals from administration, specifically drafted by Elida Bera.
77. Over approximately 4-5 months of the investigation into Ms. Ross, there were many meetings between Jose Elizondo (JISD CFO), Irma Hernandez (JISD Director of HR) and Elida Bera (JISD Associate Superintendent).
78. The entire investigation and document search happened while Ms. Ross was on administrative leave.
79. The only conversation that went on prior to Ms. Ross being placed on leave was when Ms. Ross was called into Ms. Bera's office and met with the Chief of JISD Police.
80. When Ms. Ross was called out of the leadership meeting, she was sent to JISD Police Department for questioning.
81. JISD Police escorted Ms. Ross back to Metzger to check the records and the police officers spoke to her secretary, Lauren Hopkins.
82. After that, Ms. Ross was then called to Ms. Bera's office to meet with the Chief of Police and then put on administrative leave.
83. Ms. Ross was only present on campus for that one day.
84. All of the investigation, the taking of testimony or statements from Ms. Gomez, Nato James, and Ms. Juarez, the Accounting department, PTO parents, etc., all the records JISD created and reviewed, were done while Ms. Ross was already on admin leave.

85. The entire investigation took place without Ms. Ross's presence and went on for approximately 4 months. Ms. Ross had no idea as to the status of the investigation or her leave.
86. I kept in touch with Ms. Ross over the months, I would call and ask, "Have you heard anything?" Ms. Ross just kept saying, "No, I haven't heard anything."
87. I had some conversations with Ms. Ross about employment attorneys, or labor attorneys, or who she should talk to, and if I knew anyone she could talk to.
88. My only advice to her was that she specifically get somebody who was an employment education attorney, not just an employment or labor attorney but somebody who was familiar with education.
89. I know the firm Walsh and Gallegos and several attorneys through my work with the superintendent as the assistant to the superintendent and the board secretary. The board has to use that firm for legal advice.
90. I never saw any of the lawyers in the ERC building or in Ms. Bera's office.
91. I was present the day of Ms. Ross's hearing, I was in the audience.
92. A week or two before the hearing, Ms. Bera said to me, "You know your friend has requested a open hearing," and I said, "Well, yeah. She doesn't have anything to hide." To which Bera said, "Well, you really should advise her not to do that."
93. I said, "I stay out of things," because I wasn't going to give administration any ammunition for retaliation or to use against Ms. Ross.
94. Not long after the hearings, and prior to the next school year, all the Metzger administrators that "testified" at the hearing (Gomez, Juarez, James) were either promoted or left the district.
95. The treatment Ms. Ross received was unfair--any other administrator they would have been given the opportunity to redirect the correct procedures and/or develop an improvement plan.
96. JISD had done corrective procedures and improvement plans for many administrators in the past.
97. Marsha Bellinger is an example. There were some violations or some wrongdoings, and they put her on an improvement plan and/or moved her to another campus.
98. Assistant Principal Milhieder was a Caucasian-male at Judson high School. He was involved in a grading violation--student athlete's grades had been changed. He and a couple other administrators were

7

8

placed on admin leave. JISD did an investigation then brought (them and) him back but moved him to a different campus where his status was demoted for a couple years; then they made him the principal of Park Village Elementary.

99. Ms. Ross's situation could have been handled differently. Fairly.

100.   The foregoing facts are true and correct to my personal knowledge.

Signed on the __27__ day of August 2019.

_Renee Lafreniere_
Renee Lafreniere


Subscribed and sworn to on her oath before me, the undersigned authority, by Renee Lafreniere, a person known to me on the 27th day of August 2019.

<table>
<tr><td>Notary Public<br>State of Washington<br>JEFF ROWELL<br>My Appointment Expires Feb 29, 2020</td><td>_signature_<br>Notary Public</td></tr>
</table>

[ SEAL ]

9

# Exhibit

# 19

08/30/19

Mr. Watts,

I hope to elaborate as much as I can to address your question regarding Caroline Ross and my decision not to support the recommendation of her non-renewal.

Ms. Ross has a history of academic success and leadership throughout her tenure with Judson ISD. Her success working with children from diverse socio and economically disadvantaged backgrounds was unparalleled. Her campus was regularly visited by colleagues across Texas to learn about how to immolate her success.

My vote to oppose the recommendation of Ms. Ross' non-renewal was based on my assessment of the facts. It seemed from my perspective that she was being held to a different standard and that the there was not a consistent practice of non-renewing personnel in similar situations.

In addition, I felt that this administrative issue could have been addressed with a disciplinary action, i.e., suspension, probation, etc., and not in the recommendation of a non-renewal.

I hope this addresses your inquiry.

Respectfully,

Jose A. Macias Jr.
Former Trustee, Judson ISD, Dist. 4

P. 1 of 2.

Letter of Support for Caroline Ross

## ACKNOWLEDGEMENT

STATE OF TEXAS

COUNTY OF Bexar _____

Before me, Nopporn Delarosa _____, a Notary Public,

on this day personally appeared Jose A. Macias Jr. _____,

known to me (or proved to me on the oath of _____,

or through TXDL _____

(description of identity card or other document), to be the person whose name is subscribed to the

foregoing instrument and acknowledged to me that he/she executed the same for the

purposes and consideration therein expressed.

Given under my hand and seal of office this 30th _____ day of August _____,

2 019 _____.

NOPPORN DELAROSA
Notary Public, State of Texas
My Comm. Exp. 06-26-2022
ID No. 12425637-6

_____
Notary Public, State of Texas

M082 Notary Acknowledgement. 03-26-19

P. 2 of 2

# Exhibit

# 20

Ross, Caroline000273JISD

# Campus Accountability Data
# 2006 - 2018
# Metzger MS



SCANNED

| Year | Rating |
|------|--------|
| 2018 | 66 |
| 2017 | 64 |
| 2016 | 66 |
| 2015 | 77 |
| 2014 | 68 |
| 2013 | 71 |
| 2012 | Not Listed |
| 2011 | Academically Acceptable |
| 2010 | Academically Acceptable |
| 2009 | Academically Acceptable |
| 2008 | Academically Acceptable |
| 2007 | Academically Acceptable |

Ross, Caroline000274JISD